IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| Cheryl Sheets, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Case No. |
| | : | 2:21-cv-01810 |
| Sheriff Alex Lape, et al., | : | |
| | : | |
| Defendants. | : | |

- - -

DEPOSITION OF CHERYL SHEETS

- - -

Wednesday, May 11, 2022
10:05 a.m.
345 Lincoln Avenue
Lancaster, Ohio 43130

- - -

MARILYN K. MARTIN, RPR

REGISTERED PROFESSIONAL REPORTER

- - -

ANDERSON REPORTING SERVICES, INC.
3040 Riverside Drive, Suite 125
Columbus, Ohio 43221
(614) 326-0177

APPEARANCES:

REBECCA J. SREMACK, Attorney at Law
Sremack Law Firm, LLC
2745 South Arlington Road
Akron, Ohio 44312
(330) 644-0061
rebecca@sremacklaw.com

and

BILLI COPELAND KING, Attorney at Law
King Law Firm
Akron, Ohio
(330) 940-9914
info@billicopeland.com

On behalf of the Plaintiff.

DANIEL T. DOWNEY, Attorney at Law
ANGELICA M. JARMUSZ, Attorney at Law
Fishel, Downey, Albrecht & Riepenhoff, LLP
7775 Walton Parkway, Suite 200
New Albany, Ohio 43054
(614) 221-1216
ddowney@fisheldowney.com
ajarmusz@fisheldowney.com

On behalf of the Defendants.

\- - -

ALSO PRESENT:

Deputy Marty Norris

\- - -

WEDNESDAY MORNING SESSION
May 11, 2022
10:05 a.m.

\- - -

STIPULATIONS

\- - -

It is stipulated by and between counsel for the respective parties herein that this deposition of CHERYL SHEETS, a Plaintiff herein, called by the Defendants under the statute, may be taken at this time and reduced to writing in stenotypy by the Notary, whose notes may thereafter be transcribed out of the presence of the witness; and that proof of the official character and qualifications of the Notary is waived.

\- - -

P R O C E E D I N G S

- - -

CHERYL SHEETS,

being by me first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

BY MR. DOWNEY:

Q. Ms. Sheets, my name is Dan Downey; and I represent the defendants in this lawsuit. I'm going to ask you a number of questions today regarding what occurred at your residence with the Fairfield County Sheriff's Office. If, at any point, you don't understand one of my questions, I'll ask you to advise me of that. Otherwise, for purposes of the record, we'll accept that you understood the question and answered it accurately. Does that make sense?

A. Uh-huh.

Q. I'm going to ask you to answer verbally with words so the court reporter can take down what you're saying. Nods of the head and uh-huhs and things like that, although I may understand it --

A. They don't count.

Q. Yeah. It doesn't translate very well. If you need to take a break for any reason, please let

me know or let your attorney know; and we'll go ahead and accomplish that as long as there's not a question outstanding. Okay?

A. Uh-huh.

Q. Can you state your full name for the record.

A. Cheryl Ann sheets.

Q. And what's your current residential address?

A. 515 Hocking Street, like the river, Apartment B.

Q. And how long have you resided there?

A. About twelve, thirteen years.

Q. And you reside there with anyone currently?

A. My boyfriend.

Q. Is that Boyd Pierce?

A. Yes, it is.

Q. And did you reside there with Boyd Pierce back in 2019?

THE WITNESS: [Inaudible].

MS. SREMACK: You need to answer to them.

THE WITNESS: Okay. I just wondered.

A. I don't know if there was anyone there.

It was off and on.

Q. So there was periods of time during that year --

A. He'd be gone, and then periods of time he would be there.

Q. And did you reside there with anyone else?

A. No.

Q. And specifically in 2019?

A. No. I didn't reside with anybody else.

Q. And what's your date of birth?

A. 3/23/1955.

Q. And you're not currently employed?

A. No.

Q. And when is the last time you were currently -- you were employed?

A. 2000.

Q. And you have filed for disability benefits?

A. I was on it until this year.

Q. Do you remain on Social Security Disability?

A. I'm considered full retirement.

Q. Did you derive income from any other source from 2000 to the current day?

A. Pardon?
Q. Did you derive income from any other source other than Social --
A. No, sir.
Q. And I probably should have told you this one too. Sometimes you're going to know where I'm going with your questions. I'll ask you to permit me to finish before you answer so the court reporter can get it clean.
A. Yeah.
Q. So I'll start over again.
Did you derive income from any other source from 2000 until the current day?
A. No.
Q. Are you currently under the influence of any drugs or alcohol that could affect your ability --
A. No.
Q. I'm going to ask you to let me finish.
-- that could affect your ability to understand questions or answer them accurately today?
A. No.
Q. What's your educational background?
A. I have some college.

Q. Where did you go to high school?
A. Lancaster.
Q. What year did you graduate?
A. 1973.
Q. And tell me about your education after high school.
A. I went to DeVry online.
Q. And what did you study at DeVry?
A. Computers.
Q. Have you ever been married?
A. No.
Q. Do you have any children?
A. I have a daughter.
Q. What's her name and age?
A. Her name is time name Clarissa Hunter. I think she's 51.
Q. Do you have any contact with her?
A. Sometimes.
Q. When did you most recently see her?
A. I haven't seen her in a while. But we talked on Messenger.
Q. And did you put her up for adoption?
A. Yes. My parents.
Q. Now, it's my understanding that you

interacted with officers from the Fairfield County Sheriff's Office at your residence on September 17, 2019; is that correct?

A. Yes.

Q. And is it fair to say that they were there looking for Boyd Pierce?

A. Yes.

MS. SREMACK: Objection.

You may answer.

A. Yes.

Q. And tell me about your interaction with the officers when they came to your residence.

A. I let them in. He was looking around. And he looked in places I didn't think he should, and I questioned it. And then he just went on looking.

Q. So let me ask you this. Did you know that there was a warrant out for the arrest of Mr. Pierce?

A. Yes.

Q. And I'm going to finish it.

Did you know that there was a warrant out for the arrest of Mr. Pierce on September 17, 2019, when officers from the Fairfield County Sheriff's Office came to your home?

A. Yes.

Q. Did you also interact with officers from the Fairfield County Sheriff's Office on the day before?

A. Not the day before, no.

Q. Were there other times prior to September 17, 2019, where representatives of the Fairfield County Sheriff's Office came to your home looking for Boyd Pierce?

A. Yes.

Q. And how close in proximity to September 17, 2019?

A. Several months.

Q. Okay. And did you know that Mr. Pierce was wanted on a warrant before the officers came to your residence on September 17, 2019?

A. Yes.

Q. What was he wanted for?

A. I'm not really sure.

Q. Was Mr. Pierce at your residence when the officers arrived on September 17, 2019?

A. No.

Q. What time of day did they arrive?

A. Early evening.

Q. Was anyone else present at your residence

when the officers arrived on September 17, 2019?

A. Yes. Boyd's cousin.

Q. What was his name?

A. Jeff Echard.

Q. Did you tell the officers when they arrived at your residence that no one was there?

A. No.

Q. Did you ever indicate to the officers that no one was there?

A. No.

Q. How much time took place between when the officers came to your door and you let them in?

A. I let them -- I let them in right away.

Q. So it's your testimony today that you let them in right away?

A. Yes.

MS. SREMACK: Objection. Asked and answered.

You may answer. You must let him finish the question.

A. Okay. That's fine.

Q. Is that a yes?

A. Pardon?

Q. The question.

A. What was it again?

MR. DOWNEY: Can you read it back.

(Question read back.)

A. Yes.

MS. SREMACK: Repeating objection. Asked and answered.

You may answer.

BY MR. DOWNEY:

Q. And so how big is your residence?

A. Small.

Q. So how many rooms are there?

A. Three rooms and a bathroom.

Q. And do you know how many square feet that is?

A. No.

Q. And tell me what the layout is like. Is it a living room, then a hallway? Just explain it to me?

A. It's a front room, the kitchen, the bedroom and then the bathroom.

Q. Is the bathroom off the bedroom?

A. No.

Q. The kitchen?

A. Yes.

Q. Is there a hallway?
A. No.
Q. Is it open where you can see through the rooms when you come in?
A. Yes.
Q. Are there any windows where you could see who's at your door before answering it?
A. No.
Q. How much time elapsed specifically between when you answered the door and Officer Norris walked in your residence?
A. Just after I opened the door, he walked in.
Q. Had you interacted with Officer Norris in the past?
A. No.
Q. Do you consider yourself argumentative?
A. No.
Q. Have you ever argued with a police officer prior to September 17, 2019?
A. Yes.
Q. Tell me about the time in closest proximity to the date at issue in this case, September 17, 2019?

A. Months.

Q. Tell me what happened.

A. Somebody came and took a car we had supposedly bought, and then a deputy showed up saying that somebody was reporting for yelling. And we have no neighbors, so I don't know who called, except the people that were there and took the car.

Q. Just so I understand: Did you argue with the police officer at that time?

A. A little.

Q. What did you say to the police officer?

A. I asked him why he was there and questioning my neighbor.

Q. And what did he tell you?

A. That someone reported that there was screaming and hollering at the residence.

Q. Did you know the name of this officer?

A. No. He was black.

Q. Do you recall any previous encounter with Officer Norris prior to September 17, 2019?

A. No.

Q. Had you ever been arrested prior to September 17, 2019, by any representative of the Fairfield County Sheriff's Office?

