1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3                           - - -

4    Cheryl Sheets,              :
                                 :
5          Plaintiff,            :
                                 :
6          vs.                   :    Case No.
                                 :    2:21-cv-01810
7    Sheriff Alex Lape, et al.,:
                                 :
8          Defendants.           :

9                           - - -

10          DEPOSITION OF DEPUTY MARTY NORRIS

11                          - - -

12                                Wednesday, May 11, 2022
                                  11:31 a.m.
13                                345 Lincoln Avenue
                                  Lancaster, Ohio  43130
14                          - - -

15                    MARILYN K. MARTIN, RPR

16            REGISTERED PROFESSIONAL REPORTER

17                          - - -

18

19

20

21

22

23            ANDERSON REPORTING SERVICES, INC.
              3040 Riverside Drive, Suite 125
                    Columbus, Ohio  43221
24                    (614) 326-0177

```
 1    APPEARANCES:

 2            REBECCA J. SREMACK, Attorney at Law
              Sremack Law Firm, LLC
 3            2745 South Arlington Road
              Akron, Ohio  44312
 4            (330) 644-0061
              rebecca@sremacklaw.com
 5
              and
 6
              BILLI COPELAND KING, Attorney at Law
 7            King Law Firm
              Akron, Ohio
 8            (330) 940-9914
              info@billicopeland.com
 9
                   On behalf of the Plaintiff.
10
              DANIEL T. DOWNEY, Attorney at Law
11            ANGELICA M. JARMUSZ, Attorney at Law
              Fishel, Downey, Albrecht & Riepenhoff, LLP
12            7775 Walton Parkway, Suite 200
              New Albany, Ohio  43054
13            (614) 221-1216
              ddowney@fisheldowney.com
14            ajarmusz@fisheldowney.com

15                 On behalf of the Defendants.

16                        - - -

17

18

19

20

21

22

23

24
```

```
 1                              WEDNESDAY MORNING SESSION
                                May 11, 2022
 2                              11:31 a.m.

 3                                   -  -  -

 4                              STIPULATIONS

 5                                   -  -  -

 6              It is stipulated by and between counsel

 7     for the respective parties herein that this

 8     deposition of DEPUTY MARTY NORRIS, a Defendant

 9     herein, called by the Plaintiff under the statute,

10     may be taken at this time and reduced to writing in

11     stenotypy by the Notary, whose notes may thereafter

12     be transcribed out of the presence of the witness;

13     and that proof of the official character and

14     qualifications of the Notary is waived.

15                                   -  -  -

16

17

18

19

20

21

22

23

24
```

```
 1                P R O C E E D I N G S

 2                        - - -

 3                DEPUTY MARTY NORRIS,

 4     being by me first duly sworn, as hereinafter

 5     certified, testifies and says as follows:

 6                     CROSS-EXAMINATION

 7    BY MS. KING:

 8     Q.          Hi.  How are you?

 9     A.          Good.

10     Q.          Deputy Norris, I'm attorney Billi Copeland

11    King.  I'm going to ask you a few questions.  You

12    heard some of the instructions that were given

13    before.  Do you need me to repeat those again?

14     A.          No, ma'am.

15     Q.          Okay.  Very well.  So I'm just going to

16    have you spell your name for the record.

17     A.          Yes.  Marty, M-A-R-T-Y, N-O-R-R-I-S.

18     Q.          And Marty is your proper name?

19     A.          Correct.

20     Q.          Okay.  All right.  Well, I just want

21    to -- Is your body camera on?

22     A.          It is not.  I can take it off.

23     Q.          Okay.  So I'm going to just ask you a few

24    questions about yourself and your education, your
```

1  training, your work history and employment.  So I'm

2  going to start off:  How old are you?

3  A.          Fifty.

4  Q.          Fifty.  What's your birthday?

5  A.          August 23, 1971.

6  Q.          And how long have you been with Fairfield

7  County Sheriff's Office?

8  A.          Fairfield County.  I've been with

9  Fairfield County for 30 years.

10  Q.          For 30 years?

11  A.          Yes, ma'am.

12  Q.          Anywhere before that?

13  A.          Yes.  I've was with Perry County for two

14  additional years at that.  So I got 32 years of law

15  enforcement experience.

16  Q.          Okay.  What drew you to law enforcement?

17  A.          Pardon me?

18  Q.          What drew you to law enforcement?

19  A.          A family thing.  My father, grandfather,

20  mother, brother, daughter and nephew.

21  Q.          Okay.

22  A.          So --

23  Q.          Yeah.  Sounds very similar to my family

24  too.  My father was a fire captain.

1  A.          Everybody loves a firefighter.  I should

2  have been a firefighter.

3  Q.          So how tall are you?

4  A.          Six-foot.

5  Q.          What's your approximate weight?

6  A.          About 220, 225.

7  Q.          220, 225.  Okay.  Pretty big guy.  Do you

8  do any martial arts or anything?

9  A.          No.

10  Q.          Do you exercise?

11  A.          Yes.

12  Q.          Regularly?

13  A.          Yes.  But not recently.

14  Q.          Okay.  What do you do when you exercise

15  typically?

16  A.          Usually endurance and weightlifting.

17  Q.          Keep in shape for everything, right?

18  A.          Try to.

19  Q.          Yeah.  So tell me about your education.

20  A.          Well, I graduated in 1990 through

21  Lancaster High School.  I went to Ohio University,

22  started out with law enforcement technology.  I got

23  through all my law enforcement classes, then just

24  stopped going.

1    Q.        So no degree?

2    A.        No degree.  But --

3    Q.        Some college though?

4    A.        Some college.

5    Q.        About how many years?

6    A.        You want to count credit years or going

7    years?

8    Q.        Whatever.  Both.

9    A.        I think it was roughly from -- I'm taking

10   a guess -- '94 to about '98 or so, somewhere.  It was

11   about four years it took me, and I still never got a

12   degree because I was working full time at the time.

13   Q.        What were you doing?  Perry?

14   A.        Fairfield.

15   Q.        Okay.

16   A.        And I never went because they never gave

17   tuition or there was no incentive to get a college

18   degree.

19   Q.        Uh-huh.  So what other education or

20   training do you have?

21   A.        I got the Ohio Peace Officers Training.  I

22   have basic SWAT training, advanced SWAT training.  I

23   have numerous other trainings.  I think it's in my

24   file, but I can't really say what training it is

1    because after 30 years it kind of adds up and you

2    forget what you --

3    Q.          How often do you train?

4    A.          We have continuous education.  I think

5    it's like 24 hours a year now.  But they -- I just

6    came back from training right now.  I went to a

7    nonlethal launcher school.  It's FN303.  It shoots

8    less lethal projectiles.  So I -- For training, it's

9    just constant.  On the SWAT team, we got training two

10   times a week -- or a month.  I'm sorry.

11   Q.          Yeah.  So you have deescalation training?

12   A.          Yes.

13   Q.          Tell me about that.

14   A.          I took deescalation training.  It's called

15   Verbal Judo.  It was a two-day course, a 16-hour

16   course.  I think it was in the '90s.

17   Q.          What did you learn?

18   A.          Usually you confront somebody, and you

19   answer all their questions before -- so they know --

20   Like, say I approach you on a traffic stop.  I

21   introduce myself, give my badge number, tell the

22   reason for the stop and ask them to provide their

23   information, like driver's license, stuff like that.

24   So you answer all the questions of why you stopped,

 1   what you're doing so they can't say, "Why did you

 2   stop me" and stuff like that.

 3   Q.          Why is that called Verbal Judo?

 4   A.          I don't know.  I didn't name it that.

 5   Q.          But it's basically just giving a script?

 6   A.          It's kind of informing somebody what

 7   you're doing, yeah, why you stopped them so these

 8   answers don't come up negatively.  Like, usually

 9   you'd stop somebody and that's the first thing, "Why

10   did you stop me?"  So you answer all the questions,

11   give the badge number and all that right upfront.

12   Q.          Why is it important that it doesn't come

13   out negatively?

14   A.          Why create more problems for yourself?

15   Q.          Okay.  Does that comport with your

16   policing philosophy?  Do you have a policing

17   philosophy?

18   A.          Yes, I do.

19   Q.          What is that?  Can you describe that?

20   A.          My philosophy is I'm here to help

21   everybody and to be as nice as I can to everybody

22   until there's a time where it becomes a safety

23   factor.

24   Q.          How do you determine when it's a safety

1   factor?

2   A.          Usually when somebody puts their hands on

3   you or you feel that there's a weapon that's going to

4   be used on you or somebody else.

5   Q.          Uh-huh.  Is a hand on you a threat?

6   A.          Yes.

7   Q.          Every?

8   A.          Every, yes.  Every person that puts their

9   hand on me in the field I believe is a threat because

10  I have my sidearm on me at all times, so, yes.

11  Q.          Okay.  Are you married?

12  A.          No.

13  Q.          Do you have children?

14  A.          Yes.

15  Q.          Were you ever married?

16  A.          Yes.

17  Q.          How many times?

18  A.          Once.

19  Q.          Okay.  How long ago was that?

20  A.          I got a divorce in 2007 I believe.

21  Q.          Okay.

22  A.          I believe it was.  I was married for like

23  16 years, and she was a police officer.

