```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3                         - - -

 4   Cheryl Sheets,              :
                                 :
 5          Plaintiff,           :
                                 :
 6          vs.                  :    Case No.
                                 :    2:21-cv-01810
 7   Sheriff Alex Lape, et al.,:
                                 :
 8          Defendants.          :

 9                         - - -

10     VIDEOCONFERENCE DEPOSITION OF DEPUTY WESLEY REED

11                         - - -

12                            Friday, May 13, 2022
                              10:08 a.m.
13
                           - - -
14
                     MARILYN K. MARTIN, RPR
15
               REGISTERED PROFESSIONAL REPORTER
16
                           - - -
17

18

19

20

21

22

                   ANDERSON REPORTING SERVICES, INC.
23                 3040 Riverside Drive, Suite 125
                        Columbus, Ohio  43221
24                        (614) 326-0177
```

```
 1     APPEARANCES VIA VIDEOCONFERENCE:

 2              REBECCA J. SREMACK, Attorney at Law
                Sremack Law Firm, LLC
 3              2745 South Arlington Road
                Akron, Ohio  44312
 4              (330) 644-0061
                rebecca@sremacklaw.com
 5
                and
 6
                BILLI COPELAND KING, Attorney at Law
 7              King Law Firm
                Akron, Ohio
 8              (330) 940-9914
                info@billicopeland.com
 9
                     On behalf of the Plaintiff.
10
                ANGELICA M. JARMUSZ, Attorney at Law
11              Fishel, Downey, Albrecht & Riepenhoff, LLP
                7775 Walton Parkway, Suite 200
12              New Albany, Ohio  43054
                (614) 221-1216
13              ajarmusz@fisheldowney.com

14                   On behalf of the Defendants.

15                        - - -

       ALSO PRESENT:
16
                Deputy Marty Norris
17
                          - - -
18

19

20

21

22

23

24
```

1                           FRIDAY MORNING SESSION
                            May 13, 2022
2                           10:08 a.m.

3                              - - -

4                           STIPULATIONS

5                              - - -

6              It is stipulated by and between counsel

7      for the respective parties herein that this

8      deposition of DEPUTY WESLEY REED, a Witness herein,

9      called by the Plaintiff under the statute, may be

10     taken at this time and reduced to writing in

11     stenotypy by the Notary, whose notes may thereafter

12     be transcribed out of the presence of the witness;

13     and that proof of the official character and

14     qualifications of the Notary is waived.

15                             - - -

16

17

18

19

20

21

22

23

24

```
 1                P R O C E E D I N G S

 2                        - - -

 3                DEPUTY WESLEY REED,

 4    being by me first duly sworn, as hereinafter

 5    certified, testifies and says as follows:

 6                    CROSS-EXAMINATION

 7   BY MS. KING:

 8    Q.          Good morning, Deputy Reed.  How are you

 9    today?

10    A.          I'm well.  Thank you.

11    Q.          My name is Billi Copeland King, and I'm

12    going to ask you a few questions this morning.  And

13    have you done a deposition before?

14    A.          No.  This is my first time.

15    Q.          You have not.  Great.  So there's some

16    ground rules.  One of the first ground rules is to

17    make sure that you answer audibly because the court

18    reporter, of course, cannot understand nods and

19    gestures.  So just to make sure that you speak your

20    answer.  Okay?

21    A.          Okay.

22    Q.          If, at any time, you need a break, that's

23    fine.  Just let us know; however, just make sure that

24    you finish answering the question before you ask for
```

Deputy Wesley Reed
5/13/2022

```
 1   that break.  Okay?

 2   A.          Okay.

 3   Q.          All right.  And one of the other rules

 4   that you need to take note of is:  When I'm asking a

 5   question, just wait until I finish asking the

 6   question to give your answer.  Okay?

 7   A.          Okay.

 8   Q.          All right.  Do you have any questions for

 9   me before we get started?

10   A.          No, I don't.

11   Q.          Okay.  So I'm going to go ahead and ask

12   you to state and spell your name for the record.

13   A.          Wesley Reed, W-E-S-L-E-Y, R-E-E-D.

14   Q.          Okay.  And can you give me your date of

15   birth.

16   A.          May 8, 1989.

17   Q.          Okay.  And, Deputy Reed, how tall are you?

18   A.          I am six-one.

19   Q.          Okay.  How much do you weigh?

20   A.          250.

21   Q.          Okay.  And there's one question I forgot

22   to ask you.  Are you under the influence of anything

23   today that would impact your ability to answer

24   questions?
```

```
 1    A.          No, I'm not.

 2    Q.          Okay.  Thank you.  So we're going to go

 3    ahead; and I'm going to ask you some questions about

 4    your employment history, your discipline, if you've

 5    had any discipline and a few other questions about

 6    your training and education.  Okay?

 7                All right.  So where are you currently

 8    employed?

 9    A.          Right now I'm at Fairfield County Medical

10    Center Police Department.

11    Q.          How long have you been there?

12    A.          About a year and a half.

13    Q.          So you started there in the end of 2020?

14    A.          Yeah.

15    Q.          Okay.  Do you know about what month?

16    A.          I believe it was September.

17    Q.          Okay.  And before that, where did you

18    work?

19    A.          I was here at the Fairfield County

20    Sheriff's Office.

21    Q.          Can you give me the dates of that

22    employment?

23    A.          I was hired in 2018.  I believe it was

24    August of 2018.  And I was here for just under two
```

1    years.  Left right at 2020.  I would say

2    August -- late August of 2020.

3    Q.          Okay.  And before that, where did you

4    work?

5    A.          Before that, I was not in law enforcement.

6    I was doing media for a local church.

7    Q.          How long were you there?

8    A.          I was there for probably three years, but

9    not doing media the entire time.  They were building

10   a new -- a new building, an add-on.  So I was

11   employed by the pastor to help that.  And then I have

12   a degree in film.  That's what I went to college for.

13   So after the building was complete, he kind of just

14   transitioned me over to help build the media side.

15   Q.          Okay.  We'll get to that.  So where did

16   you get your officer's training?

17   A.          I got it through OPOTA at Hocking College.

18   Q.          Do you have a degree besides film?

19   A.          I do not.

20   Q.          Okay.  And what certifications do you

21   have?