A. No.

Q. Had you ever been arrested by any police officer prior to September 17, 2019?

A. Yes.

Q. What were you arrested for?

A. I don't know. I don't remember the charges, but they were dropped.

Q. Were you ever arrested at your residence at 515 --

A. Hocking Street.

Q. -- Hocking Street? Were you ever arrested there prior to September 17, 2019?

A. No.

Q. Had you ever been present when Mr. Pierce was arrested?

A. Yes.

Q. When and how many times?

A. Twice.

Q. Tell me about those instances.

A. One time for driving without a license, and then the last time was for the charges that they had on him then.

Q. The charges involving --

A. Yeah, this last.

Q. Has Mr. Pierce been in and out of jail over the last years?
A. Not for a long time.
Q. How many times has he gone to jail since you've been with him?
A. Twice.
Q. What does Mr. Pierce do to earn revenue or income?
A. He's on Social Security.
Q. How old is Mr. Pierce?
A. Fifty-one.
Q. How did you meet him?
A. He was dating a friend.
Q. And did you see Mr. Pierce at all on the date September 17, 2019?
A. I seen his butt as he was going out the door.
Q. Explain that to me, please.
A. He was in the bathroom, and I guess he come in and left.
Q. And why do you guess that?
A. Because I didn't see him.
Q. You saw him leave?
A. I saw his butt as he was leaving.

Q. Was anyone else present when he left?
A. Jeffrey Echard.
Q. And how close in proximity was Mr. Pierce's departure with respect to the arrival of the Fairfield County officers?
A. Several hours.
Q. Were there any illicit or illegal drugs at your residence at the time the police officers were given authority by you to enter on September 17, 2019?
A. Not that I know of.
Q. Did any officer physically touch you on September 17, 2019?
A. Yes.
Q. Do you know who?
A. Mr. Pierce -- I mean, Mr. Norris.
Q. Any other officers touch you?
A. No.
Q. Were you upset that Officer Norris was taking too long to conduct his search?
A. No.
Q. Did you yell or impede Officer Norris' search in any way?
A. No.

Q. Go ahead and tell me what happened.
A. He come in and was searching for Boyd; but he started looking in my cabinets and my personal items, and I questioned why.
Q. And so I understand: How much time elapsed between when Officer Norris entered your residence and you expressed displeasure to him about where he was searching?
A. About fifteen minutes.
Q. Were there any other officers physically within your residence during that time frame?
A. There was one with Deputy Norris, and then two others entered in the front room.
Q. And it's your testimony today that Officer Norris was searching in the kitchen?
A. The whole house.
Q. I want to make sure that I pin this down so -- to accurately reflect your testimony. When you first expressed displeasure with his search, was he searching cupboards in your kitchen?
A. Yes.
Q. Had he searched any other portion of the house prior to that?
A. No. He just walked through to the

kitchen.

Q. What did Officer Norris tell you that he was there to do?

A. Arrest Boyd.

Q. And did he tell you anything else?

A. Yes.

Q. What else did he tell you?

A. Things about Boyd.

Q. What did he tell you about Boyd?

A. That he had heard he was smoking meth and allowing other people to come there and do it.

Q. That he was what?

A. Allowing people to come and smoke meth.

Q. At your residence?

A. Uh-huh.

Q. Has anyone ever smoked meth at your residence?

A. No.

Q. Have you ever smoked meth?

A. No.

Q. Have you ever used meth?

A. No.

Q. Have you ever used illicit drugs?

A. 1970s.

 Q. What drugs did you use in the 1970s?
A. Quite a few.
Q. Any of them come to mind?
A. LSD and Quaaludes and marijuana.
Q. When is the last time you used marijuana?
A. About a month ago.
Q. Do you have a medical card to use marijuana?
A. No.
MS. SREMACK: You may answer.
A. No.
Q. How did you get it?
MS. SREMACK: Objection. She's going to assert the Fifth. We're going to assert the Fifth on that one.
I'm instructing you not to answer.
A. I'm doing what my lawyer said.
Q. And just so the record is clear: With the exception of marijuana, it's your testimony that you've not used any other illegal drugs from the '70s until the current day; is that correct?
A. Yeah.
Q. Have you observed Mr. Pierce use illegal drugs at any point during your relationship with him?

A. In the past.
Q. Correct.
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. When had you most recently observed Mr. Pierce use illegal drugs?
A. I'm not sure.
Q. What do you do on a typical day?
MS. SREMACK: Objection.
You may answer.
A. I clean the house, take care of my dogs, watch TV.
Q. How many dogs do you have?
A. Two.
Q. How much time elapsed between when Officer Norris entered your residence on September 17, 2019, to when he touched you?
A. Twenty, twenty-five minutes.
Q. And during the time frame that you described, is it your testimony that you were not upset or agitated that Officer Norris was spending so much time searching your house?
A. I was irritated.

Q. Did you express your irritation with Officer Norris?
A. Just about him overstepping the boundaries of his warrant, which I thought was a search warrant.
Q. Now, did you ever lay hands on Officer Norris?
A. No.
Q. Did you get upset and grab at him?
A. No.
Q. Did you know it's not appropriate to reach out and grab a police officer who is --
A. Yes.
Q. -- conducting lawful activities?
MS. SREMACK: Objection.
You may answer.
A. Yes, I do.
Q. And so you would agree that it would not be appropriate to lay hands on an officer who is attempting to search for a fugitive, correct?
MS. SREMACK: Objection.
You may answer.
A. Yes.
Q. And you would agree that Officer Norris had every right to be in your residence after you

invited him in, correct?
MS. SREMACK: Objection.
You may answer.
A. Yes.
Q. Can you go ahead and tell me how you expressed your agitation with Officer Norris on September 17, 2019.
A. I asked for his card.
Q. You asked for his card?
A. (Witness nods.)
Q. What else did you do?
A. Asked him why he was searching my personal items.
Q. And what specific personal items is it your testimony that he was searching?
A. Just the things around the bed that I had.
Q. Did you have clothes piled up around the bed?
A. No.
Q. Did you have any junk or stuff just strewn throughout the house?
A. No.
Q. Did you have any other entrance points to the house with the exception of the door in the front

and in the back?
A. No.
Q. Now, is it a freestanding structure?
A. What's that mean?
Q. Is it a house or an apartment with other apartments?
A. It's an apartment.
Q. So there are other units nearby?
A. Just one.
Q. Do you share a wall with another unit?
A. A wall?
Q. Yeah.
A. Yes.
Q. Is it a duplex?
A. Yes.
Q. Do you know what I mean by a duplex? A house with basically two apartments that are connected --
A. Yeah.
Q. -- with a common wall?
A. Yes.
Q. So is that what it was, a duplex?
A. Yes.
Q. And was it your testimony earlier that no

one resided in the duplex next to you?

A. No. There is someone.

Q. Okay. Who lived next door?

A. Nancy. I can't remember her last name at the moment.

Q. Now, would you agree with me that someone who is impeding a lawful search for a fugitive -- that someone who is impeding that search would be behaving inappropriately and against the law?

MS. SREMACK: Objection.

You may answer.

A. Yes.

Q. And you understand why it's important for law enforcement officers to locate fugitives, correct?

A. Yes.

Q. Because those folks have arguably committed a crime and may commit more crimes, correct?

MS. SREMACK: Objection.

You may answer.

A. Yes.

Q. And would you agree with me that -- Let me ask you this. Was anything disturbed in your house

that day?

A. No.

Q. And was anyone else arrested other than you?

A. Jeffrey Echard.

Q. Why was Mr. Echard arrested, to your knowledge?

A. I don't know. I guess he had a warrant.

Q. Do you know why Mr. Echard was arrested?

A. No.

MS. SREMACK: Objection.

You may answer.

A. No.

Q. And how did you know Mr. Echard again?

A. He's Boyd's cousin.

Q. Were you friends with him?

A. Not really.

Q. How long was he there before the officers from the Fairfield County Sheriff's Office arrived on September 17, 2019?

A. About three or four days.

Q. So he was living with you?

A. No.

Q. I want to understand.

A. He was just waiting on someone to come get him from out of town.
Q. But was he staying at your place for three or four days?
A. Yes.
Q. So did he sleep there?
A. Sometimes.
Q. Did he bathe there?
A. No.
Q. Did he take meals there?
A. No.
Q. Do you know who he was waiting on to pick him up?
A. His mother.
Q. Do you know where his mother resided?
A. On the other side of Logan.
MS. SREMACK: What was that last word?
THE WITNESS: Logan.
BY MR. DOWNEY:
Q. Would it be fair to say you didn't have a problem with him staying with you while he was waiting for his mother to pick him up?
A. No. I had a problem.
Q. Tell me about that.

A. I didn't want him there.
Q. Why not?
A. I didn't know him that long.
Q. Did he bring anyone else to your residence during those three or four days?
A. Yes.
Q. Who else did he bring over?
A. Some guy.
Q. Do you know who that was?
A. No.
Q. Did Mr. Echard, to your knowledge, use illegal drugs?
A. I don't know.
Q. Do you know whether he had any with him or used in your residence?
A. No.
Q. No, you don't know?
A. No, I don't know.
Q. Do you know how Mr. Echard derived income?
A. No.
Q. And how old is Mr. Echard?
A. I don't know.
Q. Did you know that a warrant was out for Mr. Echard's arrest?