24  Q.          Do you have any discipline history?

Deputy Marty Norris
5/11/2022

11

```
 1    A.           No.  Well, I think I do.  I think I
 2    got -- I got disciplined for cussing, and then I had
 3    a minor accident.  So that's the only thing I can
 4    recall.
 5    Q.           Out of 30 --
 6    A.           Thirty-two years.
 7    Q.           -- thirty-two years, cussing?
 8    A.           Yes.
 9    Q.           A car accident?
10    A.           Yes.
11    Q.           No citizen complaints?
12    A.           I imagine there are.  Everybody -- You
13    can't please everybody.
14    Q.           Okay.  Do you have any incidents of use of
15    force?
16    A.           I can't recall any right offhand.  Usually
17    it's with the taser or OC.
18    Q.           How do you define use of force?
19    A.           Anything that would -- you would have to
20    slam somebody to the ground, place up, choke, use an
21    impact weapon on or an intermediate weapon like a
22    taser, OC.
23    Q.           Describe the hierarchy that you go through
24    when you --
```

1    A.        Usually hands on is the first level.

2    Q.        Describe "hands on" for me.

3    A.        When you grab your hands on somebody and

4    you have to slam them up against an object to take

5    control of them and it causes injury.  So every

6    incident where you put hands on is not a use of force

7    because you have to put your hands on somebody to put

8    handcuffs on them.

9    Q.        Uh-huh.  Yep.  And what about the other

10   hierarchy in the use of force?

11   A.        Then it comes to -- Pepper spray is

12   usually at the level of hands on.  Any time you put

13   hands on, you can use your pepper spray.  It jumps up

14   to taser and then after taser intermediate weapons

15   like baton, and then it goes to deadly force.  If you

16   have them available, intermediate weapons with you.

17   Q.        And have you had any incidents where

18   you've had to use deadly force?

19   A.        No.

20   Q.        Taser?

21   A.        Yes.

22   Q.        Okay.  About how many?

23   A.        Maybe a dozen, half a dozen.  I can't

24   recall.  It's been a long time.

Deputy Marty Norris
5/11/2022

1   Q.          Okay.  And there's usually reports that

2   are associated with that?

3   A.          Usually, yes.

4   Q.          Yes.  And then how many times have you had

5   to use the bottom level, the slam someone up against

6   the wall?

7   A.          Usually it doesn't come to that.  I'd say

8   maybe less than a handful of times.

9   Q.          Okay.  How would you describe a handful of

10  times?

11  A.          Less than a dozen.

12  Q.          Okay.  And so tell me, do you recall the

13  events on 9/17 --

14  A.          Yes, I do.

15  Q.          -- 2019?

16              Tell me, you know, how your day started

17  that day, what's going on.

18  A.          Well, the day was nice.  It was a nice

19  day.  I was coming off shift.  Somebody looked like

20  they were broke down in a parking lot next to the

21  defendant's residence at a, like, daycare.  I went to

22  assist them; and when I assisted them, I noticed

23  somebody running from Mr. Pierce's house, running

24  out.

Deputy Marty Nozzris
5/11/2022

1    Q.        Were you familiar with him?

2    A.        Absolutely.

3    Q.        How so?

4    A.        I was there probably four or five times.

5    One time Mr. Pierce -- I was getting ready to take

6    him into custody, and he had some medical issue in

7    the back bedroom.  I called for a quad.

8    Q.        So you've been in that residence how many

9    times?

10   A.        Three or four.

11   Q.        Three or four?

12   A.        Uh-huh.

13   Q.        Okay.  Finish telling --

14   A.        So I seen somebody running from the

15   residence, called for backup.  Confronted the people

16   outside, talked to them.  I believe they had -- they

17   didn't live there, which I already knew that.  But

18   then at that point, backup got there.  Knocked on the

19   door.  I stated my name, stated the reason why I was

20   there.  I had a warrant for Boyd Pierce.

21            Mrs. Sheets was talking through the door,

22   said, "I got to put my dog up," which we knew she had

23   a dog because when we went there before she had to

24   put her dog up and it would take several minutes.

1    She let us in.  Started searching the

2    residence.  At the first living room -- the first

3    room was the living room, I think it was Mr. Echard.

4    Mr. Echard had an active warrant.  We took him into

5    custody.  Sat him down to confirm the warrant, that

6    they still wanted him.  He was with another deputy.

7    I can't recall if it was Deputy Shorr or Deputy Reed.

8    Went back to the back bedroom.  Was

9    searching around the bedroom area.  Noticed that

10   there was a closet opened with the dog kennel in it,

11   and there was bags of clothes piled up on the dog

12   kennel, which is a good place to hide.  Usually when

13   I capture fugitives, it's usually underneath clothes,

14   underneath beds.

15   Every time I got close, Mrs. Sheets would

16   start arguing with me that I can't search there.  I

17   told her that I have a warrant for Mr. Pierce.  And

18   then at that point, I went to turn around to look

19   into the dog -- where the dog was at, and I felt a

20   hand on the back of my shoulder pulling me back like

21   that (indicating).

22   Q.        Okay.  So can you back up for me.  I'm

23   going to back up a little bit.

24   A.        Sure.

1  Q.          When you saw the individuals running, what

2  was your first thought?

3  A.          I thought it was Mr. Pierce at first.

4  Q.          Where did they run towards?

5  A.          They were in a vehicle.  They ran in the

6  vehicle that was parked outside the house.  I think

7  they said they were changing the oil or something.

8  It was a maintenance problem with the vehicle.

9  Q.          So that vehicle did not leave?

10 A.          It did not, not to my recollection.  It

11 did not leave.

12 Q.          Okay.  And when you talked to those

13 individuals, you, of course, identified them?  And

14 then --

15 A.          Yes.

16 Q.          -- what happened next?  You decided that

17 that --

18 A.          That I would go up and -- I'll back up.  A

19 day or two prior to this incident, I had a traffic

20 stop with an individual, well-known person who is

21 addicted, on drugs, Sierra Randolph.  Ms. Randolph

22 explained to me -- I told her that I was looking for

23 Boyd Pierce.  She explained to me that she was at

24 Boyd's a day or two prior to that.  She was smoking

 1   meth with Mr. Boyd -- or Mr. Pierce.  I'm sorry -- in

 2   the house and that he was there at the time and

 3   that's where he was staying.

 4   Q.          Okay.  And so what was your frame of mind

 5   at the time?

 6   A.          Frame of mind?

 7   Q.          Uh-huh.  So based upon the information

 8   that you had two days earlier --

 9   A.          Yeah.  I thought he was inside.

10   Q.          You thought that he was inside?

11   A.          I was almost, like, 99.9 percent sure he

12   was inside.

13   Q.          Okay.  And then can you explain to me:

14   When there are warrants, is there a priority to

15   warrants?

16   A.          Yeah, there is.

17   Q.          Can you take me through that.

18   A.          Well, if it's a felony warrant, which this

19   is, usually we have to do a risk assessment.  But on

20   Mr. Pierce's incident, I did several risk assessments

21   on Mr. Pierce in the past, so I knew criminal history

22   and I knew him pretty well.  So what we do on

23   warrants is we usually have a backup, one or two

24   people that come along with us.  So once they get on

 1   scene, then we work the warrant.

 2   Q.          And how many people came on the scene?

 3   A.          Three.

 4   Q.          Three people on the scene?

 5   A.          Uh-huh.

 6   Q.          Okay.  And what was the subject matter of

 7   the warrant?

 8   A.          I think it was an aggravated possession of

 9   drugs, which was a felony five.

10   Q.          Okay.  And where is that in your priority?

11   A.          Priority?

12   Q.          Is that, like, a low priority?

13   A.          A felony is pretty high in my -- In my

14   world, I think a felony is pretty high.

15   Q.          For drug possession?

16   A.          Absolutely.  We've had several overdoses.

17   We've been inundated with overdoses, overdose deaths.

18   And when I can shut that down in my community, I

19   believe that's a very, very high priority in my book.

20   Q.          Now, if can we go back to the physical

21   environment.