22   A.          We -- we do yearly certifications both at

23   the sheriff's office and at the hospital, force on

24   force training certifications, recertifications on

1    taser qualifications and qualifications on,

2    obviously, firearms.

3    Q.        Okay.  What's force on force training?

4    A.        Force on force training is understanding

5    the use of force continuum and when it is legal for

6    us to place hands on somebody and then the

7    progression of that continuum to ultimately using

8    death, force of death.  So there's a continuum

9    from -- from verbal, and then you work your way

10   through the issues and obviously use force that is

11   necessary to -- to extinguish a problem.

12   Q.        In your training, how are you taught to

13   progress through the continuum?

14   A.        Well, it's basically verbal is always the

15   very beginning; and you are going -- basing your

16   reaction from the person's -- how they -- their body

17   language, the way they're speaking back to you, these

18   little things, these little cues that officers have

19   to go on to determine that amount of force that's

20   necessary, if any is necessary.

21   Q.        Okay.  And can you name the stages of the

22   continuum of force for me?

23   A.        Not right off the top of my head.

24   Q.        Okay.  You stated No. 1 is verbal.  Do you

1    remember No. 2?

2    A.          Verbal.  And then it would go to a

3    physical -- physical contact, generally hand to hand.

4    And then it would progress from there, using

5    nonlethal or, you know, tasers, pepper spray,

6    anything of that nature that we have available to us.

7    And then moving on from less lethal, obviously, to a

8    lethal means.

9    Q.          Okay.  And so you mentioned that --

10    reaction, body language cues.  Can you name some of

11    those reactions, body language cues that would lead

12    you to go from a one, verbal to a two, physical

13    contact?

14    A.          Sure.  So it would be the person's body,

15    how they're standing, the way their hands are,

16    whether they have their hands in their pants, whether

17    their hands are out, whether they're balled as --

18    balled in fists or relaxed.  A lot of, you know,

19    gritting of the teeth.  You know, the muscles in the

20    jaw, you can look and see.

21            And then obviously, you go into the

22    verbal, how they're responding to what you're doing

23    or the commands you're giving them, if their voice

24    becomes heightened and they begin to yell, things of

1   that nature.  Mainly it's body language that I

2   personally look at and cues that tell any kind of

3   beforehand how things are going to go.

4   Q.          Okay.  And then what if you're wrong?

5   A.          Well, we have --

6              MS. JARMUSZ:  I was going to say if you

7   don't understand the question, ask her to clarify.

8   A.          We have split second decisions in a lot of

9   the things that we do every day.  And you go on what

10  you believe is the best possible thing that you're

11  observing at the time.

12  Q.          So yelling would lead to physical contact?

13  A.          No.

14             MS. JARMUSZ:  I'll object to the form.

15             But you can answer.

16  A.          No, not necessarily.  There's a lot of

17  different variables that come into play.  But, no,

18  the yelling does not always lead to a physical

19  confrontation.

20  Q.          Okay.  So let's go back to your employment

21  at Fairfield County Sheriff's Office.  While you were

22  there -- I know it was a short period of time.  But

23  while you were there, did you have any discipline

24  issues?

Deputy Wesley Reed
5/13/2022

```
 1    A.         While I was at Fairfield County?

 2    Q.         Correct.

 3    A.         I do not recall having any disciplinary

 4    issues.

 5    Q.         Have you ever had any disciplinary issues?

 6    A.         No.

 7    Q.         Okay.  Have you ever been ordered to go

 8    through any additional training?

 9    A.         No.  Nothing additional.  It's always just

10    been the in-service stuff, the usual things and a lot

11    of times asking or requesting for additional training

12    just on my own, maybe even just out of my own pocket

13    just to get some more training on my off time.

14    Q.         Okay.  So do you remember the incident

15    that happened with Cheryl Sheets on 9/17/2019?

16    A.         Yes, I do.

17    Q.         Okay.  Can you tell me about it.

18    A.         So myself, I was still on FTO, which is

19    field training.  So I was coming out of the jail and

20    going to patrol and learning all the facets of not

21    only patrol, but as a sheriff's office as a whole.

22               So we work with the canine unit.  We work

23    with the detective bureau, and we bounced around, and

24    obviously had the majority of the time out on the
```

Deputy Wesley Reed
5/13/2022

1  road with other more experienced deputies that are

2  training officers that you kind of ride along with.

3  And they -- you know, they just impart some things

4  that they've learned in their careers, and you kind

5  of gather everything and make it your own.  Once

6  you're out on your own, you just -- you work it out

7  and figure out what's best that works for you.

8            But to go back to your question, myself

9  and Training Officer Shorr, which is now Sergeant

10 Shorr here at the sheriff's office, him and I were in

11 a cruiser together.  We were on our way back into the

12 city of Lancaster, being out in the county, coming

13 back into the city.  And we overheard Deputy Norris

14 mark that he was out on a traffic stop and was asking

15 for a second unit.  So us being in that vicinity of

16 Deputy Norris, we decided to go over there and give

17 him the backup he requested.

18           So once we got there, Marty had actually

19 marked out at an apartment that was pretty much right

20 in front of where he had stopped this vehicle.

21 Apparently he had gotten some intel that there was a

22 male inside of that apartment that had a warrant.  So

23 we -- we went over to the house.

24           Marty and -- or Deputy Norris and

1    Deputy Shorr, they both went to the front door.

2    Deputy Norris asked me if I would go to the back of

3    the apartment for rear security because there's a lot

4    of times where you knock at the front, and somebody

5    runs out the back.  And we wanted to contain that

6    area and make sure anybody coming in and out that we

7    were there to stop them and detain them for a period

8    of time.

9            So I went to the back of the apartment.

10   Again, just stood by and waited.  They made entry

11   into the house after knocking.  Somebody answered the

12   door.  They let them in.  And they were inside.

13           I could hear just audible.  You know,

14   nothing that I could hear very clear.  I was standing

15   outside.

16           So they went through the house, and

17   Deputy Norris ended up opening -- unlocking the back

18   door, opening the back door, saying, "Hey, everything

19   is good here.  Can you come in here and just continue

20   to help search for this individual."

21           "Sure."

22           So I went in.  Went into the back bedroom.

23   And we were searching the back bedroom, looking in

24   closets and things like that, just any space where

1    somebody could hide themselves.  And that's what we

2    were there for.