A. No.
Q. Now, if you would, where -- where were you located in the residence at the time that Officer Norris first laid hands on you?
A. The bedroom.
Q. And that's in the back of the residence?
A. Yes.
Q. Was anyone else present?
A. His partner.
Q. Anybody else?
A. No.
Q. Did anybody else see what occurred?
A. No.
Q. Tell me what happened.
A. He said I tried to touch him, and I didn't. And I tried to explain to him, and then the next thing I know he slammed me on the bed and twisted my arm until I screamed.
Q. Now, where were you standing in proximity to Officer Norris?
A. At the head of the bed.
Q. And where were you looking?
A. At the back door and Mr. Norris.
Q. And was your gaze directed right at

Officer Norris?
A. Not really.
Q. Had Officer Norris conducted any search of the bedroom prior to this incident that you described?
A. Yes.
Q. Tell me what he did.
A. He -- That's where my personal items were, and he looked through them.
Q. Did you express any concern about Officer Norris searching your bedroom?
A. I asked why he was searching my personal items because I didn't think Boyd could fit in them.
Q. How big is Mr. Pierce?
A. Five-foot-eleven, 210 pounds.
Q. Had you previously created any area for Mr. Boyd to hide prior to September 17, 2019?
A. No.
Q. Had he prepared or created any hiding place prior to September 17, 2019, in the residence that you shared with him?
A. No.
Q. Was there a basement to the residence?
A. No.

 Q. Is there an attic to the residence?

A. No.

Q. Go ahead and describe to me what portion of your body first came into contact with Officer Norris at the time that you first touched him.

MS. SREMACK: Objection.

You may answer.

A. I didn't touch him. But he grabbed me by the upper body.

Q. And specifically where?

A. Like right around here (indicating).

Q. So you're saying he grabbed you by the hips?

A. Like above it in that area, like right here (indicating).

Q. And for purposes of the record, I think you have both hands towards your midsection; is that right?

A. Yes.

Q. And specifically which hand of Mr. Norris came into contact with your body first?

A. Both of them.

Q. So it's your testimony that both hands touched you at the same time?

A. Yes.
Q. Okay. And they touched either side of your body?
A. Yes.
Q. And then what happened next?
A. He slammed me on my bed and got on top of me and twisted my arm until I screamed.
Q. Okay. And when you say, "He slammed me on my bed," specifically walk me through that. How did that happen?
A. He had a hold of me and just (indicating).
Q. Now, which way were you facing when he first laid hands on you?
A. I was looking at him.
Q. So you were looking away from the bed?
A. I was next to the bed.
Q. But you're looking at him?
A. Uh-huh. Yes.
Q. And it's your testimony that he touched either side of you?
A. Yes.
Q. And then were you turned? Did you twist? Did you move away from him? What occurred?
A. I'm not real sure. All I know is he

 grabbed me.

Q. And have you ever experienced any issues with your memory?

A. No.

Q. Have you ever indicated to any health care practitioner that you have a hard time remembering things?

A. No.

Q. And I know you take a number of medications for various physical issues or mental health issues, correct?

A. Yes.

Q. Do any of those medications affect your ability to remember?

A. No.

Q. What portion of your body first came into contact with the bed?

A. My chest.

Q. What size bed is it?

A. It was a full.

Q. Is there a box spring?

A. Yes.

Q. At any point in time, did you attempt to move away from Officer Norris after he laid hands on

you?
A. No.
Q. At any point in time, prior to Officer Norris laying hands on you, did you move towards him?
A. No.
Q. Did you ever indicate to him to leave your house immediately?
A. No.
Q. So if you would -- You're on the bed, is that right, face down?
A. Yes.
Q. And how is Officer Norris holding you?
A. He's on top of my back.
Q. What portion of his body is on top of your back?
A. I'm not sure.
Q. How much time elapsed between when you found yourself on the bed and you were cuffed?
A. I wasn't cuffed.
Q. How much time elapsed between the time you found yourself on the bed and you experienced discomfort?
A. Within minutes.
Q. Tell me what you experienced.

A. Severe pain in my elbow as he broke it.
Q. Which elbow?
A. My left.
Q. Had you ever experienced any pain or discomfort in your left elbow prior to September 17, 2019?
A. No.
Q. So it's your testimony that you've had no prior issues with that elbow?
A. Yes.
Q. And you testified that you broke your elbow; is that right?
A. He broke my elbow.
Q. Your elbow was broken?
A. Yeah.
Q. Okay. Was your elbow dislocated?
A. Yes.
Q. Do you distinguish between a dislocation and a break?
MS. SREMACK: Objection.
You may answer.
A. Not really.
Q. With the exception of the dislocation of your elbow, did you incur any other physical injury

as a result of your interaction with Officer Norris on September 17, 2019?

A. No.

Q. Did you express that you hurt your elbow to Officer Norris?

A. Yes.

Q. What happened after you expressed that?

A. He started reading me my rights.

Q. Did anyone come to assist you with your elbow?

A. No.

Q. Did any EMTs come?

A. Yes.

Q. Did you receive medical attention?

A. Yes.

Q. Tell me about that.

A. They took me to the campus. They couldn't do anything there, so they sent me to the older hospital. And they couldn't do anything there, so they sent me to Grant in Columbus.

Q. Okay. Just so that I understand: Did anyone come to look at your elbow at your residence?

A. No.

Q. Where were you transported?

A. The campus on Memorial and -- the new -- new hospital.
Q. And so what's the name of the campus?
A. Lancaster -- I don't know. Fairfield County. I'm not sure. I call it the campus.
Q. And I have reviewed your medical records. And just generally, have you ever received medical advice regarding the care for your left elbow following September 17, 2019, that you did not follow?
A. No.
Q. Were you directed to occupational therapy?
A. Yes.
Q. Did you complete occupational therapy?
A. Yes.
Q. Did you miss any appointments?
A. One.
Q. Do you currently have hardware in your elbow?
A. Yes.
Q. Were you ever advised to have the hardware removed?
A. If I wanted.
Q. Do you currently experience any discomfort

in your left elbow?
A. Yes.
Q. Describe that to me.
A. Pain. Pain.
Q. And I want to get an understanding for it. Is it a continuous pain? Is it something that acts up occasionally? Please explain.
A. It's continuous throughout my arm.
Q. And just so I understand: Are you saying that the pain originates in your elbow and moves down or up your arm?
A. Yes.
Q. Please describe that to me.
A. When it goes down this way, it does a severe burn right there; and when it goes up this way, it makes a severe pain in my shoulder where I can hardly use it.
Q. So it's clear for the record, you pointed to both your lower arm and your upper arm during that testimony?
A. Yes.
Q. And is there ever a time when you don't experience discomfort in your left elbow or arm area?
A. Occasionally.

Q. What are some of the things that you like to do for fun?
A. Play with my dogs.
Q. Is there anything that you are unable to do today that you were unable to do prior to September 17, 2019?
A. Snap my bra on and off.
Q. I'm sorry. I didn't understand you.
A. Snap my bra on and off, scratch my back, reach long distances, holding a leash for my dogs, reach above my head very far. Can't wash my back, and I can't lift anything heavy.
Q. Are you right hand dominant?
A. Not really. I can use both.
Q. Are you right handed?
A. Yes.
Q. Now, I've read in your records that you've had four longtime relationships in your adult life; is that accurate?
A. Yes.
Q. Have you ever had a healthy relationship with a male?
MS. SREMACK: Objection.
You may answer.

A. Yes.
Q. Tell me about it.
A. Basically with Boyd it's healthy.
Q. Has Boyd Pierce ever been physically abusive to you?
A. No.
Q. Have any of the other gentlemen that you've had relationships with been physically abusive to you?
A. Yes.
Q. Have you experienced -- have you experienced any mental health issues as a result of the physical nature of some of your relationships prior to being with Mr. Pierce?
A. PTSD.
Q. Would you describe to me what it is and how you got it.
A. The man I was with at first spent eight years beating me, shooting at me, having me at places where there was shootouts and blocked me in places.
Q. And during what time frame did this occur?
A. Back in the '70s.
Q. Now, would it be fair to say that you've received mental health treatment prior to September

17, 2019?
A. Yes.
Q. And you've been diagnosed with depression, anxiety, borderline personality disorder and bipolar disorder prior to that date, correct?
A. And PTSD, yes.
Q. And PTSD. And were there any other diagnoses that I missed?
A. No.
Q. And at various times over the years, you've treated with various health care practitioners for your mental health issues, correct?
A. Yes.
Q. And the basis of your Social Security filings have been rooted in the mental health challenges that you confront, correct?
A. Yes.
Q. And you have been hospitalized at times in the past because of your mental health challenges?
A. Once.
Q. Have there been more than one occasion where you've been hospitalized?
A. No.
Q. And there are times in the past where you

have contemplated suicide; is that correct?

MS. SREMACK: Objection.

You may answer.

A. In my teens.

Q. And currently, at least based on the records that I've reviewed that are more current, recent in nature, you've indicated that you're more likely to be homicidal than suicidal; is that correct?

A. It's a joke. But, yeah. I say that.

Q. You said that in your mental health meeting with a health care practitioner, correct?

A. Yes.

Q. You've also done things like cut yourself in the past; is that right?

A. Thirteen. At thirteen.

Q. Okay. Have you done any of that in the last three years?

A. No.

Q. Would you say that your mental health, as we currently sit here, is in better shape than it was back when you were hospitalized, cutting yourself or suicidal?