22   A.          Sure.

23   Q.          When you walk into 515 Hocking, Apartment

24   B --

Deputy Marty Norris
5/11/2022

```
 1    A.          Yeah.

 2    Q.          -- how is the space oriented?

 3    A.          Very tight space.  You come up, there's a

 4    living room probably about the size of this room or

 5    smaller.  And then --

 6    Q.          About how many feet?

 7    A.          I would say anywhere from twelve to

 8    sixteen feet, if that.

 9    Q.          Okay.  And it's twelve by how much?

10    A.          I'll say probably eight, no more than

11    ten feet.

12    Q.          So that's the front room?

13    A.          Yes.

14    Q.          Eight by twelve.  What do you encounter

15    next?

16    A.          Well, I take it as a hallway/kitchen area,

17    which is probably no more than four feet width.  But

18    it goes into the bedroom.  So actually it's a full

19    open style.  I'd say a studio style.

20    Q.          An open studio style?

21    A.          Yeah.

22    Q.          Uh-huh.

23    A.          A bathroom off to -- in the middle of the

24    kitchen.
```

```
 1    Q.         And like you said before, you've been
 2    there many times?
 3    A.         Yeah.
 4    Q.         Four or five times?
 5    A.         Yep.  Yes.
 6    Q.         So you were familiar with the layout?
 7    A.         Yes.  We -- we always had -- we always
 8    thought that there was a trapdoor underneath the dog
 9    kennel or in that area because every time we went
10    over by that area, Ms. Sheets would get agitated.
11    Q.         Has -- Have you ever found Mr. Pierce
12    in --
13    A.         Oh, absolutely.
14    Q.         -- 515 Hocking?
15    A.         Yes.
16    Q.         So the other four to five incidents?
17               MS. JARMUSZ:  I was just going to remind
18    you to let her finish asking a question before you
19    start.
20    A.         Yeah.  I just think it was --
21    Q.         Out of the four to five incidents --
22    A.         Probably half.
23    Q.         -- how many times did you find him in
24    there?
```

```
1    A.          Two.

2    Q.          Two.  Okay.  And what was your

3    understanding of the nature of the relationship?

4    A.          My opinion or my understanding?

5    Q.          Your knowledge.

6    A.          I believe that Mr. Pierce was supplying

7    narcotics to Mrs. Sheets.

8    Q.          But their relationship --

9    A.          Was boyfriend, girlfriend.  But in

10   my -- my experience over 30 some years, that's

11   usually how it is.

12   Q.          Have you ever arrested Mrs. Sheets?

13   A.          No.

14   Q.          Okay.  Let's get back to the physical

15   environment.  So you described the front room, which

16   you step into immediately.

17   A.          Yeah.  She invited us in, correct.

18   Q.          So you knock on the door.  You step into

19   that --

20   A.          It wasn't immediately.

21   Q.          Well, I'm saying once you had access, you

22   stepped into the front room?

23   A.          Correct.

24   Q.          That was the first place that you stepped
```

1    into?

2    A.          Yes.

3    Q.          And then what space is next in that

4    configuration?

5    A.          The kitchen or hallway/kitchen.

6    Q.          Okay.  And you said that's about four

7    feet?

8    A.          Four feet wide, by probably six feet, if

9    that.

10   Q.          Okay.  And then where is the bedroom

11   located in that configuration?

12   A.          Right next to the kitchen.

13   Q.          How big is that space?

14   A.          I would say it was probably about eight by

15   ten.

16   Q.          Eight by ten?

17   A.          Yeah.  If that, yeah.

18   Q.          Yeah.  And I think -- Do you know what

19   type of bedroom furniture was in there?

20   A.          There was a bed, a nightstand off the bed,

21   an open closet with the dog kennel and several bags

22   of clothing piled up about five feet tall.  And she

23   claimed that she put them in there because she had

24   bedbugs and that's why and she didn't want me

1    touching them.  But in -- My experience is when

2    somebody diverts and tries to put a hazard in front

3    of you to not look there, usually that's the place

4    you need to look.

5    Q.          So she consented?  She allowed you to come

6    in?

7    A.          Oh, absolutely.  She consented for the

8    search, yes.

9    Q.          Is there at any time she gave you

10   resistance and indicated that she wanted you to

11   leave?

12   A.          When I started getting back by the dog

13   kennel and clothes piled up.  She never said leave,

14   but she didn't want me searching that area, which a

15   person could very well hide under the clothes, the

16   bags and bags of clothes.

17              And then in my experience in the past is

18   they use dogs for intimidation to cut off areas of

19   searching because people don't want to get bit.  Some

20   deputies or officers won't put the effort, in fearing

21   that they're going to get bit, to the searching

22   places.

23   Q.          Okay.  So let's talk about where

24   Mrs. Sheets was standing and where you were standing.

```
 1    A.          Mrs. Sheets was kind of at the head of the
 2    bed.  I was at the middle to the end of the bed
 3    getting ready to turn --
 4    Q.          Was this head left or right?
 5    A.          Depends.  Are you looking at the bed, or
 6    are you in the bed looking out?
 7    Q.          So if you come into the door --
 8    A.          Okay.
 9    Q.          -- and there's a bed in the room, where is
10    the bed located in the room?
11    A.          It's in the middle of the room.  The head
12    of the bed is the first thing you see.  And the foot
13    of the bed is at the rear doorway area, and the
14    kennel is right next to the foot of the bed.
15    Q.          Okay.  And please continue with describing
16    where you were in relation to Mrs. Sheets.
17    A.          Right.  I was at the middle to end of the
18    bed.  She was at the head of the bed.  I went to turn
19    to get into the -- where the dog kennel was to start
20    to remove clothing -- or bags of clothes.
21               That's when I found -- felt a hand grab my
22    shoulder.  At that point, I reached around.  As an
23    escorting technique, put my hand underneath her -- it
24    would be her bicep area, my other hand on her wrist
```

1    as a basic escort technique, which I did in my career

2    probably tens if not hundreds of -- or tens of

3    hundreds of times.

4    Q.        Uh-huh.

5    A.        Or hundreds -- thousands of times.  It's a

6    basic -- the very basic cuffing technique that you

7    would do.

8    Q.        So your back was to her?

9    A.        It was -- it was not really my back.  It

10   was my right side, which is probably a fatal mistake

11   that could be --

12   Q.        And you were turning to look?

13   A.        I was turning to go into the closet where

14   she kept on getting agitated.  It was kind of like a

15   child when they play cold and hot.  When I was first

16   into the house, she was very calm, polite.  And the

17   more I got back to the dog kennel, I could tell it's

18   getting hot because she was getting upset.

19   Q.        But was it just the dog kennel?  Were

20   there other instances where she was upset when you

21   were searching through items or cupboards?

22   A.        I wasn't searching through cupboards.  Any

23   place a person could search -- or hide, that's where

24   I was searching.

1  Q.        So you didn't touch any electronics?  You

2  didn't lift up or look at anything?

3  A.        I had no reason to look under electronics

4  or anything like that.  I don't recall moving

5  anything like that.  Looking underneath the bed,

6  looking in the closet area, that's about it.  And

7  right when I looked in the closet area, that's when

8  she became really agitated.

9  Q.        And so you described as -- Please describe

10  for me again the motion that you engaged in when you

11  allegedly felt the hand on your shoulder?

12  A.        I was turning over like this (indicating)

13  to get into the closet area when I felt somebody come

14  up onto my shoulder, my right shoulder area where my

15  gun is located.  Put their hand on my shoulder and

16  started to pull me back.  And I believe her statement

17  was, "You're overstepping your search."  And at that

18  point, she was -- started to -- I started to take her

19  into custody.

20  Q.        But -- I interrupted you.  But previously

21  you were describing how you put -- how you -- I guess

22  I would say thread her wrist through.  Did you have

23  control of her wrist or underneath?

24  A.        It's like this (indicating), wrist,

1  underneath bicep area, come over like this.  Very

2  basic.

3  Q.          Okay.  And is that considered sufficient

4  control?

5  A.          Yeah.  That's an escort technique.  That's

6  a very -- I mean, that's -- that's -- that is police

7  academy 101.  That's the first thing they teach you

8  in the police academy.  Very, very basic.  At that

9  point, she had her injury.

10 Q.          Did you slam her on the bed?

11 A.          I did not slam her on the bed.  I placed

12 her on the bed.

13 Q.          Okay.  And why did you place her on the

14 bed if you had sufficient control?

15 A.          Because I was -- That was a soft area.  I

16 mean, it's better putting her on the bed than

17 putting -- because the area is very tight in there.

18 For me to step around her, I would have to have put

19 her on the bed to get around her.  There was probably

20 maybe a foot or so from the doorway leading to the

21 closet area.

22 Q.          Only a foot?

23 A.          About a foot, maybe two foot, if that.  It

24 is hard to get --

1    Q.        You said that was eight by ten?

2    A.        Yeah.  It had a --

3    Q.        Do -- Go ahead.

4    A.        Like I said, it had a lot of clutter.

5    Q.        What size bed?

6    A.        I couldn't say.  It looked like a queen

7    bed.  But I said -- I couldn't say for sure.  It

8    looked like a bigger bed.

9    Q.        And you said there's a nightstand on the

10   other side?

11   A.        Nightstand.  I think there was a dresser.

12   I can't recall.

13   Q.        How big was that space?

14   A.        Space?

15   Q.        On the other side of the bed where the

16   nightstand is located.

17   A.        It was bigger over on the other side.

18   Yeah.  Yeah.  It would have been ideal to cuff her

19   over there, but I don't have the luxury of picking

20   where I take somebody into custody.  That's up to

21   them.

22   Q.        Okay.  And then what happened after that?

23   A.        Well, after that, I felt that her arm was

24   dislocated.  It was just like that (indicating).  I

1   mean, it was -- her arm was like a noodle.  Very,

2   very soft.  So at that point, I called for a squad

3   immediately.

4   Q.          Was she still face down on the bed?

5   A.          No.  I let go of her at that point.  I

6   said -- I told my -- I told Deputy Reed I would call

7   for a squad.  And we were calling for a squad at that

8   point.  And she was let go.  At no time was I on top

9   of her.

10  Q.          So what do you -- Define on top of

11  someone.  If you pushed them down and you're holding

12  them down, are you talking full body weight?

13  A.          No.

14  Q.          Describe.

15  A.          Well, I'm on the floor.  I'm never -- I

16  never leave the floor.  I push her down like that

17  (indicating) to gain control of her arm to cuff it.