3              And about that time I came in -- it didn't

4    take very long at all, a couple minutes -- when

5    Ms. Sheets came from the front of the apartment, and

6    she came back to the back bedroom.  And at the very

7    beginning, she was just observing, seeing what we

8    were doing.  And then she became verbal, asking --

9    you know, asking us what we were doing.

10             And we continued to let her know just to

11   stay calm.  The easier it is for us to get in there,

12   look where we feel we need to look and get out the

13   better so we're not taking up her time, and we can go

14   on to other things.

15             And she was very persistent with us about

16   exactly what we were doing, and we were continually

17   repeating ourselves, looking -- you know, we have --

18   "There's a man here that apparently has a warrant.

19   We're looking for him."  And she just kept ramping

20   up, ramping up to the point where Deputy Norris asked

21   her, "If you would please remain calm and quiet, we

22   can do our jobs.  If not, I'm going to arrest you for

23   obstruction of justice, disorderly conduct."

24             And at that time, that heightened her even

1    more.  She actually began yelling at us.  Again, we

2    repeated ourselves, letting her know if she does not

3    stay calm and compliant that she would be going to

4    jail.  And she did not listen to our

5    multiple -- multiple requests for her to do that, so

6    that's when Deputy Norris told her that she was under

7    arrest.

8            And as we were placing her -- As he went

9    to grab her to place her in handcuffs, that's when

10   she reached out and attempted to grab Marty's

11   shoulder.  At that point, he grabbed her hand and

12   maneuvered her to the bed where I was on the side of

13   the bed.  I had placed -- Just to help control her, I

14   placed my hand on the back of her head.  As Marty was

15   bringing her arm back, that's when she yelled and

16   said, "You broke my arm.  You broke my arm."

17           So we both looked at each other.  He

18   released her arm.  I released from the back of her

19   head.  And that's when we called for medical.  So we

20   put her on an ambulance, and I rode with her to

21   Fairfield Medical Center River Valley Campus on 33

22   where she was treated.

23   Q.        Okay.  Thank you for that.  I have a few

24   follow-up questions for you.

1    A.          Sure.

2    Q.          So you said that this went from a traffic

3    stop to an apartment search?

4    A.          Yes.

5    Q.          Okay.  And when you were by the back door

6    providing rear security, how long were you there?

7    A.          I would say I was there no longer than

8    eight minutes.  It really was not a very long period

9    of time.

10          The apartment complex -- or the apartment

11   itself -- not the complex.  But the apartment is only

12   so big, so it really did not take a very long period

13   of time before Marty unlocked that back door.

14   Q.          Okay.  And so you were there for eight

15   minutes.  And you said that when you made entry that

16   Cheryl Sheets was still in the front room?

17   A.          Yes.  That was -- Yeah.  She was -- If she

18   wasn't in the -- she was not in that back room where

19   we were initially, she was -- I was -- would guess

20   that she would be in the front room or in that

21   hallway that led to the back, but she was not there

22   initially.

23   Q.          Okay.  And tell me the approximate amount

24   of time that you entered that back bedroom to where

1   the incident -- the touching happened between

2   Deputy Norris and Ms. Sheets -- Ms. Sheets rather.

3               MS. JARMUSZ:  Object to form.

4               You can answer.

5               MS. KING:  I can't hear you.

6               MS. JARMUSZ:  I just objected to form but

7   said he could answer.

8               MS. KING:  Okay.  Thank you.

9   A.          I would say we were back there for no more

10  than ten -- no more than ten minutes.

11  Q.          Now, you mentioned the size of the space,

12  that it was small.

13  A.          Yeah.  It was a smaller apartment.

14  Q.          Can you give me approximate dimensions of

15  the room?

16  A.          I cannot.  It was -- it was very small.

17  That's the only thing I could say.  I couldn't -- The

18  actual back bedroom, is that what you're asking, back

19  bedroom?

20  Q.          I'm asking you about the space that you

21  were in when you stepped into the residence.

22  A.          Okay.  Yeah.  I don't know.  I can't tell

23  you the approximate dimensions of that room.  I just

24  know it was small.

1    Q.          Can you tell me what was in that room?

2    A.          Yeah.  There was a bed, probably about a

3    twin size bed, one wooden dresser and a bunch of

4    clothes and stuff.  I remember seeing just a bunch of

5    clothes.  And we -- There was a -- there's a small

6    closet as well that was just packed full of stuff.

7    But in terms of furniture, it was really just -- I

8    think there was a small nightstand too, but really

9    those were the only three furniture items that were

10   in the room.

11   Q.          Okay.  Did you observe anything else?

12   A.          No.  I don't -- I don't -- I can't -- I

13   don't remember specifics other than those -- those

14   three -- three things in there.

15   Q.          Tell me about how the space is arranged

16   when you stepped in the back door.  Were you by the

17   nightstand, or were you by the closet?

18               MS. JARMUSZ:  I'll object to form.

19               You can answer.

20   A.          I know that that back door -- If I

21   remember, that back door opened, and the closet was

22   behind that door once you opened it up because

23   I -- I -- I believe I recall opening the door and

24   having to close it again so that we could search the

Deputy Wesley Reed
5/13/2022

 1    closet space.  So I would guess when I entered, I was

 2    closest to the closet.

 3    Q.          During the incident, did you remain

 4    closest to the closet?

 5    A.          Yeah.  I mean, that was -- that was the

 6    most obvious space in that room where somebody could

 7    have been concealing themselves, so that was really

 8    the -- that -- that was the one spot that we were

 9    trying to look through for the individual.  But after

10    we had done that and she had -- became very

11    heightened, that's when I kind of went around to the

12    back of the bed to help Marty out just to, you know,

13    get closer to the both of them.

14    Q.          What did Ms. Sheets say exactly -- her

15    exact words about overstepping?

16    A.          Yeah.  I believe that's pretty much what

17    she was saying, was that, "You're overstepping.

18    You're overstepping your bounds."  And we reassured

19    her that we were not.  But that's the one thing that

20    I remember her repeating quit a lot.  Yeah.  That was

21    probably the one thing that she continued to say over

22    and over.