A. Yes.

Q. Have you received any benefit from the mental health that you've undergone in the last couple years?
A. No.
Q. Have you pursued any mental health treatment related directly to the incidents that occurred on September 17, 2019?
A. I was already under -- under people, and I did express very -- because it really upset me, and it put my PTSD into high gear.
Q. Are you easily upset?
A. Not really.
Q. Have you had difficulty creating or maintaining relationships with others?
A. No.
Q. Have you had difficulty maintaining relationships with family members?
A. Yes.
Q. Tell me about that.
A. After my grandma died, they just -- my mom and my grandma died, they just quit talking to me.
Q. And who are "they"?
A. My family.
Q. Do you know why?

A. No.
Q. Have you examined your behaviors to determine whether or not they played a role in these folks not communicating with you?
A. My medications, I guess how they made me react.
Q. And what medications do you currently take?
A. Lamictal.
Q. Is there anything else?
A. I take for my heart, my lungs, for my thyroid, for my stomach, for my cholesterol and my stomach, you know, reflux.
Q. Have you expressed to any of your health care practitioners your hope to make money on this case?
A. No.
Q. Have you ever expressed that you're waiting on making money on this case to a health care practitioner?
A. No.
Q. Just so I'm clear: You were transported on September 17, 2019, from your residence to the hospital?

A. The campus, yes.
Q. To the campus. How long were you there?
A. I don't know. They put me -- They knocked me out, and they couldn't do nothing. I don't know how long a time it was.
Q. Were you there overnight?
A. No.
Q. Were you still in custody while you were there?
A. I guess, yeah.
Q. Was there an officer there with you?
A. His partner.
Q. And what time did you leave the hospital?
A. I'm not sure.
Q. Where did you go after being at the hospital?
A. To the old hospital.
Q. So you went to another hospital that very night?
A. Yes.
Q. And who else was present with you?
A. Just myself.
Q. Did you go on your own?
A. No. The ambulance took me.

Q. Were any officers with you?
A. No. But they were there.
Q. Okay. Were you ever brought to the Fairfield County jail?
A. No.
Q. Did you ever spend any time in the Fairfield County jail as a result of the events that occurred on September 17, 2019?
A. No.
Q. Did you end up pleading guilty to a misdemeanor?
A. Yes.
Q. What did you plead guilty to?
A. Falsification.
Q. And what is your understanding of falsification?
MS. SREMACK: Objection.
You may answer.
A. That I gave the wrong answer on a question.
Q. And do you recall which question that would be?
A. I guess if he had been there. But I didn't hear it.

Q. Did you have an attorney?
A. Yes.
Q. Who was your attorney for the criminal matter?
A. Dye.
Q. I'm sorry?
A. Dye, D-Y-E.
Q. Is that a first name or last name?
A. Last name.
Q. So after the second hospital, did you go home?
A. No.
Q. Where did you go?
A. Grant in Columbus.
Q. How long were you at Grant?
A. Until like 3:00 or 4:00 in the morning.
Q. And what services did they provide to you at Grant?
A. They popped my arm so they could put it back even, inline.
Q. So essentially did they try to pop the dislocation back into the elbow?
A. Yes.
Q. Into the joint?

A. Yes.

Q. And did they give you a splint so as to stabilize the elbow?

A. No.

Q. Did anybody give you a splint during the three hospitals that you visited that night?

A. No.

Q. What were your instructions upon leaving Grant?

A. To see an orthopedic surgeon.

Q. And just so I'm clear: They didn't give you anything to put your arm in a splint there?

A. Just a sling.

Q. So you had a sling; is that right?

A. Yes.

Q. And did the sling go up around your neck and underneath your arm?

A. Yes.

Q. And were you required to use that sling until you were able to follow up with an orthopedic doctor?

A. No.

Q. What was your understanding of what the purpose of the sling was?

MS. SREMACK: Objection.
You may answer.
A. Just to cradle it so I didn't have to worry about it going down and popping out again.
Q. Did any health care practitioner at any of those three places that you visited on September 17 and 18, 2019, advise you not to use your left arm until you came into contact with an orthopedic surgeon?
A. When I went back the 18th, they put a splint on it.
Q. And just specifically I'm asking for that period when you were at the hospital and then you were released.
A. It was at least the same night at 3:00 or 4:00 in the morning.
Q. Okay. So are you saying that you went back to another health care practitioner on the 19th?
A. Yeah. The emergency room.
Q. And then you got a splint?
A. Yes.
Q. Were you told to use that splint?
A. Until I saw my -- an orthopedic surgeon.
Q. And what was your understanding as to what

you were to do to care for your arm in the interim between getting the splint and seeing an orthopedic surgeon?

A. Do nothing.

Q. Do you smoke?

A. No.

Q. Have you ever smoked?

A. Yes.

Q. How much did you smoke during that time frame?

A. Two packs.

Q. From when to when?

A. I don't know. From -- Altogether 18 years, but I quit in 1988.

Q. Are you currently or have you ever been under any dietary restrictions?

A. No.

Q. Has any health care practitioner advised you not to use illegal drugs?

A. Yeah.

Q. Who has advised you of that and why?

A. All of them.

MS. SREMACK: Objection.

You may answer.

A. All of them.

Q. Has any health care practitioner advised you that the use of the illegal drugs could affect the recovery of your left elbow?

A. Nothing was mentioned then.

MR. DOWNEY: We're just going to take a brief break.

(Recess taken.)

MR. DOWNEY: Let's go back on the record. I just have a few more questions for you today, ma'am.

BY MR. DOWNEY:

Q. In your records, there are notes that you've had blackouts due to temper in the past. Can you describe that to me or what you were talking about there.

A. It's been a long time. But they were situations where people literally kind of backed me into a corner, and so I had to defend myself. But it's been a long time, long time.

Q. And would you black out in those instances?

A. I don't anymore.

Q. But just so I understand: When is the

last time one of these instances occurred?
A. Ten years ago.
Q. And did you black out because -- Why did you black out? Do you know?
A. My girlfriend attacked me.
Q. And who is that?
A. Her name was Cindy Cleary. She's dead now.
Q. And she attacked you. What happened?
A. We got in a physical fight.
Q. And did -- Was law enforcement contacted?
A. No.
Q. Did you black out?
A. I think so.
Q. Do you remember the fight at all?
A. I remember her hitting me. Then I remember her saying she had enough. And I was on top of her, and so I quit.
Q. And why did you -- Why would you describe that as a blackout situation?
A. Because I don't remember anything from the time she hit me to the time she said, "I'm done."
Q. Any other instances that come to mind where that's occurred?

A. Years ago when I was with my first old man.
Q. Go ahead and describe to me what occurred.
A. He used to beat on me. And so when he'd beat me so much, I'd fight back.
Q. And when did this occur?
A. In the '70s and the early '80s.
Q. What was the name of this gentleman?
A. James Logan.
Q. When is the last time you saw him?
A. Fourteen years ago.
Q. Is he still alive?
A. Yes.
Q. He ever apologize for his behaviors?
A. Once.
Q. Was this gentleman in a motorcycle gang?
A. Yes.
Q. Was he a violent individual?
A. Yes.
Q. Going back to September 17, 2019, did you ever indicate to anyone that you fell into Officer Norris prior to him laying hands on you?
A. No.
Q. Have you ever said those words?

A. No.

Q. Did you ever explain that to anyone?

A. No.

MS. SREMACK: Objection.

You may answer.

A. No.

Q. Have you been truthful and honest to all the health care practitioners you've worked with over the years?

A. Yes.

Q. Now, you've got two dogs; is that right?

A. Yes.

Q. Did you have any dogs on September 17, 2019?

A. One.

Q. Okay. Do you still have that dog?

A. Yes.

Q. What kind of dog is it?

A. American bully and pit bull.

Q. Has that dog ever bit anyone?

A. No.

Q. Is the dog dangerous in any way?

A. No.

Q. If you would, where was the dog at the

time that Officer Norris entered your residence on September 17, 2019?

A. Locked in a cage in the closet.

Q. Did you lock the dog in the cage prior to Officer Norris getting there?

A. When he knocked, yeah, I put her in.

Q. So when you knew Officer Norris was at the door, that's when you went and you put the dog in the crate?

A. Yeah.

Q. Where is the crate located?

A. In the bedroom in the closet.

Q. So does the closet have doors on it?

A. One, but it's folded open.

Q. So is the door kept open all the time?

A. Yes.

Q. And the crate -- The dog would have been in the closet in the crate?

A. Yes.

Q. How big is this dog?

A. Then she was only about 50 pounds. Now she's 80.

Q. Sounds like she's going the same direction as me.

And so how much time did it take you to track down the dog, put it in the crate and then go back to the door to let Officer -- let the officer in?

A. She's voice commanded. Right away.

Q. Excuse me?

A. She's voice commanded, so she went right away.

Q. Is she able to put herself in the crate?

A. She walked in, but I locked it.

Q. Okay. So how much time took place between when you first gave the command to your dog, put her in the crate and then went back to the door to let in Officer Norris?

A. She went right in, and then I answered the door.

Q. And just so I understand: There had to be a period of time for you to, like, walk back to the bedroom and fix the crate.

A. Maybe five minutes at the most.

Q. And so the dog was there in the bedroom the whole time?

A. Yes.

Q. Just give me another minute or two. I

promise it won't by seven hours.