18  At that point, I felt her arm give.  I left her on

19  the bed, called for a squad, and they came and

20  treated her.

21  Q.          Okay.  Did you hear it give?

22  A.          Oh, yeah.  It gave, yeah.  I didn't hear

23  it, but I felt it.  So at that point -- All the years

24  I've been doing this and never had somebody's arm be

1   that soft to -- very, very less force.

2   Q.          What were you thinking at that time?  How

3   did you feel?

4               MS. JARMUSZ:  Hold on.  Are you done with

5   your answer?  Because I think we're starting to cut

6   him off a little before moving on to the next

7   question.  Do you have anything more?

8   A.          I can't remember.  What was the question

9   again?

10  Q.          I said:  What were you thinking at that

11  time?  How did you feel?

12  A.          What was I thinking?  I was like, I can't

13  believe this just happened.  That's what I was

14  thinking and that she needs medical attention.

15  That's what I was thinking.

16  Q.          Did you have any particular feeling?

17  A.          Feeling?

18  Q.          If not, that's fine.

19  A.          I'm trying to -- feeling for her or

20  feeling -- Well, yeah, I -- It was unfortunate that

21  she got hurt, yeah.  That's not what I wanted to have

22  done.  I'm here to help people, not hurt people.

23  Q.          Okay.  And describe what happened after

24  that.

Deputy Marty Norris
5/11/2022

```
1    A.          Called for a squad.  Called for a
2    supervisor.  Supervisor came on the scene.  A squad
3    came, removed Mrs. Sheets.  We took, I think,
4    Mr. Echard to jail.
5              And there was an interview of Mr. Echard.
6    I can't recall when that was exactly.  But Mr. Echard
7    did confirm that Mr. Pierce was at the location that
8    day.
9    Q.          Okay.  But you said -- You've never had
10   any encounters with Mrs. Sheets -- or Ms. Sheets?
11   A.          Oh, I've had encounters.  I've had several
12   pleasant encounters.  I mean, I've searched her
13   house, like I said, three or four times; and it was
14   always a pleasant encounter.
15   Q.          So you didn't have any preconceived
16   notions before you, you know, knocked on the door to
17   exercise a warrant?
18   A.          I'm not sure if I understand your
19   question.
20   Q.          I'm just asking you about your frame of
21   mind.  You described to me that day and that you saw
22   them sitting in the childcare parking lot.  And you
23   saw, you know, others running, that turned out not to
24   be Boyd.  At that point, did you have any
```

1    preconceived notions, any -- Was there any thought

2    that, you know, there was something going on there?

3                    MS. JARMUSZ:  I'll object to form.

4                    But you can answer.

5    A.            Absolutely.  It's a drug house.  Of

6    course.

7    Q.            So have you ever taken any courses in

8    anger management, any training?

9    A.            Training?  Anger management?  Not

10    that -- not that I recall.

11    Q.            Okay.  I'm going to need a break here

12    soon.

13                    (Recess taken.)

14                    MS. KING:  Back on the record.

15    BY MS. KING:

16    Q.            So I just have a few follow-up questions

17    for you.

18    A.            Okay.

19    Q.            Do you remember the medical incident that

20    Boyd Pierce had?

21    A.            Yeah.  We went to arrest him.  He -- I

22    think Mrs. Sheets said that he had something wrong

23    with his abdomen.  At that point, we called for a

24    squad.  They transported him.

1    Q.        Okay.

2    A.        But he was in the bed at the time.  And

3    that was -- I'm not sure.  It was sometime prior to

4    the incident that we're talking about.

5    Q.        Okay.  You said he was in the bed at the

6    time?

7    A.        Yeah.  He was in the bed.  He was in the

8    back bedroom, I don't know, middle bedroom.

9    Q.        Was he too ill to get up?

10   A.        I don't know.  I can't really testify to

11   his medical condition.

12   Q.        Yeah.  I was just wondering, you know,

13   what prompted the ambulance.

14   A.        Well, if anybody asks for medical

15   assistance, we've got to provide them medical

16   assistance.  Usually we'll have them checked out, and

17   then medics will tell us he's okay to be incarcerated

18   or we have to transport him.

19   Q.        The other four to five times where you've

20   gone there, has he claimed a medical -- or you didn't

21   find him?

22   A.        I don't believe we found him there at that

23   time.

24   Q.        Okay.

1    A.        But then at times, we would go to the

2    neighbors in the area, and they said, "Well, when you

3    left, he went out the back door."  So --

4    Q.        Okay.  You know, that's prompted me to ask

5    about this trapdoor again.

6    A.        I'm assuming it was a trapdoor due to the

7    neighbors testifying -- or not testifying -- but

8    telling me, "Hey, when you show up and search the

9    house," he leaves after we leave, shortly after.

10   Q.        So you just assumed there was a trapdoor?

11   A.        Assumed there was some hiding point in

12   that back bedroom area where the dog is due to my

13   past experience locating fugitives.  I've located

14   fugitives in trapdoors.  I've located fugitives under

15   clothing in that area.

16            Like I said, there was a very --

17   concentration of clothing bagged up where somebody

18   could be hiding.  And every time I'd go to that

19   position, Mrs. Sheets would get agitated.  So I'm

20   assuming there was something worth while looking at

21   in that location.

22   Q.        Okay.  So I also wanted to follow up on

23   your description of the game of hot and cold.

24   A.        Yes.

1  Q.          Can you describe more about that?

2  A.          Absolutely.  When your child -- I don't

3  know if you ever played it.  You would hide an

4  object; and then if you were getting closer to that

5  object, the person who hid that object would say

6  "hot"; or if you were getting away from that object,

7  they would say "cold."

8  Q.          So what in her specific behavior?

9  A.          Her specific behavior was every time I got

10 back by where her dog was and the clothes, she would

11 get agitated.  And then she would, "You're

12 overstepping looking there."

13         I can't remember how many times it was.

14 But there was several times that she would -- I could

15 see her getting agitated.  I believe I told her to

16 step away or that she would get closer to me I

17 believe.

18 Q.          Is it typical that -- that under those

19 circumstances, you would be in a confined -- or a

20 smaller space with someone?

21 A.          I'm in small spaces all the time.  Usually

22 it's trailers even smaller than that.  Over my

23 experience, I believe one year, I had 458 fugitive

24 apprehensions.  So I'm sure I've been in more

1    confined areas than that.

2    Q.          Do you ever ask someone to stand in a

3    specific -- like a --

4    A.          Absolutely.

5    Q.          Tell me about that.

6    A.          I would -- I -- Distance is always your

7    friend when you're in law enforcement because the

8    farther you're away from somebody the less likely

9    they are to harm you or get your gun or get anything

10   that could harm you.  So any time that somebody walks

11   up on you or -- in that incident, you want them to

12   back up.  So --

13   Q.          I want to go back to the physical space

14   again.

15   A.          Sure.

16   Q.          When you walk in, for your safety, what do

17   you typically do?

18   A.          Usually you look around your environments.

19   You pick out the threats that -- anything that could

20   harm you.  Then the second thing you do is pick out

21   the unknowns.  The unknowns usually are -- could be

22   just as harmful as the things that you know is a

23   threat.

24   Q.          So that was a good description.  So walk

1   me through what you saw when you walked in that front

2   room.

3   A.          When I walked in the front room, there was

4   an immediate threat, that was Mr. Echard.  Mr. Echard

5   was taken into custody after knowing about a warrant,

6   which I believe I -- and Mrs. Sheets said there was

7   no one else in the house.  So at that point, I was

8   already deceived once; so I don't know why -- that

9   would be a big flag, that this person is

10  untrustworthy of believing anything they have to say

11  to you.

12  Q.          Yeah.  Can you take me back, though, to

13  the physical space.  Where was -- I think it was

14  Mr. Echard?

15  A.          Mr. Echard was in the living room.

16  Q.          Where?

17  A.          Yes.  Probably about five to six feet off

18  the front door.

19  Q.          To the left or --

20  A.          To the left, correct.  The door is on the

21  right.  The left is open space somewhat.  There was

22  some clutter in there, furniture, I think like a

23  bicycle or something.  There was some other clutter

24  in there.  Like I said, it was a real tight space.

1    Q.          How much furniture was in that space?

2    A.          I can't really recall, but I just remember

3    it was a cluttered living room.

4    Q.          Was it cluttered in the sense of it

5    appeared that she was unkempt or moving stuff around?

6    A.          Mainly moving stuff around.  Like I said,

7    I think there was a bicycle in there, but there was

8    parts of -- parts in there.  I'm not sure what kind

9    of parts they were, if they were vehicle parts

10   or -- or bicycle parts.  But there was something in

11   the living room.

12   Q.          Okay.  And you mentioned that she said

13   that she had bedbugs.

14   A.          Yes.

15   Q.          How did that conversation go?

16   A.          Well, when I started to reach for the bags

17   to remove them, she said, "You don't want to touch

18   them.  They have bed bugs on them."  And that's when

19   she started getting agitated.

20   Q.          Did you have any other indication that

21   there were bedbugs in there, like sprays or --

22   A.          No.  Which aroused my suspicions up even

23   more.  Like I said, when you're going to hunt for

24   somebody, the people that are hiding -- allegedly

1    hiding these fugitives out, they want to make you

2    believe that there's some hazard that you don't want

3    to -- you don't want to discover in there, you don't

4    want to touch that, you want to kind of stay away

5    from it.  So usually that's a good indicator that

6    they're trying to hide something.