23    Q.          Was it something that you were doing?

24    A.          No.  Not to my knowledge.  I don't think

1    it was something that either one of us were doing.  I

2    believe we were both very reasonable.  We weren't

3    tossing things around.  We weren't flipping her -- We

4    weren't destroying her home.  We were in there and

5    moving things as much as what we needed to, but it

6    wasn't like we were just, you know, ransacking her

7    apartment looking for this guy.  That's not

8    what -- You know, that's not what we were doing.

9    Q.          During the search, what items did you

10   move?

11   A.          It was -- I think we -- We moved the

12   dresser, the clothing dresser out just a little bit

13   and then -- because there was a space I think in

14   between that dresser and the back wall, so we moved

15   that a little bit.  We moved it back.  The majority

16   of the stuff that we moved was in the closet just

17   because she had so many items of clothing, trash bags

18   probably filled with clothes or something else that

19   was just piled up at the bottom of the closet.  So

20   the majority of that we were moving out so that we

21   could actually look and see into the back corners of

22   that closet to see if someone was sitting back there.

23   Q.          What are the approximate dimensions of the

24   closet?

```
 1   A.          I cannot -- I cannot answer that.  I do
 2   know that it was wide enough for someone to either
 3   stand or maybe a smaller person to sit almost like in
 4   the fetal position down in that corner.  But it
 5   couldn't have been any more than, I don't know, a
 6   three by four.  Just a little closet.
 7   Q.          Okay.  And you mentioned that you had
 8   moved some of the items in the closet.
 9   A.          Yeah.  We moved --
10   Q.          What were those items?
11   A.          Just larger trash bags.  That's what I
12   remember most, is that she had multiple trash bags
13   that were kind of just piled in there.  So we wanted
14   to move those to see if someone had went back into
15   that little nook of that closet and then put those
16   things back on themselves.  So we were just securing
17   that area and making sure no one was back there
18   hiding.
19   Q.          Okay.  And in your estimation, how long
20   did that take?
21   A.          It was within that ten-minute window that
22   we were back in that room.  It couldn't have taken
23   any more than a couple minutes to move that stuff.
24   But it was within that ten-minute span of your
```

1  earlier question, how long you -- I felt we were back

2  in that room together searching.

3  Q.        Okay.  So during that ten minutes, you

4  said that had you moved the dresser, and you searched

5  the closet?

6  A.        Yeah.

7  Q.        Did you search any other area of the

8  bedroom?

9  A.        No.  I mean, we checked underneath -- You

10  know, we dipped our head down and checked underneath

11  the bed.  But there really was no -- nothing else to

12  look through at that time.  I mean, we had pretty

13  much looked through that entire room.

14  Q.        Okay.  So can you tell me in detail what

15  happened during the physical contact between

16  Deputy Norris and Ms. Sheets?

17  A.        You want me to go -- Can you restate it

18  again?  I'm sorry.

19  Q.        Yes.

20  A.        Step by step?

21  Q.        Step by step, yes.

22  A.        Okay.  Well, she was -- she was very upset

23  at that time.  Given multiple commands of her, you

24  know, calming down or she would be arrested.

```
1    So -- so Marty -- or Deputy Norris -- I'm sorry -- he

2    once again, after multiple times telling her that

3    that would be her circumstance if she continued

4    to -- to be loud and disruptive, that he turned to

5    her and said, "Ma'am, go ahead and put your hands

6    behind your back.  You're going to jail."

7                And at that point is when she threw her

8    hands up and went towards Marty, lunging towards him.

9    And that's when he -- he grabbed her -- grabbed her

10   wrist and removed her hand from his shoulder, moving

11   her by the arm towards the bed.  And once she -- Once

12   he placed her on the bed, she was -- she was face

13   down, chest down on the bed, and he was maneuvering

14   her arm back.  And while he was doing that, that's

15   when the injury occurred.  And she -- that's when she

16   yelled that we had broken her arm.

17                And it was immediate.  As soon as she

18   started yelling, you know, we both looked at each

19   other.  Marty gave me a nod like, "Okay.  It's time

20   to, you know, cool off."  We obviously did something.

21                And so we both backed off from her.  And

22   it was a -- it was immediately after that, once we

23   stood up that we called for the ambulance; and they

24   were there in a very quick amount of time.
```

```
 1    Q.          And describe what the environment was like
 2    at that point.  Was it still heightened?
 3    A.          No.  Not at all.  No.  As soon as -- as
 4    soon as we both realized that that had happened,
 5    the -- it completely shifted.  We -- we were off of
 6    her, obviously getting her arm into some sort of
 7    position after we had called for the squad.  Gave her
 8    the aid that we could assist her with by, you know,
 9    keeping her arm close to her chest, standing her up,
10    making sure she was -- you know, doing all these very
11    basic, I guess, first aid for something like that,
12    for an injury like that.
13    Q.          Did you touch her arm at any time?
14    A.          I did not, no.  No.  As soon as it
15    happened, we got it to the front.  That's when
16    Deputy Norris -- we got her off the bed and moved her
17    to the front of the residence where we kind of just
18    stood by and waited for the ambulance to get there.
19    Q.          Okay.  Did you have a body cam on that
20    day?
21    A.          No.  We did not.  At that time, the
22    sheriff's office did not issue any body cameras.
23    They -- I can't -- I can't give you when those were
24    implemented because I had already left and was at
```