MR. DOWNEY: Off the record.

(Discussion held off the record.)

MR. DOWNEY: Back on the record.

BY MR. DOWNEY:

Q. Briefly, ma'am, do you currently experience any financial distress?

A. No.

Q. Have you experienced any financial distress in the last three years?

A. Yes.

Q. Describe that to me.

A. Well, I pay all my bills, but I'm always broke. I can't do nothing else.

Q. And has that abated?

A. Pardon?

Q. Has that stopped, the financial distress?

A. Yeah.

MR. DOWNEY: I have no additional questions for you today, ma'am. Thank you for your time.

(Signature not waived.)

\- - -

And, thereupon, the deposition was

concluded at approximately 11:16 a.m.

\- - -

State of Ohio :
SS:
County of Franklin:

I, CHERYL SHEETS, do hereby certify that I have read the foregoing transcript of my deposition given on May 11, 2022; that together with the correction page attached hereto noting changes in form or substance, if any, it is true and correct.

_______________________________
CHERYL SHEETS

I do hereby certify that the foregoing transcript of the deposition of CHERYL SHEETS was submitted to the witness for reading and signing; that after she had stated to the undersigned Notary Public that she had read and examined her deposition, she signed the same in my presence on the _______________day of __________, ___________.

__________________________________

__________________________________
Notary Public

My commission expires _______________________________

- - -

CERTIFICATE

State of Ohio :
SS:
County of Franklin:

I, Marilyn K. Martin, Notary Public in and for the State of Ohio, duly commissioned and qualified, certify that the within named witness was by me duly sworn to testify to the whole truth in the cause aforesaid; that the testimony was taken down by me in stenotypy in the presence of said witness, afterwards transcribed upon a computer; that the foregoing is a true and correct transcript of the testimony given by said witness taken at the time and place in the foregoing caption specified.

I certify that I am not a relative, employee, or attorney of any of the parties hereto, or of any attorney or counsel employed by the parties, or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand and affixed my seal of office at Columbus, Ohio, on this 25th day of May, 2022.

Marilyn Martin

MARILYN K. MARTIN
Notary Public in and for the State of Ohio
and Registered Professional Reporter.

My Commission Expires October 16, 2026.

WORD INDEX

< 1 >
10:05 1:12 3:2
11 1:12 3:1 59:5
11:16 58:1
125 1:23
16 60:24
17 9:2, 21 10:6, 11, 15, 20 11:1 13:20, 24 14:20, 23 15:3, 12 16:15 17:9, 13 21:18 23:7 26:20 30:17, 20 35:5 36:2 37:9 39:6 41:1 43:7 44:23 46:8 49:6 53:20 54:13 55:2
18 49:7 50:13
18th 49:10
1970s 19:24 20:1
1973 8:4
1988 50:14
19th 49:18

< 2 >
2:21-cv-01810 1:6
200 2:12
2000 6:16, 24 7:13
2019 5:20 6:8 9:3, 21 10:6, 11, 15, 20 11:1 13:20, 24 14:20, 23 15:3, 12 16:15 17:10, 13 21:18 23:7 26:20 30:17, 20 35:6 36:2 37:9 39:6 41:1 43:7 44:23 46:8 49:7 53:20 54:14 55:2
2022 1:12 3:1 59:5 60:19
2026 60:24
210 30:15
221-1216 2:13
25th 60:19
2745 2:3

< 3 >
3/23/1955 6:11
3:00 47:16 49:15
3040 1:23
326-0177 1:24
330 2:4, 8
345 1:13

< 4 >
4:00 47:16 49:16
43054 2:12
43130 1:13
43221 1:23
44312 2:3

< 5 >
50 55:21
51 8:16
515 5:10 15:9

< 6 >
614 1:24 2:13
644-0061 2:4

< 7 >
70s 20:20 40:22 53:7
7775 2:12

< 8 >
80 55:22
80s 53:7

< 9 >
940-9914 2:8

< A >
a.m 1:12 3:2 58:1
abated 57:15
ability 7:17, 20 33:14
able 48:20 56:9
abusive 40:5, 8
accept 4:15
accomplish 5:2
accurate 39:19
accurately 4:16 7:21 18:18
action 60:16
activities 22:13
acts 38:6
additional 57:19
address 5:9
adoption 8:22
adult 39:18
advice 37:8
advise 4:14 49:7
advised 37:21 50:18, 21 51:2
affect 7:16, 20 33:13 51:3
affixed 60:18
aforesaid 60:7
age 8:14
agitated 21:22
agitation 23:6
ago 20:6 52:2 53:1, 11
agree 22:17, 23 25:6, 23
ahead 5:1 18:1 23:5 31:3 53:3
ajarmusz@fisheldowney.com 2:14
Akron 2:3, 7
al 1:7
Albany 2:12
Albrecht 2:11
alcohol 7:16
Alex 1:7
alive 53:12
allowing 19:11, 13
Altogether 50:13
ambulance 45:24
American 54:19
ANDERSON 1:13
ANGELICA 2:11
Ann 5:7
answer 4:18 5:22 7:8, 21 9:9 11:19 12:7 20:10, 16 21:11 22:15, 21 23:3 25:11, 21 26:12 31:7 35:21 39:24 42:3 46:18, 19 49:2 50:24 54:5
answered 4:16 11:18 12:6 13:10 56:15
answering 13:7
anxiety 41:4
anybody 6:9 29:10, 12 48:5
anymore 51:23
Apartment 5:11 24:5, 7
apartments 24:6, 17
apologize 53:14
APPEARANCES 2:1
appointments 37:16
appropriate 22:10, 18
approximately 58:1
area 30:16 31:14 38:23
arguably 25:17
argue 14:8
argued 13:19
argumentative 13:17
Arlington 2:3
arm 29:18 32:7 38:8, 11, 19, 23 47:19 48:12, 17 49:7 50:1
arrest 9:17, 21 19:4 28:24
arrested 14:22 15:2, 5, 8, 11, 15 26:3, 6, 9
arrival 17:4
arrive 10:22
arrived 10:20 11:1, 6 26:19
Asked 11:17 12:5 14:12 23:8, 9, 12 30:12
asking 49:12
assert 20:14
assist 36:9
attached 59:6
attacked 52:5, 9
attempt 33:23
attempting 22:19
attention 36:14
attic 31:1
Attorney 2:2, 4, 8, 11 5:1 47:1, 3 60:14, 15
authority 17:9
Avenue 1:13

< B >
back 5:20 12:2, 3 24:1 29:6, 23 34:13, 15 39:9, 11 40:22 42:22 47:20, 22

49:10, 18 51:9 53:5, 20 56:3, 13, 18 57:4
**backed** 51:18
**background** 7:23
**based** 42:5
**basement** 30:23
**basically** 24:17 40:3
**basis** 41:14
**bathe** 27:8
**bathroom** 12:12, 20, 21 16:19
**beat** 53:4, 5
**beating** 40:19
**bed** 23:16, 18 29:17, 21 32:6, 9, 15, 16 33:17, 19 34:9, 18, 21
**bedroom** 12:20, 21 29:5 30:4, 11 55:12 56:19, 21
**behalf** 2:8, 15
**behaving** 25:9
**behaviors** 44:2 53:14
**benefit** 43:1
**benefits** 6:18
**better** 42:21
**big** 12:9 30:14 55:20
**BILLI** 2:4
**bills** 57:13
**bipolar** 41:4
**birth** 6:10
**bit** 54:20
**black** 14:18 51:21 52:3, 4, 13
**blackout** 52:20
**blackouts** 51:14
**blocked** 40:20
**body** 31:4, 9, 21 32:3 33:16 34:14
**borderline** 41:4
**bought** 14:4
**boundaries** 22:3
**box** 33:21
**Boyd** 5:17, 19 9:6 10:8 18:2 19:4, 8, 9 30:13, 17 40:3, 4
**Boyd's** 11:2 26:15
**boyfriend** 5:16
**bra** 39:7, 9
**break** 4:24 35:19 51:7
**brief** 51:7
**Briefly** 57:6
**bring** 28:4, 7
**broke** 35:1, 11, 13 57:14
**broken** 35:14
**brought** 46:3
**bull** 54:19
**bully** 54:19
**burn** 38:15
**butt** 16:16, 24