7    Q.          Okay.  Did she have anything in her hands

8    when you were in the bedroom?

9    A.          I don't believe so because my attention

10   was to the dog, dog kennel, clothing that was all up

11   there.

12   Q.          Okay.  Did she lead you into the bedroom?

13   A.          I don't -- I don't recall.  I believe I

14   went back there because that was probably the most

15   likely place for Boyd to be hiding at, is in the

16   bedroom because we were in there before, and the

17   closet, like I said, was always -- drew our

18   suspicions that something was up with the dog, the

19   clothes.  There was always a possibility that

20   somebody was hiding there.

21   Q.          So is it -- Is my understanding true that

22   when you went in the bedroom, you went in there

23   first, and you were by yourself?

24   A.          I can't recall.  I can't recall if I was

```
1   first or Deputy Reed was first or I let Deputy Reed
2   in the back door because I believe he was covering
3   the back door at some point.  But when the incident
4   occurred, the physical incident, Deputy Reed was on
5   the other side of the bed by the back door.
6   Q.          Okay.  And by "the other side of the bed,"
7   you mean by the nightstand side of the bed?
8   A.          Yes.  But at the foot of the bed.  By the
9   foot of the bed and the back door.
10  Q.          Okay.  And then prior -- Because of the
11  limited space, prior to her touching you, was
12  there -- I mean, how did she get by you if you went
13  in the bedroom first?
14  A.          How did she get -- She wasn't by me.  I
15  was between the foot of the bed and the middle of the
16  bed.  She came up.  The kitchen is leading up to
17  here, and the head of the bed was here; and that's
18  where she was.
19  Q.          Okay.  And that's even -- So the closet in
20  proximity to Mrs. Sheets was -- was that behind her
21  or in front of her?
22  A.          Right beside her.
23  Q.          And you were -- you said in --
24  A.          Between the closet and the head of the
```

Deputy Marty Nozzris
5/11/2022

```
 1    bed.  Then Mrs. Sheets was there.
 2    Q.         And to confirm what happened when she
 3    allegedly touched your shoulder, it was your right
 4    shoulder?
 5    A.         Yes.
 6    Q.         And what arm did you grab of hers?
 7    A.         It would be her left -- left wrist and
 8    underneath her left bicep area.
 9    Q.         And underneath her left bicep, you're
10    demonstrating that that was your right hand?
11    A.         Yes.
12    Q.         That was under her left bicep?
13    A.         Uh-huh.
14    Q.         Okay.  And so it was your left hand that
15    was on her wrist?
16    A.         Yes.  Correct.
17    Q.         Okay.
18    A.         Wrist, correct.
19    Q.         Did anyone else have physical contact with
20    her?
21    A.         No.
22               MS. KING:  I think that's it for me.  Do
23    you want to confer?  Do you have any follow-up
24    questions?
```

 1              MR. SREMACK:  No.

 2              MS. KING:  That's it.

 3              MS. JARMUSZ:  We'll read.

 4                 (Signature not waived.)

 5                      - - -

 6              And, thereupon, the deposition was

 7    concluded at approximately 12:39 p.m.

 8                      - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Deputy Marty Norris
5/11/2022

1   State of Ohio      :
                            SS:
2   County of Franklin :

3          I, DEPUTY MARTY NORRIS, do hereby certify

4   that I have read the foregoing transcript of my

5   deposition given on May 11, 2022; that together with

6   the correction page attached hereto noting changes in

7   form or substance, if any, it is true and correct.

8

9          _____

10                    DEPUTY MARTY NORRIS

11         I do hereby certify that the foregoing

12  transcript of the deposition of DEPUTY MARTY NORRIS

13  was submitted to the witness for reading and signing;

14  that after he had stated to the undersigned Notary

15  Public that he had read and examined his deposition,

16  he signed the same in my presence on the

17  _____day of _____, _____.

18                       _____

19                       _____

20                       Notary Public

21  My commission expires _____

22                       - - -

23

24

```
 1                    CERTIFICATE
     State of Ohio       :
 2                        SS:
     County of Franklin:
 3                I, Marilyn K. Martin, Notary Public in and

 4     for the State of Ohio, duly commissioned and

 5     qualified, certify that the within named witness was

 6     by me duly sworn to testify to the whole truth in the

 7     cause aforesaid; that the testimony was taken down by

 8     me in stenotypy in the presence of said witness,

 9     afterwards transcribed upon a computer; that the

10     foregoing is a true and correct transcript of the

11     testimony given by said witness taken at the time and

12     place in the foregoing caption specified.

13                I certify that I am not a relative,

14     employee, or attorney of any of the parties hereto,

15     or of any attorney or counsel employed by the

16     parties, or financially interested in the action.

17                IN WITNESS WHEREOF, I have set my hand and

18     affixed my seal of office at Columbus, Ohio, on this

19     25th day of May, 2022.

20     _____

21

22     MARILYN K. MARTIN
       Notary Public in and for the State of Ohio
23     and Registered Professional Reporter.

24     My Commission Expires October 16, 2026.
```

WORD INDEX

< 1 >
101    27:7
11    1:12
  3:1    43:5
11:31    1:12
  3:2
12:39    42:7
125    1:23
16    10:23
  44:24
16-hour    8:15
1971    5:5
1990    6:20

< 2 >
2:21-cv-01810
  1:6
200    2:12
2007    10:20
2019    13:15
2022    1:12
  3:1    43:5
  44:19
2026    44:24
220    6:6, 7
221-1216    2:13
225    6:6, 7
23    5:5
24    8:5
25th    44:19
2745    2:3

< 3 >
30    5:9, 10
  8:1    11:5
  21:10
3040    1:23
32    5:14
326-0177    1:24
330    2:4, 8
345    1:13

< 4 >
43054    2:12
43130    1:13
43221    1:23
44312    2:3
458    35:23

< 5 >
515    18:23
  20:14

< 6 >

614    1:24
  2:13
644-0061    2:4

< 7 >
7775    2:12

< 9 >
9/17    13:13
90s    8:16
94    7:10
940-9914    2:8
98    7:10
99.9    17:11

< A >
a.m    1:12
  3:2
abdomen    32:23
Absolutely
  14:2    18:16
  20:13    23:7
  32:5    35:2
  36:4
academy    27:7,
  8
access    21:21
accident
  11:3, 9
action    44:16
active    15:4
addicted
  16:21
additional
  5:14
adds    8:1
advanced    7:22
affixed    44:18
aforesaid
  44:7
aggravated
  18:8
agitated
  20:10    25:14
  26:8    34:19
  35:11, 15
  38:19
ago    10:19
ahead    28:3
ajarmusz@fishel
downey.com
  2:14
Akron    2:3, 7
al    1:7
Albany    2:12

Albrecht    2:11
Alex    1:7
allegedly
  26:11    38:24
  41:3
allowed    23:5
ambulance
  33:13
ANDERSON    1:13
ANGELICA    2:11
anger    32:8, 9
answer    8:19,
  24    9:10
  30:5    32:4
answers    9:8
anybody    33:14
Apartment
  18:23
APPEARANCES
  2:1
appeared    38:5
apprehensions
  35:24
approach    8:20
approximate
  6:5
approximately
  42:7
area    15:9
  19:16    20:9,
  10    23:14
  24:13, 24
  26:6, 7, 13,
  14    27:1, 15,
  17, 21    34:2,
  12, 15    41:8
areas    23:18
  36:1
arguing    15:16
Arlington    2:3
arm    28:23
  29:1, 17, 18,
  24    41:6
aroused    38:22
arrest    32:21
arrested
  21:12
arts    6:8
asking    20:18
  31:20
asks    33:14
assessment
  17:19
assessments
  17:20
assist    13:22

assistance
  33:15, 16
assisted
  13:22
associated
  13:2
assumed
  34:10, 11
assuming
  34:6, 20
attached    43:6
attention
  30:14    39:9
Attorney    2:2,
  4, 8, 11
  4:10    44:14,
  15
August    5:5
available
  12:16
Avenue    1:13

< B >
back    8:6
  14:7    15:8,
  20, 22, 23
  16:18    18:20
  21:14    23:12
  25:8, 9, 17
  26:16    32:14
  33:8    34:3,
  12    35:10
  36:12, 13
  37:12    39:14
  40:2, 3, 5, 9
backup    14:15,
  18    17:23
badge    8:21
  9:11
bagged    34:17
bags    15:11
  22:21    23:16
  24:20    38:16
based    17:7
basic    7:22
  25:1, 6
  27:2, 8
basically    9:5
bathroom
  19:23
baton    12:15
bed    22:20
  24:2, 5, 6, 9,
  10, 12, 13, 14,
  18    26:5
  27:10, 11, 12,