Deputy Wesley Reed
5/13/2022

```
 1    Fairfield -- or I was already at Fairfield County
 2    Medical Center, working there by the time they
 3    actually had implemented those body cameras.
 4              MS. KING:  Okay.  So at this time, I would
 5    like to take a break.
 6                       (Recess taken.)
 7              MS. KING:  Thank you.  Deputy Reed, that's
 8    all of the questions that I have for you today.
 9              MS. JARMUSZ:  We will read.
10                  (Signature not waived.)
11                          - - -
12              And, thereupon, the deposition was
13    concluded at approximately 10:49 a.m.
14                          - - -
15
16
17
18
19
20
21
22
23
24
```

```
 1    State of Ohio      :
                               SS:
 2    County of Franklin :

 3              I, DEPUTY WESLEY REED, do hereby certify

 4    that I have read the foregoing transcript of my

 5    deposition given on May 13, 2022; that together with

 6    the correction page attached hereto noting changes in

 7    form or substance, if any, it is true and correct.

 8

 9              _____

10                   DEPUTY WESLEY REED

11              I do hereby certify that the foregoing

12    transcript of the deposition of DEPUTY WESLEY REED

13    was submitted to the witness for reading and signing;

14    that after he had stated to the undersigned Notary

15    Public that he had read and examined his deposition,

16    he signed the same in my presence on the

17    _____day of _____, _____.

18                        _____

19                        _____

20                             Notary Public

21    My commission expires _____

22                             - - -

23

24
```

```
 1                    CERTIFICATE
     State of Ohio      :
 2                        SS:
     County of Franklin:
 3              I, Marilyn K. Martin, Notary Public in and

 4    for the State of Ohio, duly commissioned and

 5    qualified, certify that the within named witness was

 6    by me duly sworn to testify to the whole truth in the

 7    cause aforesaid; that the testimony was taken down by

 8    me in stenotypy in the presence of said witness,

 9    afterwards transcribed upon a computer; that the

10    foregoing is a true and correct transcript of the

11    testimony given by said witness taken at the time and

12    place in the foregoing caption specified.

13              I certify that I am not a relative,

14    employee, or attorney of any of the parties hereto,

15    or of any attorney or counsel employed by the

16    parties, or financially interested in the action.

17              IN WITNESS WHEREOF, I have set my hand and

18    affixed my seal of office at Columbus, Ohio, on this

19    27th day of May, 2022.

20    _____

21
      MARILYN K. MARTIN
22    Notary Public in and for the State of Ohio
      and Registered Professional Reporter.
23

24    My Commission Expires October 16, 2026.
```

Deputy Wesley Reed
5/13/2022

1

---

**WORD INDEX**

**< 1 >**
1   8:24
10:08   1:12
  3:2
10:49   25:13
125   1:23
13   1:12
  3:1   26:5
16   27:24
1989   5:16

**< 2 >**
2   9:1
2:21-cv-01810
  1:6
200   2:11
2018   6:23, 24
2020   6:13
  7:1, 2
2022   1:12
  3:1   26:5
  27:19
2026   27:24
221-1216   2:12
250   5:20
2745   2:3
27th   27:19

**< 3 >**
3040   1:23
326-0177   1:24
33   15:21
330   2:4, 8

**< 4 >**
43054   2:12
43221   1:23
44312   2:3

**< 6 >**
614   1:24
  2:12
644-0061   2:4

**< 7 >**
7775   2:11

**< 8 >**
8   5:16

**< 9 >**
9/17/2019
  11:15
940-9914   2:8

**< A >**
a.m   1:12
  3:2   25:13
ability   5:23
action   27:16
actual   17:18
additional
  11:8, 9, 11
add-on   7:10
affixed   27:18
aforesaid
  27:7
ahead   5:11
  6:3   23:5
aid   24:8, 11
ajarmusz@fishel
downey.com
  2:13
Akron   2:3, 7
al   1:7
Albany   2:12
Albrecht   2:11
Alex   1:7
ambulance
  15:20   23:23
  24:18
amount   8:19
  16:23   23:24
ANDERSON   1:12
ANGELICA   2:8
answer   4:17,
20   5:6, 23
  10:15   17:4,
7   18:19
  21:1
answered
  13:11
answering
  4:24
anybody   13:6
apartment
  12:19, 22
  13:3, 9
  14:5   16:3,
10, 11   17:13
  20:7
Apparently
  12:21   14:18
APPEARANCES
  2:1
approximate
  16:23   17:14,
23   20:23
approximately
  25:13

**< A > (cont.)**

area   13:6
  21:17   22:7
Arlington   2:3
arm   15:15,
16, 18   23:11,
14, 16   24:6,
9, 13
arranged
  18:15
arrest   14:22
  15:7
arrested
  22:24
asked   13:2
  14:20
asking   5:4,
5   11:11
  12:14   14:8,
9   17:18, 20
assist   24:8
attached   26:6
attempted
  15:10
Attorney   2:2,
4, 8   27:14,
15
audible   13:13
audibly   4:17
August   6:24
  7:2
available   9:6

**< B >**
back   8:17
  10:20   12:8,
11, 13   13:2,
5, 9, 17, 18,
22, 23   14:6
  15:14, 15, 18
  16:5, 13, 18,
21, 24   17:9,
18   18:16, 20,
21   19:12
  20:14, 15, 21,
22   21:14, 16,
17, 22   22:1
  23:6, 14
backed   23:21
backup   12:17
bags   20:17
  21:11, 12
balled   9:17,
18
basic   24:11
basically

8:14
basing   8:15
bed   15:12,
13   18:2, 3
  19:12   22:11
  23:11, 12, 13
  24:16
bedroom
  13:22, 23
  14:6   16:24
  17:18, 19
  22:8
began   15:1
beginning
  8:15   14:7
behalf   2:8,
14
believe   6:16,
23   10:10
  18:23   19:16
  20:2
best   10:10
  12:7
better   14:13
big   16:12
BILLI   2:4
  4:11
birth   5:15
bit   20:12, 15
body   8:16
  9:10, 11, 14
  10:1   24:19,
22   25:3
bottom   20:19
bounced   11:23
bounds   19:18
break   4:22
  5:1   25:5
bringing
  15:15
broke   15:16
broken   23:16
build   7:14
building   7:9,
10, 13
bunch   18:3, 4
bureau   11:23

**< C >**
called   3:9
  15:19   23:23
  24:7
calm   14:11,
21   15:3
calming   22:24
cam   24:19

cameras
  24:22   25:3
Campus   15:21
canine   11:22
caption   27:12
careers   12:4
Case   1:6
cause   27:7
Center   6:10
  15:21   25:2
CERTIFICATE
  27:1
certifications
  7:20, 22, 24
certified   4:5
certify   26:3,
11   27:5, 13
changes   26:6
character
  3:13
checked   22:9,
10
Cheryl   1:4
  11:15   16:16
chest   23:13
  24:9
church   7:6
circumstance
  23:3
city   12:12,
13
clarify   10:7
clear   13:14
close   18:24
  24:9
closer   19:13
closest   19:2,
4
closet   18:6,
17, 21   19:1,
2, 4   20:16,
19, 22, 24
  21:6, 8, 15
  22:5
closets   13:24
clothes   18:4,
5   20:18
clothing
  20:12, 17
college   7:12,
17
Columbus
  1:23   27:18
come   10:17
  13:19