< C >
**cabinets** 18:3
**cage** 55:3, 4
**call** 37:5
**called** 3:9 14:6
**campus** 36:17 37:1, 3, 5 45:1, 2
**caption** 60:12
**car** 14:3, 7
**card** 20:7 23:8, 9
**care** 21:12 33:5 37:8 41:11 42:12 44:15, 19 49:5, 18 50:1, 18 51:2 54:8
**Case** 1:6 13:23 44:16, 19
**cause** 60:7
**CERTIFICATE** 60:1
**certified** 4:5
**certify** 59:3, 11 60:5, 13
**challenges** 41:16, 19
**changes** 59:6
**character** 3:13
**charges** 15:7, 21, 23
**Cheryl** 1:4, 10 3:8 4:3 5:7 59:3, 9, 12
**chest** 33:18
**children** 8:12
**cholesterol** 44:12
**Cindy** 52:7
**Clarissa** 8:15
**clean** 7:9 21:12
**clear** 20:18 38:18 44:22 48:11
**Cleary** 52:7
**close** 10:10 17:3
**closest** 13:22
**closet** 55:3, 12, 13, 18
**clothes** 23:17
**college** 7:24
**Columbus** 1:23 36:20 47:14 60:18
**come** 13:4 16:20 18:2 19:11, 13 20:3 27:1 36:9, 12, 22 52:23
**command** 56:12
**commanded** 56:5, 7
**commission** 59:19 60:24
**commissioned** 60:4
**commit** 25:18
**committed** 25:18
**common** 24:20
**communicating** 44:4
**complete** 37:14
**computer** 60:9
**Computers** 8:9
**concern** 30:10
**concluded** 58:1
**conduct** 17:20
**conducted** 30:3
**conducting** 22:13
**confront** 41:16
**connected** 24:18
**consider** 13:17
**considered** 6:22
**contact** 8:17 31:4, 21 33:17 49:8
**contacted** 52:11
**contemplated** 42:1
**continuous** 38:6, 8
**COPELAND** 2:4
**corner** 51:19
**correct** 9:3 20:21 21:2 22:19 23:1 25:15, 19 33:11 41:5, 12, 16 42:1, 9, 12 59:7 60:10
**correction** 59:6
**counsel** 3:6 60:15
**count** 4:22
**County** 4:11 9:1, 22 10:2, 7 14:24 17:5 26:19 37:5 46:4, 7 59:2 60:2
**couple** 43:3
**COURT** 1:1 4:19 7:8
**cousin** 11:2 26:15
**cradle** 49:3
**crate** 55:9, 11, 17, 18 56:2, 9, 13, 19
**created** 30:16, 19
**creating** 43:13
**crime** 25:18
**crimes** 25:18
**criminal** 47:3
**CROSS-EXAMINATION** 4:6
**cuffed** 34:18, 19
**cupboards** 18:20
**current** 5:8 6:24 7:13 20:21 42:6
**currently** 5:15 6:12, 15 7:15 37:18, 24 42:5, 21 44:7 50:15 57:6
**custody** 45:8
**cut** 42:14
**cutting** 42:22

< D >
**Dan** 4:8
**dangerous** 54:22
**DANIEL** 2:8
**date** 6:10 13:23 16:15 41:5
**dating** 16:13
**daughter** 8:13
**day** 6:24 7:13 10:2, 4, 22 20:21 21:9 26:1 59:17 60:19
**days** 26:21 27:4 28:5
**ddowney@fisheldowney.com** 2:13

dead 52:7
defend 51:19
Defendants 1:8 2:15 3:9 4:9
departure 17:4
DEPOSITION 1:10 3:8 57:24 59:4, 12, 15
depression 41:3
Deputy 2:18 14:4 18:12
derive 6:23 7:2, 12
derived 28:19
describe 31:3 38:3, 13 40:16 51:15 52:19 53:3 57:12
described 21:21 30:5
determine 44:3
DeVry 8:7, 8
diagnosed 41:3
diagnoses 41:8
died 43:20, 21
dietary 50:16
difficulty 43:13, 16
directed 29:24 37:12
direction 55:23
directly 43:6
disability 6:17, 21
discomfort 34:22 35:5 37:24 38:23
Discussion 57:3
dislocated 35:16
dislocation 35:18, 23 47:22
disorder 41:4, 5
displeasure 18:7, 19
distances 39:10
distinguish 35:18
distress 57:7, 10, 17
DISTRICT 1:1
disturbed 25:24
DIVISION 1:2
doctor 48:21
dog 54:16, 18, 20, 22, 24 55:4, 8, 17, 20 56:2, 12, 21
dogs 21:12, 14 39:3, 10 54:11, 13
doing 20:17
dominant 39:13
door 11:12 13:7, 10, 12 16:17 23:24 25:3 29:23 55:8, 15 56:3, 13, 16
doors 55:13
DOWNEY 2:8, 11 4:7, 8 12:2, 8 27:19 51:6, 9, 12 57:2, 4, 5, 19
Drive 1:23
driving 15:20
dropped 15:7
drugs 7:16 17:7 19:23 20:1, 20, 24 21:7 28:12 50:19 51:3
due 51:14
duly 4:4 60:4, 6
duplex 24:14, 16, 22 25:1
Dye 47:5, 7
D-Y-E 47:7

< E >
earlier 24:24
Early 10:23 53:7
earn 16:7
easily 43:11
EASTERN 1:2
Echard 11:4 17:2 26:5, 6, 9, 14 28:11, 19, 21
Echard's 28:24
education 8:5
educational 7:23
eight 40:18
either 32:2, 20
elapsed 13:9 18:6 21:16 34:17, 20
elbow 35:1, 2, 5, 9, 12, 13, 14, 16, 24 36:4, 10, 22 37:8, 19 38:1, 10, 23 47:22 48:3 51:4
emergency 49:19
employed 6:12, 15 60:15
employee 60:14
EMTs 36:12
encounter 14:19
enforcement 25:14 52:11
enter 17:9
entered 18:6, 13 21:17 55:1
entrance 23:23
essentially 47:21
et 1:7
evening 10:23
events 46:7
examined 44:2 59:15
exception 20:19 23:24 35:23
Excuse 56:6
experience 37:24 38:23 57:7
experienced 33:2 34:21, 24 35:4 40:11, 12 57:9
expires 59:19 60:24
explain 12:17 16:18 29:16 38:7 54:2
express 22:1 30:10 36:4 43:9
expressed 18:7, 19 23:6 36:7 44:14, 18

< F >
face 34:10
facing 32:12
fair 9:5 27:20 40:23
Fairfield 4:11 9:1, 22 10:2, 6 14:24 17:5 26:19 37:4 46:4, 7
Falsification 46:14, 16
family 43:17, 23
far 39:11
feet 12:13
fell 53:21
fifteen 18:9
Fifth 20:14
Fifty-one 16:11
fight 52:10, 15 53:5
filed 6:17
filings 41:15
financial 57:7, 9, 17
financially 60:16
fine 11:21
finish 7:8, 19 9:19 11:19
Firm 2:2, 7
first 4:4 18:19 29:4 31:4, 5, 21 32:13 33:16 40:18 47:8 53:1 56:12
Fishel 2:11
fit 30:13
five 56:20
Five-foot-eleven 30:15
fix 56:19
folded 55:14
folks 25:17 44:4
follow 37:10 48:20
following 37:9
follows 4:5
foregoing 59:4, 11 60:10, 12
form 59:7
found 34:18, 21
four 26:21 27:4 28:5 39:18
Fourteen 53:11
frame 18:11 21:20 40:21 50:10
Franklin 59:2 60:2
freestanding 24:3
friend 16:13
friends 26:16
front 12:19 18:13 23:24
fugitive 22:19 25:7
fugitives 25:14
full 5:5 6:22 33:20
fun 39:2

< G >

gang 53:16
gaze 29:24
gear 43:10
generally 37:7
gentleman 53:8, 16
gentlemen 40:7
getting 50:2 55:5
girlfriend 52:5
give 48:2, 5, 11 56:24
given 17:9 59:5 60:11
go 5:1 8:1 18:1 23:5 31:3 45:15, 23 47:10, 13 48:16 51:9 53:3 56:2
goes 38:14, 15
going 4:9, 18 7:6, 7, 19 9:19 16:16 20:13, 14 49:4 51:6 53:20 55:23
grab 22:8, 11
grabbed 31:8, 12 33:1
graduate 8:3
grandma 43:20, 21
Grant 36:20 47:14, 15, 18 48:9
guess 16:19, 21 26:8 44:5 45:10 46:23
guilty 46:10, 13
guy 28:8

< H >
hallway 12:17 13:1
hand 31:20 39:13 60:17
handed 39:15
hands 22:5, 18 29:4 31:17, 23 32:13 33:24 34:4 53:22
happen 32:10
happened 14:2 18:1 29:14 32:5 36:7 52:9
hard 33:6
hardware 37:18, 21
head 4:20 29:21 39:11
health 33:5, 11 40:12, 24 41:11, 12, 15, 19 42:11, 12, 20 43:2, 5 44:14, 19 49:5, 18 50:18 51:2 54:8
healthy 39:21 40:3
hear 46:24
heard 19:10
heart 44:11
heavy 39:12
He'd 6:4 53:4
held 57:3
hereinafter 4:4
hereto 59:6 60:14
hide 30:17
hiding 30:19
high 8:1, 6 43:10
hips 31:13
hit 52:22
hitting 52:16
Hocking 5:10 15:10, 11
hold 32:11
holding 34:12 39:10
hollering 14:16
home 9:23 10:7 47:11
homicidal 42:8
honest 54:7
hope 44:15
hospital 36:19 37:2 44:24 45:13, 16, 17, 18 47:10 49:13
hospitalized 41:18, 22 42:22
hospitals 48:6
hours 17:6 57:1
house 18:16, 23 21:12, 23 23:21, 24 24:5, 17 25:24 34:7
Hunter 8:15
hurt 36:4