14, 16, 19
  28:5, 7, 8,
  15    29:4, 19
  33:2, 5, 7
  38:18    40:5,
  6, 7, 8, 9, 15,
  16, 17    41:1
bedbugs
  22:24    38:13,
  21
bedroom    14:7
  15:8, 9
  19:18    22:10,
  19    33:8
  34:12    39:8,
  12, 16, 22
  40:13
beds    15:14
behalf    2:8,
  15
behavior
  35:8, 9
believe    10:9,
  20, 22    14:16
  18:19    21:6
  26:16    30:13
  33:22    35:15,
  17, 23    37:6
  39:2, 9, 13
  40:2
believing
  37:10
better    27:16
bicep    24:24
  27:1    41:8,
  9, 12
bicycle
  37:23    38:7,
  10
big    6:7
  22:13    28:13
  37:9
bigger    28:8,
  17
BILLI    2:4
  4:10
birthday    5:4
bit    15:23
  23:19, 21
body    4:21
  29:12
book    18:19
bottom    13:5
Boyd    14:20
  16:23    17:1

31:24    32:20
39:15
Boyd's    16:24
boyfriend
21:9
break    32:11
broke    13:20
brother    5:20
bugs    38:18

< C >
call    29:6
called    3:9
8:14    9:3
14:7, 15
29:2, 19
31:1    32:23
calling    29:7
calm    25:16
camera    4:21
captain    5:24
caption    44:12
capture    15:13
car    11:9
career    25:1
Case    1:6
cause    44:7
causes    12:5
CERTIFICATE
44:1
certified    4:5
certify    43:3,
11    44:5, 13
changes    43:6
changing    16:7
character
3:13
checked    33:16
Cheryl    1:4
child    25:15
35:2
childcare
31:22
children
10:13
choke    11:20
circumstances
35:19
citizen    11:11
claimed
22:23    33:20
classes    6:23
close    15:15
closer    35:4,
16

closet    15:10
22:21    25:13
26:6, 7, 13
27:21    39:17
40:19, 24
clothes
15:11, 13
23:13, 15, 16
24:20    35:10
39:19
clothing
22:22    24:20
34:15, 17
39:10
clutter    28:4
37:22, 23
cluttered
38:3, 4
cold    25:15
34:23    35:7
college    7:3,
4, 17
Columbus
1:23    44:18
come    9:8, 12
13:7    17:24
19:3    23:5
24:7    26:13
27:1
comes    12:11
coming    13:19
commission
43:19    44:24
commissioned
44:4
community
18:18
complaints
11:11
comport    9:15
computer    44:9
concentration
34:17
concluded
42:7
condition
33:11
confer    41:23
configuration
22:4, 11
confined
35:19    36:1
confirm    15:5
31:7    41:2
confront    8:18

Confronted
14:15
consented
23:5, 7
considered
27:3
constant    8:9
contact    41:19
continue
24:15
continuous
8:4
control    12:5
26:23    27:4,
14    29:17
conversation
38:15
COPELAND    2:4
4:10
Correct    4:19
21:17, 23
37:20    41:16,
18    43:7
44:10
correction
43:6
counsel    3:6
44:15
count    7:6
County    5:7,
8, 9, 13
43:2    44:2
course    8:15,
16    16:13
32:6
courses    32:7
COURT    1:1
covering    40:2
create    9:14
credit    7:6
criminal
17:21
CROSS-
EXAMINATION
4:6
cuff    28:18
29:17
cuffing    25:6
cupboards
25:21, 22
cussing    11:2,
7
custody    14:6
15:5    26:19
28:20    37:5

cut    23:18
30:5

< D >
DANIEL    2:8
daughter    5:20
day    13:16,
17, 18, 19
16:19, 24
31:8, 21
43:17    44:19
daycare    13:21
days    17:8
ddowney@fisheld
owney.com
2:13
deadly    12:15,
18
deaths    18:17
deceived    37:8
decided    16:16
deescalation
8:11, 14
Defendant    3:8
Defendants
1:8    2:15
defendant's
13:21
define    11:18
29:10
degree    7:1,
2, 12, 18
demonstrating
41:10
Depends    24:5
DEPOSITION
1:10    3:8
42:6    43:5,
12, 15
deputies
23:20
DEPUTY    1:10
3:8    4:3, 10
15:6, 7
29:6    40:1,
4    43:3, 9, 12
describe
9:19    11:23
12:2    13:9
26:9    29:14
30:23    35:1
described
21:15    26:9
31:21
describing
24:15    26:21

description
34:23    36:24
determine
9:24
discipline
10:24
disciplined
11:2
discover    39:3
dislocated
28:24
Distance    36:6
DISTRICT    1:1
diverts    23:2
DIVISION    1:2
divorce    10:20
dog    14:22,
23, 24    15:10,
11, 19    20:8
22:21    23:12
24:19    25:17,
19    34:12
35:10    39:10,
18
dogs    23:18
doing    7:13
9:1, 7    29:24
door    14:19,
21    21:18
24:7    31:16
34:3    37:18,
20    40:2, 3,
5, 9
doorway
24:13    27:20
DOWNEY    2:8,
11
dozen    12:23
13:11
dresser    28:11
drew    5:16,
18    39:17
Drive    1:23
driver's    8:23
drug    18:15
32:5
drugs    16:21
18:9
due    34:6, 12
duly    4:4
44:4, 6

< E >
earlier    17:8
EASTERN    1:2

Echard   15:3, 4   31:4, 5, 6   37:4, 14, 15
education   4:24   6:19   7:19   8:4
effort   23:20
eight   19:10, 14   22:14, 16   28:1
electronics   26:1, 3
employed   44:15
employee   44:14
employment   5:1
encounter   19:14   31:14
encounters   31:10, 11, 12
endurance   6:16
enforcement   5:15, 16, 18   6:22, 23   36:7
engaged   26:10
environment   18:21   21:15
environments   36:18
escort   25:1   27:5
escorting   24:23
et   1:7
events   13:13
Everybody   6:1   9:21   11:12, 13
exactly   31:6
examined   43:15
exercise   6:10, 14   31:17
experience   5:15   21:10   23:1, 17   34:13   35:23
expires   43:19   44:24
explain   17:13

explained   16:22, 23

< F >
face   29:4
factor   9:23   10:1
Fairfield   5:6, 8, 9   7:14
familiar   14:1   20:6
family   5:19, 23
farther   36:8
fatal   25:10
father   5:19, 24
fearing   23:20
feel   10:3   30:3, 11
feeling   30:16, 17, 19, 20
feet   19:6, 8, 11, 17   22:7, 8, 22   37:17
felony   17:18   18:9, 13, 14
felt   15:19   24:21   26:11, 13   28:23   29:18, 23
field   10:9
Fifty   5:3, 4
file   7:24
financially   44:16
find   20:23   33:21
fine   30:18
Finish   14:13   20:18
fire   5:24
firefighter   6:1, 2
Firm   2:2, 7
first   4:4   9:9   12:1   15:2   16:2, 3   21:24   24:12   25:15   27:7   39:23   40:1, 13
Fishel   2:11

five   14:4   18:9   20:4, 16, 21   22:22   33:19   37:17
flag   37:9
floor   29:15, 16
FN303   8:7
follow   34:22
follows   4:5
follow-up   32:16   41:23
foot   24:12, 14   27:20, 22, 23   40:8, 9, 15
force   11:15, 18   12:6, 10, 15, 18   30:1
foregoing   43:4, 11   44:10, 12
forget   8:2
form   32:3   43:7
found   20:11   24:21   33:22
four   7:11   14:4, 10, 11   19:17   20:4, 16, 21   22:6, 8   31:13   33:19
frame   17:4, 6   31:20
Franklin   43:2   44:2
friend   36:7
front   19:12   21:15, 22   23:2   37:1, 3, 18   40:21
fugitive   35:23
fugitives   15:13   34:13, 14   39:1
full   7:12   19:18   29:12
furniture   22:19   37:22   38:1

< G >
gain   29:17
game   34:23

getting   14:5   23:12   24:3   25:14, 18   35:4, 6, 15   38:19
girlfriend   21:9
give   8:21   9:11   29:18, 21
given   4:12   43:5   44:11
giving   9:5
go   11:23   16:18   18:20   25:13   28:3   29:5, 8   34:1, 18   36:13   38:15
goes   12:15   19:18
going   4:11, 15, 23   5:2   6:24   7:6   10:3   13:17   15:23   20:17   23:21   32:2, 11   38:23
Good   4:9   15:12   36:24   39:5
grab   12:3   24:21   41:6
graduated   6:20
grandfather   5:19
ground   11:20
guess   7:10   26:21
gun   26:15   36:9
guy   6:7

< H >
half   12:23   20:22

hallway/kitchen   19:16   22:5
hand   10:5, 9   15:20   24:21, 23, 24   26:11, 15   41:10, 14   44:17

handcuffs   12:8
handful   13:8, 9
hands   10:2   12:1, 2, 3, 6, 7, 12, 13   39:7
happened   16:16   28:22   30:13, 23   41:2
hard   27:24
harm   36:9, 10, 20
harmful   36:22
hazard   23:2   39:2
head   24:1, 4, 11, 18   40:17, 24
hear   29:21, 22
heard   4:12
help   9:20   30:22
hereinafter   4:4
hereto   43:6   44:14
Hey   34:8
Hi   4:8
hid   35:5
hide   15:12   23:15   25:23   35:3   39:6
hiding   34:11, 18   38:24   39:1, 15, 20
hierarchy   11:23   12:10
High   6:21   18:13, 14, 19
history   5:1   10:24   17:21
Hocking   18:23   20:14
Hold   30:4
holding   29:11
hot   25:15, 18   34:23   35:6
hours   8:5
house   13:23   16:6   17:2   25:16   31:13