---

coming 11:19
12:12 13:6
commands
9:23 22:23
commission
26:19 27:24
commissioned
27:4
complete 7:13
completely
24:5
complex
16:10, 11
compliant
15:3
computer 27:9
concealing
19:7
concluded
25:13
conduct 14:23
confrontation
10:19
contact 9:3,
13 10:12
22:15
contain 13:5
continually
14:16
continue
13:19
continued
14:10 19:21
23:3
continuum
8:5, 7, 8, 13,
22
control 15:13
cool 23:20
COPELAND 2:4
4:11
corner 21:4
corners 20:21
Correct 11:2
26:7 27:10
correction
26:6
counsel 3:6
27:15
County 6:9,
19 10:21
11:1 12:12
25:1 26:2
27:2
couple 14:4

21:23
course 4:18
COURT 1:1
4:17
CROSS-
EXAMINATION
4:6
cruiser 12:11
cues 8:18
9:10, 11
10:2
currently 6:7

< D >
date 5:14
dates 6:21
day 10:9
24:20 26:17
27:19
death 8:8
decided 12:16
decisions
10:8
Defendants
1:8 2:14
degree 7:12,
18
Department
6:10
DEPOSITION
1:10 3:8
4:13 25:12
26:5, 12, 15
deputies 12:1
DEPUTY 1:10
2:15 3:8
4:3, 8 5:17
12:13, 16, 24
13:1, 2, 17
14:20 15:6
17:2 22:16
23:1 24:16
25:7 26:3,
9, 12
describe 24:1
destroying
20:4
detail 22:14
detain 13:7
detective
11:23
determine
8:19
different
10:17

dimensions
17:14, 23
20:23
dipped 22:10
disciplinary
11:3, 5
discipline
6:4, 5 10:23
disorderly
14:23
disruptive
23:4
DISTRICT 1:1
DIVISION 1:2
doing 7:6, 9
9:22 14:8,
9, 16 19:23
20:1, 8
23:14 24:10
door 13:1,
12, 18 16:5,
13 18:16, 20,
21, 22, 23
Downey 2:11
dresser 18:3
20:12, 14
22:4
Drive 1:23
duly 4:4
27:4, 6

< E >
earlier 22:1
easier 14:11
EASTERN 1:2
education 6:6
eight 16:8,
14
either 20:1
21:2
employed 6:8
7:11 27:15
employee
27:14
employment
6:4, 22
10:20
ended 13:17
enforcement
7:5
entered
16:24 19:1
entire 7:9
22:13
entry 13:10
16:15

environment
24:1
estimation
21:19
et 1:7
exact 19:15
exactly
14:16 19:14
examined
26:15
experienced
12:1
expires
26:19 27:24
extinguish
8:11

< F >
face 23:12
facets 11:20
Fairfield
6:9, 19
10:21 11:1
15:21 25:1
feel 14:12
felt 22:1
fetal 21:4
field 11:19
figure 12:7
filled 20:18
film 7:12, 18
financially
27:16
fine 4:23
finish 4:24
5:5
firearms 8:2
Firm 2:2, 7
first 4:4,
14, 16 24:11
Fishel 2:11
fists 9:18
flipping 20:3
follows 4:5
follow-up
15:24
force 7:23,
24 8:3, 4, 5,
8, 10, 19, 22
foregoing
26:4, 11
27:10, 12
forgot 5:21
form 10:14
17:3, 6

18:18 26:7
four 21:6
Franklin
26:2 27:2
Friday 1:12
3:1
front 12:20
13:1, 4
14:5 16:16,
20 24:15, 17
FTO 11:18
full 18:6
furniture
18:7, 9

< G >
gather 12:5
generally 9:3
gestures 4:19
getting 24:6
give 5:6, 14
6:21 12:16
17:14 24:23
Given 22:23
26:5 27:11
giving 9:23
go 5:11
6:2 8:19
9:2, 12, 21
10:3, 9, 20
11:7 12:8,
16 13:2
14:13 22:17
23:5
going 4:12
5:11 6:2, 3
8:15 10:3,
6 11:20
14:22 15:3
23:6
Good 4:8
13:19
gotten 12:21
grab 15:9, 10
grabbed
15:11 23:9
Great 4:15
gritting 9:19
ground 4:16
guess 16:19
19:1 24:11
guy 20:7

< H >
half 6:12
hallway 16:21

hand 9:3
15:11, 14
23:10 27:17
handcuffs
15:9
hands 8:6
9:15, 16, 17
23:5, 8
happened
11:15 17:1
22:15 24:4,
15
head 8:23
15:14, 19
22:10
hear 13:13,
14 17:5
heightened
9:24 14:24
19:11 24:2
help 7:11,
14 13:20
15:13 19:12
hereinafter
4:4
hereto 26:6
27:14
Hey 13:18
hide 14:1
hiding 21:18
hired 6:23
history 6:4
Hocking 7:17
home 20:4
hospital 7:23
house 12:23
13:11, 16

< I >
immediate
23:17
immediately
23:22
impact 5:23
impart 12:3
implemented
24:24 25:3
incident
11:14 17:1
19:3
individual
13:20 19:9
influence
5:22
info@billicopel
and.com 2:8

initially
16:19, 22
injury 23:15
24:12
in-service
11:10
inside 12:22
13:12
intel 12:21
interested
27:16
issue 24:22
issues 8:10
10:24 11:4,
5
items 18:9
20:9, 17
21:8, 10

< J >
jail 11:19
15:4 23:6
JARMUSZ 2:8
10:6, 14
17:3, 6
18:18 25:9
jaw 9:20
jobs 14:22
justice 14:23