< I >
illegal 17:7 20:20, 23 21:7 28:12 50:19 51:3
illicit 17:7 19:23
immediately 34:7
impede 17:22
impeding 25:7, 8
important 25:13
inappropriately 25:9
Inaudible 5:21
incident 30:4
incidents 43:6
income 6:23 7:2, 12 16:8 28:19
incur 35:24
indicate 11:8 34:6 53:21
indicated 33:5 42:7
indicating 31:11, 15 32:11
individual 53:18
influence 7:15
info@billicopeland.com 2:8
injury 35:24
inline 47:20
instances 15:19 51:22 52:1, 23
instructing 20:16
instructions 48:8
interact 10:1
interacted 9:1 13:14
interaction 9:11 36:1
interested 60:16
interim 50:1
invited 23:1
involving 15:23
irritated 21:24
irritation 22:1
issue 13:23
issues 33:2, 10, 11 35:9 40:12 41:12
items 18:4 23:13, 14 30:8, 13

< J >
jail 16:1, 4 46:4, 7
James 53:9
JARMUSZ 2:11
Jeff 11:4
Jeffrey 17:2 26:5
joint 47:24
joke 42:10
junk 23:20

< K >
kept 55:15
kind 51:18 54:18
KING 2:4, 7
kitchen 12:19, 23 18:15, 20 19:1
knew 55:7
knocked 45:3 55:6
know 5:1, 24 7:6 9:16, 20 10:13 12:13 14:6, 17 15:6 17:11, 15 22:10 24:16 26:8, 9, 14 27:12, 15 28:3, 9, 13, 14, 17, 18, 19, 22, 23 29:17 32:24 33:9 37:4 43:24 44:13 45:3, 4 50:13 52:4
knowledge 26:7 28:11

< L >
laid 29:4 32:13 33:24
Lamictal 44:9
Lancaster 1:13 8:2 37:4
Lape 1:7
Law 2:2, 4, 7, 8, 11 25:9, 14 52:11
lawful 22:13 25:7
lawsuit 4:9
lawyer 20:17
lay 22:5, 18
laying 34:4 53:22
layout 12:16
leash 39:10
leave 16:23 34:6 45:13
leaving 16:24 48:8
left 16:20 17:1 35:3, 5 37:8

38:1, 23
49:7    51:4
license    15:20
life    39:18
lift    39:12
Lincoln    1:13
literally
  51:18
little    14:10
lived    25:3
living    12:17
  26:22
LLC    2:2
LLP    2:11
locate    25:14
located    29:3
  55:11
lock    55:4
Locked    55:3
  56:10
Logan    27:16,
18    53:9
long    5:2, 12
  16:3    17:20
  26:18    28:3
  39:10    45:2,
5    47:15
  51:17, 20
longtime
  39:18
look    36:22
looked    9:14
  30:9
looking    9:6,
13, 15    10:7
  18:3    29:22
  32:14, 15, 17
lower    38:19
LSD    20:4
lungs    44:11

< M >
ma'am    51:11
  57:6, 20
maintaining
  43:14, 16
making    44:19
male    39:22
man    40:18
  53:2
marijuana
  20:4, 5, 8, 19
MARILYN    1:13
  60:3, 19
married    8:10

MARTIN    1:13
  60:3, 19
Marty    2:18
matter    47:4
meals    27:10
mean    17:16
  24:4, 16
medical    20:7
  36:14    37:6,
7
medications
  33:10, 13
  44:5, 7
meet    16:12
meeting    42:12
members    43:17
Memorial    37:1
memory    33:3
mental    33:10
  40:12, 24
  41:12, 15, 19
  42:11, 20
  43:2, 5
mentioned
  51:5
Messenger
  8:21
meth    19:10,
13, 16, 19, 21
midsection
  31:17
mind    20:3
  52:23
minute    56:24
minutes    18:9
  21:19    34:23
  56:20
misdemeanor
  46:11
missed    41:8
mom    43:20
moment    25:5
money    44:15,
19
month    20:6
months    10:12
  14:1
MORNING    3:1
  47:16    49:16
mother    27:14,
15, 22
motorcycle
  53:16
move    32:23
  33:24    34:4

moves    38:10

< N >
name    4:8
  5:5    8:14,
15    11:3
  14:17    25:4
  37:3    47:8,
9    52:7    53:8
named    60:5
Nancy    25:4
nature    40:13
  42:7
nearby    24:8
neck    48:16
need    4:24
  5:22
neighbor
  14:13
neighbors
  14:6
New    2:12
  37:2
night    45:19
  48:6    49:15
Nods    4:20
  23:10
Norris    2:18
  13:10, 14
  14:20    17:16,
19, 22    18:6,
12, 15    19:2
  21:17, 22
  22:2, 6, 23
  23:6    29:4,
20, 23    30:1,
3, 11    31:5,
20    33:24
  34:4, 12
  36:1, 5
  53:22    55:1,
5, 7    56:14
Notary    3:11,
14    59:14, 19
  60:3, 22
notes    3:11
  51:13
noting    59:6
number    4:10
  33:9

< O >
Objection
  9:8    11:17
  12:5    20:13
  21:10    22:14,

20    23:2
  25:10, 20
  26:11    31:6
  35:20    39:23
  42:2    46:17
  49:1    50:23
  54:4
observed
  20:23    21:6
occasion
  41:21
occasionally
  38:7, 24
occupational
  37:12, 14
occur    40:21
  53:6
occurred
  4:11    29:12
  32:23    43:7
  46:8    52:1,
24    53:3
October    60:24
Office    4:12
  9:2, 23
  10:2, 7
  14:24    26:19
  60:18
Officer
  13:10, 14, 19
  14:9, 11, 17,
20    15:3
  17:12, 19, 22
  18:6, 15
  19:2    21:17,
22    22:2, 5,
11, 18, 23
  23:6    29:3,
20    30:1, 3,
10    31:4
  33:24    34:3,
12    36:1, 5
  45:11    53:21
  55:1, 5, 7
  56:3, 14
officers    9:1,
12, 22    10:1,
14, 20    11:1,
5, 8, 12
  17:5, 8, 17
  18:10    25:14
  26:18    46:1
official    3:13
OHIO    1:1, 13,
23    2:3, 7,
12    59:1

60:1, 4, 18,
22
old    16:10
  28:21    45:17
  53:1
older    36:18
Once    41:20
  53:15
online    8:7
open    13:3
  55:14, 15
opened    13:12
originates
  38:10
orthopedic
  48:10, 20
  49:8, 23
  50:2
outstanding
  5:3
overnight
  45:6
overstepping
  22:3

< P >
packs    50:11
page    59:6
pain    35:1, 4
  38:4, 6, 10,
16
Pardon    7:1
  11:23    57:16
parents    8:23
Parkway    2:12
parties    3:7
  60:14, 16
partner    29:9
  45:12
pay    57:13
people    14:7
  19:11, 13
  43:8    51:18
period    49:13
  56:18
periods    6:2,
4
permit    7:7
personal
  18:3    23:12,
14    30:8, 12
personality
  41:4
physical
  33:10    35:24
  40:13    52:10

physically 17:12 18:10 40:4, 8
pick 27:12, 22
Pierce 5:17, 19 9:6, 17, 21 10:8, 13, 19 15:14 16:1, 7, 10, 14 17:16 20:23 21:7 30:14 40:4, 14
Pierce's 17:4
piled 23:17
pin 18:17
pit 54:19
place 11:11 27:3 30:20 56:11 60:12
places 9:14 40:19, 20 49:6
Plaintiff 1:5 2:8 3:8
Play 39:3
played 44:3
plead 46:13
pleading 46:10
please 4:24 16:18 38:7, 13
point 4:12 20:24 33:23 34:3
pointed 38:18
points 23:23
police 13:19 14:9, 11 15:2 17:8 22:11
pop 47:21
popped 47:19
popping 49:4
portion 18:22 31:3 33:16 34:14
pounds 30:15 55:21
practitioner 33:6 42:12 44:20 49:5, 18 50:18 51:2
practitioners 41:11 44:15 54:8
prepared 30:19
presence 3:12 59:16 60:8
PRESENT 2:17 10:24 15:14 17:1 29:8 45:21
previous 14:19
previously 30:16
prior 10:5 13:20 14:20, 22 15:3, 12 18:23 30:4, 17, 20 34:3 35:5, 9 39:5 40:14, 24 41:5 53:22 55:4
probably 7:5
problem 27:21, 23
PROFESSIONAL 1:13 60:22
promise 57:1
proof 3:13
provide 47:17
proximity 10:10 13:23 17:3 29:19
PTSD 40:15 41:6, 7 43:10
Public 59:15, 19 60:3, 22
purpose 48:24
purposes 4:14 31:16
pursued 43:5
put 8:22 43:10 45:3 47:19 48:12 49:10 55:6, 8 56:2, 9, 12

< Q >
Quaaludes 20:4
qualifications 3:14
qualified 60:5
question 4:15 5:2 11:20, 24 12:3 46:20, 21
questioned 9:15 18:4
questioning 14:13
questions 4:10, 13 7:7, 21 51:10 57:20
quit 43:21 50:14 52:18
Quite 20:2