32:5  34:9
37:7
**hundreds**
25:2, 3, 5
**hunt**  38:23
**hurt**  30:21,
22

**< I >**
**ideal**  28:18
**identified**
16:13
**ill**  33:9
**imagine**  11:12
**immediate**
37:4
**immediately**
21:16, 20
29:3
**impact**  11:21
**important**
9:12
**incarcerated**
33:17
**incentive**
7:17
**incident**
12:6  16:19
17:20  32:19
33:4  36:11
40:3, 4
**incidents**
11:14  12:17
20:16, 21
**indicated**
23:10
**indicating**
15:21  26:12,
24  28:24
29:17
**indication**
38:20
**indicator**
39:5
**individual**
16:20
**individuals**
16:1, 13
**info@billicopel**
**and.com**  2:8
**information**
8:23  17:7
**informing**  9:6
**injury**  12:5
27:9

**inside**  17:9,
10, 12
**instances**
25:20
**instructions**
4:12
**interested**
44:16
**intermediate**
11:21  12:14,
16
**interrupted**
26:20
**interview**
31:5
**intimidation**
23:18
**introduce**
8:21
**inundated**
18:17
**invited**  21:17
**issue**  14:6
**items**  25:21

**< J >**
**jail**  31:4
**JARMUSZ**  2:11
20:17  30:4
32:3  42:3
**Judo**  8:15
9:3
**jumps**  12:13

**< K >**
**Keep**  6:17
**kennel**  15:10,
12  20:9
22:21  23:13
24:14, 19
25:17, 19
39:10
**kept**  25:14
**kind**  8:1
9:6  24:1
25:14  38:8
39:4
**KING**  2:4, 7
4:7, 11
32:14, 15
41:22  42:2
**kitchen**
19:24  22:5,
12  40:16
**knew**  14:17,

22  17:21, 22
**knock**  21:18
**Knocked**
14:18  31:16
**know**  8:19
9:4  13:16
22:18  31:16,
23  32:2
33:8, 10, 12
34:4  35:3
36:22  37:8
**knowing**  37:5
**knowledge**
21:5

**< L >**
**Lancaster**
1:13  6:21
**Lape**  1:7
**launcher**  8:7
**Law**  2:2, 4,
7, 8, 11
5:14, 16, 18
6:22, 23
36:7
**layout**  20:6
**lead**  39:12
**leading**
27:20  40:16
**learn**  8:17
**leave**  16:9,
11  23:11, 13
29:16  34:9
**leaves**  34:9
**left**  24:4
29:18  34:3
37:19, 20, 21
41:7, 8, 9,
12, 14
**lethal**  8:8
**level**  12:1,
12  13:5
**license**  8:23
**lift**  26:2
**limited**  40:11
**Lincoln**  1:13
**little**  15:23
30:6
**live**  14:17
**living**  15:2,
3  19:4
37:15  38:3,
11
**LLC**  2:2
**LLP**  2:11

**located**
22:11  24:10
26:15  28:16
34:13, 14
**locating**
34:13
**location**
31:7  34:21
**long**  5:6
10:19  12:24
**look**  15:18
23:3, 4
25:12  26:2,
3  36:18
**looked**  13:19
26:7  28:6, 8
**looking**
16:22  24:5,
6  26:5, 6
34:20  35:12
**lot**  13:20
28:4  31:22
**loves**  6:1
**low**  18:12
**luxury**  28:19

**< M >**
**ma'am**  4:14
5:11
**maintenance**
16:8
**management**
32:8, 9
**MARILYN**  1:13
44:3, 19
**married**
10:11, 15, 22
**martial**  6:8
**MARTIN**  1:13
44:3, 19
**MARTY**  1:10
3:8  4:3, 17,
18  43:3, 9,
12
**M-A-R-T-Y**
4:17
**matter**  18:6
**mean**  27:6,
16  29:1
31:12  40:7,
12
**medical**  14:6
30:14  32:19
33:11, 14, 15,
20
**medics**  33:17

**mentioned**
38:12
**meth**  17:1
**middle**  19:23
24:2, 11, 17
33:8  40:15
**mind**  17:4, 6
31:21
**minor**  11:3
**minutes**  14:24
**mistake**  25:10
**month**  8:10
**MORNING**  3:1
**mother**  5:20
**motion**  26:10
**moving**  26:4
30:6  38:5, 6

**< N >**
**name**  4:16,
18  9:4
14:19
**named**  44:5
**narcotics**
21:7
**nature**  21:3
**need**  4:13
23:4  32:11
**needs**  30:14
**negatively**
9:8, 13
**neighbors**
34:2, 7
**nephew**  5:20
**never**  7:11,
16  23:13
29:15, 16, 24
31:9
**New**  2:12
**nice**  9:21
13:18
**nightstand**
22:20  28:9,
11, 16  40:7
**nonlethal**  8:7
**noodle**  29:1
**NORRIS**  1:10
3:8  4:3, 10
43:3, 9, 12
**N-O-R-R-I-S**
4:17
**Notary**  3:11,
14  43:14, 19
44:3, 22
**notes**  3:11

noticed
  13:22  15:9
noting   43:6
notions
  31:16  32:1
number  8:21
  9:11
numerous   7:23

< O >
object  12:4
  32:3  35:4,
  5, 6
OC  11:17, 22
occurred  40:4
October  44:24
offhand  11:16
Office  5:7
  44:18
officer  10:23
Officers
  7:21  23:20
official  3:13
Oh  20:13
  23:7  29:22
  31:11
OHIO  1:1, 13,
  23  2:3, 7,
  12  6:21
  7:21  43:1
  44:1, 4, 18,
  22
oil  16:7
old  5:2
Once  10:18
  17:24  21:21
  37:8
open  19:19,
  20  22:21
  37:21
opened  15:10
opinion  21:4
oriented  19:2
outside
  14:16  16:6
overdose
  18:17
overdoses
  18:16, 17
overstepping
  26:17  35:12

< P >
p.m  42:7
page  43:6

Pardon  5:17
parked  16:6
parking
  13:20  31:22
Parkway  2:12
particular
  30:16
parties  3:7
  44:14, 16
parts  38:8,
  9, 10
Peace  7:21
people  14:15
  17:24  18:2,
  4  23:19
  30:22  38:24
Pepper  12:11,
  13
percent  17:11
Perry  5:13
  7:13
person  10:8
  16:20  23:15
  25:23  35:5
  37:9
philosophy
  9:16, 17, 20
physical
  18:20  21:14
  36:13  37:13
  40:4  41:19
pick  36:19,
  20
picking  28:19
Pierce  14:5,
  20  15:17
  16:3, 23
  17:1, 21
  20:11  21:6
  31:7  32:20
Pierce's
  13:23  17:20
piled  15:11
  22:22  23:13
place  11:20
  15:12  21:24
  23:3  25:23
  27:13  39:15
  44:12
placed  27:11
places  23:22
Plaintiff
  1:5  2:8
  3:9
play  25:15
played  35:3

pleasant
  31:12, 14
please  11:13
  24:15  26:9
point  14:18
  15:18  24:22
  26:18  27:9
  29:2, 5, 8,
  18, 23  31:24
  32:23  34:11
  37:7  40:3
police  10:23
  27:6, 8
policing  9:16
polite  25:16
position
  34:19
possession
  18:8, 15
possibility
  39:19
preconceived
  31:15  32:1
presence
  3:12  43:16
  44:8
Pretty  6:7
  17:22  18:13,
  14
previously
  26:20
prior  16:19,
  24  33:3
  40:10, 11
priority
  17:14  18:10,
  11, 12, 19
probably
  14:4  19:4,
  10, 17  20:22
  22:8, 14
  25:2, 10
  27:19  37:17
  39:14
problem  16:8
problems  9:14
PROFESSIONAL
  1:13  44:22
projectiles
  8:8
prompted
  33:13  34:4
proof  3:13
proper  4:18
provide  8:22
  33:15

proximity
  40:20
Public  43:15,
  19  44:3, 22
pull  26:16
pulling  15:20
push  29:16
pushed  29:11
put  12:6, 7,
  12  14:22, 24
  22:23  23:2,
  20  24:23
  26:15, 21
  27:18
puts  10:2, 8
putting
  27:16, 17

< Q >
quad  14:7
qualifications
  3:14
qualified
  44:5
queen  28:6
question
  20:18  30:7,
  8  31:19
questions
  4:11, 24
  8:19, 24
  9:10  32:16
  41:24