< K >
keeping 24:9
kept 14:19
kind 7:13
10:2 12:2,
4 19:11
21:13 24:17
KING 2:4, 7
4:7, 11
17:5, 8
25:4, 7
knock 13:4
knocking
13:11
know 4:23
6:15 9:5,
18, 19 10:22
12:3 13:13
14:9, 10, 17
15:2 17:22,
24 18:20
19:12 20:6,
8 21:2, 5
22:10, 24
23:18, 20
24:8, 10

knowledge
19:24

< L >
Lancaster
12:12
language
8:17 9:10,
11 10:1
Lape 1:7
larger 21:11
late 7:2
Law 2:2, 4,
7, 8 7:5
lead 9:11
10:12, 18
learned 12:4
learning
11:20
led 16:21
Left 7:1
24:24
legal 8:5
lethal 9:7, 8
letting 15:2
listen 15:4
little 8:18
20:12, 15
21:6, 15
LLC 2:2
LLP 2:11
local 7:6
long 6:11
7:7 14:4
16:6, 8, 12
21:19 22:1
longer 16:7
look 9:20
10:2 14:12
19:9 20:21
22:12
looked 15:17
22:13 23:18
looking
13:23 14:17,
19 20:7
lot 9:18
10:8, 16
11:10 13:3
19:20
loud 23:4
lunging 23:8

< M >
Ma'am 23:5

majority
11:24 20:15,
20
making 21:17
24:10
male 12:22
man 14:18
maneuvered
15:12
maneuvering
23:13
MARILYN 1:12
27:3, 19
mark 12:14
marked 12:19
MARTIN 1:12
27:3, 19
Marty 2:15
12:18, 24
15:14 16:13
19:12 23:1,
8, 19
Marty's 15:10
mean 19:5
22:9, 12
means 9:8
media 7:6, 9,
14
Medical 6:9
15:19, 21
25:2
mentioned
9:9 17:11
21:7
minutes 14:4
16:8, 15
17:10 21:23
22:3
month 6:15
MORNING 3:1
4:8, 12
move 20:10
21:14, 23
moved 20:11,
14, 15, 16
21:8, 9
22:4 24:16
moving 9:7
20:5, 20
23:10
multiple
15:5 21:12
22:23 23:2
muscles 9:19

< N >

name 4:11
5:12 8:21
9:10
named 27:5
nature 9:6
10:1
necessarily
10:16
necessary
8:11, 20
need 4:22
5:4 14:12
needed 20:5
New 2:12
7:10
nightstand
18:8, 17
nod 23:19
nods 4:18
nonlethal 9:5
nook 21:15
Norris 2:15
12:13, 16, 24
13:2, 17
14:20 15:6
17:2 22:16
23:1 24:16
Notary 3:11,
14 26:14, 19
27:3, 22
note 5:4
notes 3:11
noting 26:6

< O >
object 10:14
17:3 18:18
objected 17:6
observe 18:11
observing
10:11 14:7
obstruction
14:23
obvious 19:6
obviously
8:2, 10 9:7,
21 11:24
23:20 24:6
occurred
23:15
October 27:24
Office 6:20
7:23 10:21
11:21 12:10
24:22 27:18
Officer 12:9

officers
  8:18  12:2
officer's
  7:16
official  3:13
OHIO  1:1, 23
  2:3, 7, 12
  26:1  27:1,
  4, 18, 22
Once  12:5,
  18  18:22
  23:2, 11, 22
opened  18:21,
  22
opening
  13:17, 18
  18:23
OPOTA  7:17
ordered  11:7
outside  13:15
overheard
  12:13
overstepping
  19:15, 17, 18

< P >
packed  18:6
page  26:6
pants  9:16
Parkway  2:11
parties  3:7
  27:14, 16
pastor  7:11
patrol  11:20,
  21
pepper  9:5
period  10:22
  13:7  16:8,
  12
persistent
  14:15
person  21:3
personally
  10:2
person's
  8:16  9:14
physical  9:3,
  12  10:12, 18
  22:15
piled  20:19
  21:13
place  8:6
  15:9  27:12
placed  15:13,
  14  23:12
placing  15:8

Plaintiff
  1:5   2:8
  3:9
play  10:17
please  14:21
pocket  11:12
point  14:20
  15:11  23:7
  24:2
Police  6:10
position
  21:4  24:7
possible
  10:10
presence
  3:12  26:16
  27:8
PRESENT  2:15
pretty  12:19
  19:16  22:12
probably  7:8
  18:2  19:21
  20:18
problem  8:11
PROFESSIONAL
  1:12  27:22
progress
  8:13  9:4
progression
  8:7
proof  3:13
providing
  16:6
Public  26:15,
  19  27:3, 22
put  15:20
  21:15  23:5

< Q >
qualifications
  3:14  8:1
qualified
  27:5
question
  4:24  5:5, 6,
  21  10:7
  12:8  22:1
questions
  4:12  5:8,
  24  6:3, 5
  15:24  25:8
quick  23:24
quiet  14:21
quit  19:20

< R >

ramping
  14:19, 20
ransacking
  20:6
reached  15:10
reaction
  8:16  9:10
reactions
  9:11
read  25:9
  26:4, 15
reading  26:13
realized  24:4
really  16:8,
  12  18:7, 8
  19:7  22:11
rear  13:3
  16:6
reasonable
  20:2
reassured
  19:18
REBECCA  2:2
rebecca@sremack
law.com  2:4
recall  11:3
  18:23
recertification
s  7:24
Recess  25:6
record  5:12
reduced  3:10
REED  1:10
  3:8  4:3, 8
  5:13, 17
  25:7  26:3,
  9, 12
R-E-E-D  5:13
REGISTERED
  1:12  27:22
relative
  27:13
relaxed  9:18
released
  15:18
remain  14:21
  19:3
remember  9:1
  11:14  18:4,
  13, 21  19:20
  21:12
removed  23:10
repeated  15:2
repeating
  14:17  19:20

REPORTER
  1:12   4:18
  27:22
REPORTING
  1:12
requested
  12:17
requesting
  11:11
requests  15:5
residence
  17:21  24:17
respective
  3:7
responding
  9:22
restate  22:17
ride  12:2
Riepenhoff
  2:11
right  5:3, 8
  6:7, 9   7:1
  8:23  12:19
River  15:21
Riverside
  1:23
Road  2:3
  12:1
rode  15:20
room  16:16,
  18, 20  17:15,
  23  18:1, 10
  19:6  21:22
  22:2, 13
RPR  1:12
rules  4:16
  5:3
runs  13:5