< R >
reach 22:10 39:10, 11
react 44:6
read 12:2, 3 39:17 59:4, 15
reading 36:8 59:13
real 32:24
really 10:18 26:17 30:2 35:22 39:14 43:9, 12
reason 4:24
REBECCA 2:2
rebecca@sremacklaw.com 2:4
recall 14:19 46:21
receive 36:14
received 37:7 40:24 43:1
Recess 51:8
record 4:15 5:6 20:18 31:16 38:18 51:9 57:2, 3, 4
records 37:6 39:17 42:6 51:13
recovery 51:4
reduced 3:10
reflect 18:18
reflux 44:13
regarding 4:10 37:8
REGISTERED 1:13 60:22
related 43:6
relationship 20:24 39:21
relationships 39:18 40:8, 13 43:14, 17
relative 60:13
released 49:14
remain 6:20
remember 15:6 25:4 33:14 52:15, 16, 17, 21
remembering 33:6
removed 37:22
Repeating 12:5
reported 14:15
REPORTER 1:13 4:19 7:8 60:22
REPORTING 1:13 14:5
represent 4:9
representative 14:23
representatives 10:6
required 48:19
reside 5:14, 19 6:6, 9
resided 5:12 25:1 27:15
residence 4:11 9:2, 12 10:15, 19, 24 11:6 12:9 13:11 14:16 15:8 17:8 18:7, 11 19:14, 17 21:17 22:24 28:4, 15 29:3, 6 30:20, 23 31:1 36:22 44:23 55:1
residential 5:8
respect 17:4
respective 3:7
restrictions 50:16
result 36:1 40:12 46:7
retirement 6:22
revenue 16:7
reviewed 37:6 42:6
Riepenhoff 2:11
right 11:13, 15 22:24 29:24 31:11, 14, 18 34:10 35:12 38:15 39:13, 15 42:15 48:14 54:11 56:5, 7, 15
rights 36:8
river 5:10
Riverside 1:23
Road 2:3
role 44:3
room 12:17, 19 18:13 49:19
rooms 12:11, 12 13:4
rooted 41:15
RPR 1:13

< S >
saw 16:23, 24 49:23 53:10
saying 4:20 14:4 31:12 38:9 49:17 52:17
says 4:5
school 8:1, 6
scratch 39:9
screamed 29:18 32:7

screaming
14:16
seal   60:18
search   17:20,
23   18:19
22:4, 19
25:7, 8   30:3
searched
18:22
searching
18:2, 8, 15,
20   21:23
23:12, 15
30:11, 12
second   47:10
Security
6:20   16:9
41:14
see   8:19
13:3, 6
16:14, 22
29:12   48:10
seeing   50:2
seen   8:20
16:16
sense   4:16
sent   36:18,
20
September
9:2, 21
10:5, 10, 15,
20   11:1
13:20, 24
14:20, 23
15:3, 12
16:15   17:9,
13   21:17
23:7   26:20
30:17, 20
35:5   36:2
37:9   39:6
40:24   43:7
44:23   46:8
49:6   53:20
54:13   55:2
SERVICES
1:13   47:17
SESSION   3:1
set   60:17
seven   57:1
Severe   35:1
38:15, 16
shape   42:21
share   24:10
shared   30:21

Sheets   1:4,
10   3:8   4:3,
8   5:7   59:3,
9, 12
Sheriff   1:7
Sheriff's
4:12   9:2,
22   10:2, 7
14:24   26:19
shooting
40:19
shootouts
40:20
shoulder
38:16
showed   14:4
side   27:16
32:2, 20
Signature
57:22
signed   59:16
signing   59:13
sir   7:4
sit   42:21
situation
52:20
situations
51:18
size   33:19
slammed
29:17   32:6,
8
sleep   27:6
sling   48:13,
14, 16, 19, 24
Small   12:10
smoke   19:13
50:5, 9
smoked   19:16,
19   50:7
smoking   19:10
Snap   39:7, 9
Social   6:20
7:3   16:9
41:14
Somebody
14:3, 5
sorry   39:8
47:6
Sounds   55:23
source   6:24
7:3, 13
South   2:3
SOUTHERN   1:1
specific
23:14

specifically
6:8   13:9
31:10, 20
32:9   49:12
specified
60:12
spend   46:6
spending
21:22
spent   40:18
splint   48:2,
5, 12   49:11,
20, 22   50:2
spring   33:21
square   12:13
SREMACK   2:2
5:22   9:8
11:17   12:5
20:10, 13
21:10   22:14,
20   23:2
25:10, 20
26:11   27:17
31:6   35:20
39:23   42:2
46:17   49:1
50:23   54:4
SS   59:1
60:2
stabilize
48:3
standing
29:19
start   7:11
started   18:3
36:8
state   5:5
59:1   60:1,
4, 22
stated   59:14
STATES   1:1
statute   3:9
staying   27:3,
21
stenotypy
3:11   60:8
stipulated
3:6
STIPULATIONS
3:4
stomach
44:12, 13
stopped   57:17
Street   5:10
15:10, 11
strewn   23:20

structure
24:3
study   8:8
stuff   23:20
submitted
59:13
substance
59:7
suicidal
42:8, 23
suicide   42:1
Suite   1:23
2:12
supposedly
14:4
sure   10:18
18:17   21:8
32:24   34:16
37:5   45:14
surgeon
48:10   49:9,
23   50:3
sworn   4:4
60:6

< T >
take   4:19,
24   21:12
27:10   33:9
44:8, 11
51:6   56:1
taken   3:10
51:8   60:7,
11
talked   8:21
talking
43:21   51:15
teens   42:4
tell   8:5
9:11   11:5
12:16   13:22
14:2, 14
15:19   18:1
19:2, 5, 7, 9
23:5   27:24
29:14   30:7
34:24   36:16
40:2   43:19
temper   51:14
Ten   52:2
testified
35:11
testifies   4:5
testify   60:6
testimony
11:14   18:14,

18   20:19
21:21   23:15
24:24   31:23
32:19   35:8
38:20   60:7,
11
Thank   57:20
therapy
37:12, 14
thing   29:17
things   4:21
19:8   23:16
33:7   39:1
42:14
think   8:16
9:14   30:13
31:16   52:14
thirteen
5:13   42:16
thought   22:4
Three   12:12
26:21   27:3
28:5   42:18
48:6   49:6
57:10
thyroid   44:12
time   3:10
6:2, 4, 14
8:15   10:22
11:11   13:9,
22   14:9
15:20, 21
16:3   17:8
18:5, 11
20:5   21:16,
20, 23   29:3
31:5, 24
33:6, 23
34:3, 17, 20
38:22   40:21
45:5, 13
46:6   50:9
51:17, 20
52:1, 22
53:10   55:1,
15   56:1, 11,
18, 22   57:21
60:11
times   10:5
15:17   16:4
41:10, 18, 24
today   4:10
7:21   11:14
18:14   39:5
51:10   57:20

**told** 7:5 49:22
**top** 32:6 34:13, 14 52:17
**touch** 17:12, 17 29:15 31:8
**touched** 21:18 31:5, 24 32:2, 19
**town** 27:2
**track** 56:2
**transcribed** 3:12 60:9
**transcript** 59:4, 12 60:10
**translate** 4:23
**transported** 36:24 44:22
**treated** 41:11
**treatment** 40:24 43:6
**tried** 29:15, 16
**true** 59:7 60:10
**truth** 60:6
**truthful** 54:7
**try** 47:21
**turned** 32:22
**TV** 21:13
**twelve** 5:13
**Twenty** 21:19
**twenty-five** 21:19
**Twice** 15:18 16:6
**twist** 32:22
**twisted** 29:18 32:7
**two** 18:13 21:15 24:17 50:11 54:11 56:24
**typical** 21:9

**< U >**
**Uh-huh** 4:17 5:4 19:15 21:3 32:18
**uh-huhs** 4:20
**unable** 39:4, 5
**undergone** 43:2
**underneath** 48:17
**undersigned** 59:14
**understand** 4:13, 21 7:21 14:8 18:5 25:13 26:24 36:21 38:9 39:8 51:24 56:17
**understanding** 8:24 38:5 46:15 48:23 49:24
**understood** 4:15
**unit** 24:10
**UNITED** 1:1
**units** 24:8
**upper** 31:9 38:19
**upset** 17:19 21:22 22:8 43:9, 11
**use** 20:1, 7, 23 21:7 28:11 38:17 39:14 48:19 49:7, 22 50:19 51:3

**< V >**
**various** 33:10 41:10, 11
**verbally** 4:18
**violent** 53:18
**visited** 48:6 49:6
**voice** 56:5, 7
**vs** 1:6

**< W >**
**waiting** 27:1, 12, 22 44:19
**waived** 3:14 57:22
**walk** 32:9 56:18
**walked** 13:10, 12 18:24 56:10
**wall** 24:10, 11, 20
**Walton** 2:12
**want** 18:17 26:24 28:1 38:5
**wanted** 10:14, 17 37:23
**warrant** 9:17, 20 10:14 22:4 26:8 28:23
**wash** 39:11
**watch** 21:13
**way** 17:23 32:12 38:14, 16 54:22
**Wednesday** 1:12 3:1
**well** 4:23 57:13
**went** 8:7 9:15 45:18 49:10, 17 55:8 56:7, 13, 15
**We're** 20:14 51:6
**WHEREOF** 60:17
**windows** 13:6
**witness** 3:12 5:21, 23 23:10 27:18 59:13 60:5, 8, 11, 17
**wondered** 5:23
**word** 27:17
**words** 4:19 53:24
**worked** 54:8
**worry** 49:4
**writing** 3:10
**wrong** 46:19

**< Y >**
**Yeah** 4:23 7:10 15:24 20:22 24:12, 19 35:15 42:10 45:10 49:19 50:20 55:6, 10 57:18
**year** 6:3, 19 8:3
**years** 5:13 16:2 40:19 41:10 42:18 43:3 50:14 52:2 53:1, 11 54:9 57:10
**yell** 17:22
**yelling** 14:5