< R >
ran  16:5
Randolph
  16:21
reach  38:16
reached  24:22
read  42:3
  43:4, 15
reading  43:13
ready  14:5
  24:3
real  37:24
really  7:24
  25:9  26:8
  33:10  38:2
rear  24:13
reason  8:22
  14:19  26:3
REBECCA  2:2
rebecca@sremack
law.com  2:4

recall  11:4,
  16  12:24
  13:12  15:7
  26:4  28:12
  31:6  32:10
  38:2  39:13,
  24
Recess  32:13
recollection
  16:10
record  4:16
  32:14
reduced  3:10
Reed  15:7
  29:6  40:1, 4
REGISTERED
  1:13  44:22
Regularly
  6:12
relation
  24:16
relationship
  21:3, 8
relative
  44:13
remember
  30:8  32:19
  35:13  38:2
remind  20:17
remove  24:20
  38:17
removed  31:3
repeat  4:13
REPORTER
  1:13  44:22
REPORTING
  1:13
reports  13:1
residence
  13:21  14:8,
  15  15:2
resistance
  23:10
respective
  3:7
Riepenhoff
  2:11
right  4:20
  6:17  8:6
  9:11  11:16
  22:12  24:4,
  14, 17  25:10
  26:7, 14
  37:21  40:22
  41:3, 10

risk   17:19, 20
Riverside   1:23
Road   2:3
room   15:2, 3   19:4, 12   21:15, 22   24:9, 10, 11   37:2, 3, 15   38:3, 11
roughly   7:9
RPR   1:13
run   16:4
running   13:23   14:14   16:1   31:23

< S >
safety   9:22, 24   36:16
Sat   15:5
saw   16:1   31:21, 23   37:1
saying   21:21
says   4:5
scene   18:1, 2, 4   31:2
School   6:21   8:7
script   9:5
seal   44:18
search   15:16   23:8   25:23   26:17   34:8
searched   31:12
searching   15:1, 9   23:14, 19, 21   25:21, 22, 24
second   36:20
see   24:12   35:15
seen   14:14
sense   38:4
SERVICES   1:13
SESSION   3:1
set   44:17
shape   6:17
Sheets   1:4   14:21   15:15   20:10   21:7, 12   23:24   24:1, 16

31:3, 10
32:22   34:19
37:6   40:20
41:1
Sheriff   1:7
Sheriff's   5:7
shift   13:19
shoots   8:7
Shorr   15:7
shortly   34:9
shoulder   15:20   24:22   26:11, 14, 15   41:3, 4
show   34:8
shut   18:18
side   25:10   28:10, 15, 17   40:5, 6, 7
sidearm   10:10
Sierra   16:21
Signature   42:4
signed   43:16
signing   43:13
similar   5:23
sitting   31:22
six   22:8   37:17
Six-foot   6:4
sixteen   19:8
size   19:4   28:5
slam   11:20   12:4   13:5   27:10, 11
small   35:21
smaller   19:5   35:20, 22
smoking   16:24
soft   27:15   29:2   30:1
somebody   8:18   9:6, 9   10:2, 4   11:20   12:3, 7   13:19, 23   14:14   23:2   26:13   28:20   34:17   36:8, 10   38:24   39:20
somebody's   29:24
somewhat

37:21
soon   32:12
sorry   8:10   17:1
Sounds   5:23
South   2:3
SOUTHERN   1:1
space   19:2, 3   22:3, 13   28:13, 14   35:20   36:13   37:13, 21, 24   38:1   40:11
spaces   35:21
specific   35:8, 9   36:3
specified   44:12
spell   4:16
spray   12:11, 13
sprays   38:21
squad   29:2, 7, 19   31:1, 2   32:24
SREMACK   2:2   42:1
SS   43:1   44:2
stand   36:2
standing   23:24
start   5:2   15:16   20:19   24:19
started   6:22   13:16   15:1   23:12   26:16, 18   38:16, 19
starting   30:5
State   43:1   44:1, 4, 22
stated   14:19   43:14
statement   26:16
STATES   1:1
statute   3:9
stay   39:4
staying   17:3
stenotypy   3:11   44:8
step   21:16, 18   27:18   35:16

stepped   21:22, 24
stipulated   3:6
STIPULATIONS   3:4
stop   8:20, 22   9:2, 9, 10   16:20
stopped   6:24   8:24   9:7
studio   19:19, 20
stuff   8:23   9:2   38:5, 6
style   19:19, 20
subject   18:6
submitted   43:13
substance   43:7
sufficient   27:3, 14
Suite   1:23   2:12
supervisor   31:2
supplying   21:6
Sure   15:24   17:11   18:22   28:7   31:18   33:3   35:24   36:15   38:8
suspicions   38:22   39:18
SWAT   7:22   8:9
sworn   4:4   44:6

< T >
take   4:22   12:4   14:5, 24   17:17   19:16   26:18   28:20   37:12
taken   3:10   32:7, 13   37:5   44:7, 11
talk   23:23
talked   14:16   16:12

talking   14:21   29:12   33:4
tall   6:3   22:22
taser   11:17, 22   12:14, 20
teach   27:7
team   8:9
technique   24:23   25:1, 6   27:5
technology   6:22
tell   6:19   8:13, 21   13:12, 16   25:17   33:17   36:5
telling   14:13   34:8
ten   19:11   22:15, 16   28:1
tens   25:2
testifies   4:5
testify   33:10   44:6
testifying   34:7
testimony   44:7, 11
thing   5:19   9:9   11:3   24:12   27:7   36:20
things   36:22
think   7:9, 23   8:4, 16   11:1   15:3   16:6   18:8, 14   20:20   22:18   28:11   30:5   31:3   32:22   37:13, 22   38:7   41:22
thinking   30:2, 10, 12, 14, 15
Thirty-two   11:6, 7
thought   16:2, 3   17:9, 10   20:8   32:1

thousands 25:5
thread 26:22
threat 10:5, 9 36:23 37:4
threats 36:19
Three 14:10, 11 18:3, 4 31:13
tight 19:3 27:17 37:24
time 3:10 7:12 9:22 12:12, 24 14:5 15:15 17:2, 5 20:9 23:9 29:8 30:2, 11 33:2, 6, 23 34:18 35:9, 21 36:10 44:11
times 8:10 10:10, 17 13:4, 8, 10 14:4, 9 20:2, 4, 23 25:3, 5 31:13 33:19 34:1 35:13, 14
told 15:17 16:22 29:6 35:15
top 29:8, 10
touch 26:1 38:17 39:4
touched 41:3
touching 23:1 40:11
traffic 8:20 16:19
trailers 35:22
train 8:3
training 5:1 7:20, 21, 22, 24 8:6, 8, 9, 11, 14 32:8, 9
trainings 7:23
transcribed 3:12 44:9

transcript 43:4, 12 44:10
transport 33:18
transported 32:24
trapdoor 20:8 34:5, 6, 10
trapdoors 34:14
treated 29:20
tries 23:2
true 39:21 43:7 44:10
truth 44:6
Try 6:18
trying 30:19 39:6
tuition 7:17
turn 15:18 24:3, 18
turned 31:23
turning 25:12, 13 26:12
twelve 19:7, 9, 14
two 5:13 8:9 16:19, 24 17:8, 23 21:1, 2 27:23
two-day 8:15
type 22:19
typical 35:18
typically 6:15 36:17

< U >
Uh-huh 7:19 10:5 12:9 14:12 17:7 18:5 19:22 25:4 41:13
underneath 15:13, 14 20:8 24:23 26:5, 23 27:1 41:8, 9
undersigned 43:14
understand 31:18

understanding 21:3, 4 39:21
unfortunate 30:20
UNITED 1:1
University 6:21
unkempt 38:5
unknowns 36:21
untrustworthy 37:10
upfront 9:11
upset 25:18, 20
use 11:14, 18, 20 12:6, 10, 13, 18 13:5 23:18
Usually 6:16 8:18 9:8 10:2 11:16 12:1, 12 13:1, 3, 7 15:12, 13 17:19, 23 21:11 23:3 33:16 35:21 36:18, 21 39:5

< V >
vehicle 16:5, 6, 8, 9 38:9
Verbal 8:15 9:3
vs 1:6

< W >
waived 3:14 42:4
walk 18:23 36:16, 24
walked 37:1, 3
walks 36:10
wall 13:6
Walton 2:12
want 4:20 7:6 22:24 23:14, 19 36:11, 13 38:17 39:1, 2, 3, 4 41:23

wanted 15:6 23:10 30:21 34:22
warrant 14:20 15:4, 5, 17 17:18 18:1, 7 31:17 37:5
warrants 17:14, 15, 23
weapon 10:3 11:21
weapons 12:14, 16
Wednesday 1:12 3:1
week 8:10
weight 6:5 29:12
weightlifting 6:16
well 4:15, 20 6:20 11:1 13:18 17:18, 22 19:16 21:21 23:15 28:23 29:15 30:20 33:14 34:2 38:16
well-known 16:20
went 6:21 7:16 8:6 13:21 14:23 15:8, 18 20:9 24:18 32:21 34:3 39:14, 22 40:12
we're 30:5 33:4
We've 18:16, 17 33:15
WHEREOF 44:17
wide 22:8
width 19:17
witness 3:12 43:13 44:5, 8, 11, 17
wondering 33:12
work 5:1 18:1
working 7:12

world 18:14
worth 34:20
wrist 24:24 26:22, 23, 24 41:7, 15, 18
writing 3:10
wrong 32:22

< Y >
Yeah 5:23 6:19 8:11 9:7 17:9, 16 19:1, 21 20:3, 20 21:17 22:17, 18 27:5 28:2, 18 29:22 30:20, 21 32:21 33:7, 12 37:12
year 8:5 35:23
years 5:9, 10, 14 7:5, 6, 7, 11 8:1 10:23 11:6, 7 21:10 29:23
Yep 12:9 20:5