< S >
saying  13:18
  19:17
says  4:5
seal  27:18
search  13:20
  16:3  18:24
  20:9  22:7
searched  22:4
searching
  13:23  22:2
second  10:8
  12:15
securing
  21:16
security
  13:3  16:6

see  9:20
  20:21, 22
  21:14
seeing  14:7
  18:4
September
  6:16
Sergeant  12:9
SERVICES  1:12
SESSION  3:1
set  27:17
Sheets  1:4
  11:15  14:5
  16:16  17:2
  19:14  22:16
Sheriff  1:7
Sheriff's
  6:20   7:23
  10:21  11:21
  12:10  24:22
shifted  24:5
Shorr  12:9,
  10  13:1
short  10:22
shoulder
  15:11  23:10
side  7:14
  15:12
Signature
  25:10
signed  26:16
signing  26:13
sit  21:3
sitting  20:22
six-one  5:18
size  17:11
  18:3
small  17:12,
  16, 24  18:5,
  8
smaller
  17:13  21:3
somebody  8:6
  13:4, 11
  14:1  19:6
soon  23:17
  24:3, 4, 14
sorry  22:18
  23:1
sort  24:6
South  2:3
SOUTHERN  1:1
space  13:24
  17:11, 20
  18:15  19:1,

*6* 20:13
span 21:24
speak 4:19
speaking 8:17
specifics
 18:*13*
specified
 27:*12*
spell 5:*12*
split 10:*8*
spot 19:*8*
spray 9:5
squad 24:7
SREMACK 2:2
SS 26:*1*
 27:*2*
stages 8:*21*
stand 21:*3*
standing
 9:15 13:14
 24:9
started 5:9
 6:13 23:18
state 5:*12*
 26:*1* 27:*1*,
 *4*, 22
stated 8:24
 26:14
STATES 1:1
statute 3:9
stay 14:11
 15:*3*
stenotypy
 3:*11* 27:8
Step 22:20,
 21
stepped
 17:*21* 18:16
stipulated
 3:*6*
STIPULATIONS
 3:4
stood 13:10
 23:23 24:18
stop 12:14
 13:7 16:3
stopped 12:20
stuff 11:10
 18:4, *6*
 20:16 21:23
submitted
 26:13
substance
 26:7
Suite 1:*23*
 2:*11*

sure 4:17,
 *19*, *23* 9:14
 13:6, *21*
 16:*1* 21:17
 24:10
sworn 4:4
 27:6

< T >
take 5:4
 14:4 16:*12*
 21:20 25:5
taken 3:10
 21:22 25:6
 27:7, *11*
tall 5:*17*
taser 8:*1*
tasers 9:5
taught 8:12
teeth 9:*17*
tell 10:2
 11:17 16:23
 17:22 18:*1*,
 *15* 22:14
telling 23:2
ten 17:10
 22:3
ten-minute
 21:21, 24
terms 18:7
testifies 4:5
testify 27:6
testimony
 27:7, *11*
Thank 4:10
 6:2 15:23
 17:*8* 25:7
thing 10:10
 17:17 19:*19*,
 *21*
things 8:18
 9:24 10:*3*,
 *9* 11:10
 12:3 13:24
 14:14 18:14
 20:*3*, *5*
 21:16
think 18:*8*
 19:24 20:*11*,
 *13*
three 7:*8*
 18:*9*, 14
 21:*6*
threw 23:7
time 3:*10*
 4:*14*, 22

7:9 10:*11*,
 22 11:13, 24
 13:*8* 14:*3*,
 *13*, 24 16:*9*,
 13, 24 22:*12*,
 23 23:*19*, 24
 24:*13*, 21
 25:2, *4*
 27:*11*
times 11:*11*
 13:*4* 23:2
today 4:*9*
 5:23 25:*8*
told 15:*6*
top 8:*23*
tossing 20:*3*
touch 24:*13*
touching 17:*1*
traffic
 12:*14* 16:*2*
training 6:6
 7:16, 24
 8:*3*, 4, *12*
 11:*8*, *11*, 13,
 *19* 12:*2*, *9*
transcribed
 3:*12* 27:*9*
transcript
 26:4, *12*
 27:10
transitioned
 7:14
trash 20:*17*
 21:*11*, *12*
treated 15:*22*
true 26:7
 27:10
truth 27:6
trying 19:*9*
turned 23:*4*
twin 18:*3*
two 6:24
 9:*12*

< U >
ultimately
 8:7
underneath
 22:*9*, 10
undersigned
 26:*14*
understand
 4:*18* 10:7
understanding
 8:4

unit 11:22
 12:*15*
UNITED 1:1
unlocked
 16:*13*
unlocking
 13:*17*
upset 22:*22*
use 8:5, *10*
usual 11:*10*

< V >
Valley 15:*21*
variables
 10:*17*
vehicle 12:*20*
verbal 8:*9*,
 *14*, 24 9:*2*,
 *12*, 22 14:*8*
vicinity
 12:*15*

VIDEOCONFERENCE
 1:*10* 2:1
voice 9:*23*
vs 1:*6*

< W >
wait 5:5
waited 13:*10*
 24:*18*
waived 3:*14*
 25:*10*
wall 20:*14*
Walton 2:*11*
want 22:*17*
wanted 13:5
 21:*13*
warrant
 12:*22* 14:*18*
way 8:*9*, 17
 9:*15* 12:*11*
weigh 5:*19*
well 4:*10*
 8:*14* 10:5
 18:*6* 22:*22*
went 7:*12*
 12:*23* 13:*1*,
 *9*, 16, 22
 15:*8* 16:*2*
 19:*11* 21:*14*
 23:*8*
we're 6:2
 14:*13*, *19*
WESLEY 1:*10*
 3:*8* 4:*3*

5:*13* 26:*3*,
 9, 12
W-E-S-L-E-Y
 5:*13*
WHEREOF 27:*17*
wide 21:*2*
window 21:*21*
Witness 3:*8*,
 *12* 26:*13*
 27:*5*, *8*, *11*,
 17
wooden 18:*3*
words 19:*15*
work 6:*18*
 7:*4* 8:*9*
 11:*22* 12:*6*
working 25:*2*
works 12:7
wrist 23:*10*
writing 3:*10*
wrong 10:*4*

< Y >
Yeah 6:*14*
 16:*17* 17:*13*,
 22 18:*2*
 19:*5*, 16, 20
 21:*9* 22:*6*
year 6:*12*
yearly 7:*22*
years 7:*1*, 8
yell 9:*24*
yelled 15:*15*
 23:*16*
yelling
 10:*12*, 18
 15:*1* 23:*18*