UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHERYL SHEETS,**

      **Plaintiff,**

v.

      Case No. 2:21-cv-1810
      Judge Edmund A. Sargus, Jr.
      Magistrate Judge Chelsey M. Vascura

**SHERIFF ALEX LAPE,** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Sheriff Alex Lape, the County of Fairfield (Ohio), Board of Commissioners of the County of Fairfield, and Deputy Marty Norris's Motion for Summary Judgment. (ECF No. 23). For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment.

### A. Procedural Background

Plaintiff Cheryl Sheets' suit against the above-named defendants was filed in the Fairfield County Common Pleas Court on March 19, 2021. (ECF No. 2, Page 1). Her suit was removed to this Court on April 13, 2021. (ECF No. 1). Plaintiff's complaint alleged a "[v]iolation of the Fourth Amendment of the United States Constitution." (ECF No. 2, Page 5). Plaintiff seeks recovery from Defendants under 42 U.S.C. 1983. (*Id*., Page 6). Plaintiff's complaint also alleged two state law claims. First, a "[v]iolation of Article 1, Section 14 of the Ohio Constitution" against all Defendants. (*Id*.). And second, "[n]egligent [i]nfliction of [e]motional [d]istress" against only "Defendant Deputy Norris." (*Id*.). All Defendants filed their Answer with this Court on April 19, 2021. (ECF No. 4).

Defendants filed their instant Motion for Summary Judgment on October 20, 2022.  (ECF No. 23).  Plaintiff Responded on December 1, 2022.  (ECF No. 26).  Defendants Replied on December 15, 2022.  (ECF No. 27).

**B. Factual Background**

On September 17, 2019 Plaintiff Cheryl Sheets, a sixty-three year old woman, was in her residence in the City of Lancaster, Ohio.  The same day, Deputy Norris patrolled the area.  As Dpt. Norris was ending his shift, he noticed a broken-down vehicle in a parking lot next to Sheets' residence. (ECF No. 19, Page 13).  He made contact with the driver and attempted to provide assistance.  (*Id*.).  As the deputy was doing so, he noticed a man running out of Sheets' apartment.  (*Id*.).  Dpt. Norris identified this man as one Boyd Pierce.  (*Id*., Page 14).  Aware that a warrant had been issued for Pierce, Dpt. Norris called for backup.  (*Id*., Page 14).  The warrant was for "an aggravated possession of drugs… a felony five," which Dpt. Norris describes as a "pretty high" priority for the department.  (*Id*., Page 18).  After calling for backup, Dpt. Norris followed the man, and eventually realized that he was not actually Pierce.  (*Id*., Page 16).

Dpt. Norris and his backup, Dpt. Schorr, then attempted to gain entry to Ms. Sheets' apartment to look for Pierce while another officer, Dpt. Reed, went to cover "the rear of the residence" to prevent any escape attempt. (ECF No. 21, Page 10) (ECF No. 20, Page 13).  Dpt. Norris states that, based on a conversation with an associate of Pierce's a couple days earlier, he was "99.9 percent sure [Pierce] was inside."  (ECF No. 19, Page 17).  After roughly five minutes, Sheets allowed the deputies into her home.  (*Id*., Pages 14–15) (ECF No. 21, Page 11).  A few minutes later, Dpt. Norris opened the apartment's back door and allowed Dpt. Reed inside.  (ECF No. 20, Page 13).

2

While the deputies did have a warrant for Mr. Pierce, they did not have a search warrant for the residence. However, it is undisputed that Sheets consented to the officers' entry. Once inside, Dpt. Norris noticed another person, one Mr. Echard. (ECF No, 19, Page 15). This seemed to surprise him, as Dpt. Norris reported "Mrs. Sheets said there was no one else in the house." (ECF No. 19, Page 37). Neither Dpt. Reed nor Dpt. Schorr reported hearing Sheets make such a statement.

Aware that a warrant had been issued for Echard, Dpt. Schorr detained him and eventually took Echard into custody while the other two began searching the residence. (*Id*.) (ECF No. 21, Page 11). After making their way through most of the rooms in her small apartment, Dpt. Norris and Dpt. Reed entered Sheets' bedroom. (*Id*., Page 15). As they began searching through her cramped bedroom closet, the deputies report Sheets growing argumentative. (*Id*.) (ECF No. 20, Page 14). Dpt. Reed states "[s]he actually began yelling at us." (ECF No. 20, Page 15). Sheets contradicts this account. While Sheets concedes that she was "irritated," she denies expressing this feeling in the way Dpt. Reed describes. Instead, Sheets claims she simply "asked for [Dpt. Norris'] card" and "[a]sked him why he was searching my personal items." (ECF No. 18, Page 23). Dpt. Norris did not report any yelling but did relate that every time he moved closer to the closet, Sheets started "arguing with me that I can't search there." (ECF No. 19, Page 15). Dpt. Norris took Sheets' protests as a sign that he needed to look in the closet. (*Id*., Page 23).

As Dpt. Norris attempted to complete his search, he claims to have felt Sheets' hand grab his right shoulder and to have heard her say "[y]ou're overstepping your search." (*Id*., Page 26). According to the deputy's account, this is what prompted him to take Sheets' arm and detain her,

3

using what he describes as "the very basic cuffing technique." (ECF No. 19, Page 25). Sheets, however, denies ever touching the deputy. (ECF No. 18, Page 22).[1]

Dpt. Norris relates that Sheets received an injury on her arm immediately after he began his "very very basic" technique. (ECF No. 19, Page 27). He says he then proceeded to place her on the bed, because the space in her bedroom was limited and he thought it was the best location to keep her. (ECF No. 19, Page 27). Dpt. Reed's account is similar to Dpt. Norris's, but with a different order of events. Dpt. Reed states "[Dpt. Norris] grabbed [Sheets'] hand and maneuvered her to the bed where I was on the side of the bed. I had placed -- Just to help control her, I placed my hand on the back of her head. As Marty was bringing her arm back, that's when she yelled and said, 'You broke my arm. You broke my arm.'" (ECF No. 20, Page 15). Sheets' account differs more significantly from Dpt. Norris' telling. According to Sheets, Dpt. Norris first alleged that she touched him and "then the next thing I know he slammed me on the bed and twisted my arm until I screamed." (ECF No. 18, Page 29). Sheets felt discomfort in her arm "within minutes" of finding herself on the bed. (*Id*., Page 34). Nowhere in Dpt. Norris' or Dpt. Reeds' depositions do they report Sheets struggling with them or attempting to resist arrest.

The record shows Plaintiff suffered a dislocated elbow as a result of Dpt. Norris' actions (ECF No. 18, Page 35) (ECF No. 22, Exhibit 2, Page 006909). However, both Plaintiff and her counsel seem to confuse this injury with a broken elbow. (ECF No. 26, Page 17) (ECF No. 18, Page 35). In either scenario, Sheets suffered a serious injury to an elbow that, according to her deposition, had "no prior issues." (ECF No. 18, Page 35). This deposition testimony, however, contradicts Dpt. Norris' incident report. There, the deputy reports "Sheets was yelling 'you

---

[1] Dpt. Reed's account doesn't match Dpt. Norris's either. According to Dpt. Reed, Sheets only made contact with Dpt. Norris after he started to handcuff her. Dpt. Reed relates, "[a]s [Dpt. Norris] went to grab [Sheets] to place her in handcuffs, that's when she reached out and attempted to grab Marty's shoulder." (ECF No. 21, Page 15).

broke my arm, I know you broke my arm because I had this arm broken before and knows what it feels like.'" (ECF No. 22, Exhibit 2, Page 006919). Dpt. Reed's incident report does not include any language about a previous injury. Instead, he relates that Sheets simply said, "My arm, my arm, you broke my arm!" (ECF No. 22, Exhibit 2, Page 006925).

After dislocating her arm, Sheets alleges that the deputies did nothing to immediately assist her, and instead started "reading me my rights." (*Id.*, Page 36). She states she only received medical attention after the EMTs arrived. (*Id.*). Dpt. Reed does not report providing Sheets any medical attention but does state in deposition that he and Dpt. Norris quickly "called for medical" after realizing Sheets was injured. (ECF No. 20, Page 15). Dpt. Norris' incident report lists three offenses allegedly committed by Sheets during her interaction with the deputies. These are obstructing official business, obstructing justice, and resisting arrest. (ECF No. 22, Exhibit 2, Page 006918). The deputies did not find Pierce in Sheets' residence. However, Dpt. Norris reports Echard saying "that Boyd Pierce was just there 10 minutes prior to our arrival but ran out the back door." (ECF No. 22, Exhibit 2, Page 006923).

C. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

5

475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). It is with this standard in mind that the instant motion will be decided.

The moving party bears the burden of production first. "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably find for her. *See Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

6

> The summary judgment analysis is further refined under 42 U.S.C. Section 1983 as to qualified immunity.
>
> "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). 'Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.' *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)); see also *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659-660 (6th Cir. 2021).

*Williams v. Maurer*, 9 F.4th 416, 430–31 (6th Cir. 2021).

**D. Analysis**

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. These include a 42 U.S.C. 1983 claim against all Defendants (ECF No. 2, Pages 5–6), a claim based on a violation of Article 1, Section 14 of the Ohio Constitution against all Defendants (*Id.*, Page 6), and a claim for negligent infliction of emotional distress against only Defendant Deputy Norris (*Id.*).

As a threshold matter, summary judgment is granted as to Defendants Sheriff Alex Lape, the County of Fairfield, and the Board of Commissioners of the County of Fairfield. The Court grants summary judgment as to these Defendants because Plaintiff "fails to properly address another party's assertion of fact as required by Rule 56(c)." FED. R. CIV. P. 56(e). Here, Defendants in their Motion for Summary Judgment make the case that these three, as a matter of law, cannot be found liable for any of Plaintiff's claims. (ECF No. 23). Plaintiff's Response, however, fails to address Defendants' argument. Nowhere in her Response, aside from the case caption, is there any reference to Sheriff Lape. (ECF No. 26). Nowhere does Plaintiff mention the County of Fairfield. (*Id.*). And nowhere does Plaintiff discuss The Board of Commissioners

7

of the County of Fairfield. (*Id*.). Further, summary judgment is granted as to Defendant Deputy Norris on Plaintiff's state constitutional and negligent infliction of emotional distress claims. Plaintiff did not respond to these arguments or mention these claims. Instead, Plaintiff's Response focused solely on her federal Section 1983 claim against Deputy Norris. (ECF No. 26). Plaintiff's decision to ignore to Defendants' arguments amounts to the abandonment of the above listed claims. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013), citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) and *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006).

As such, this Court **GRANTS** Defendants' Motion for Summary Judgment as to Defendants Sheriff Alex Lape, The County of Fairfield, and The Board of Commissioners of the County of Fairfield under Rule 56(e)(3). Summary judgment is also **GRANTED** as to Deputy Norris on Plaintiff's Ohio state constitutional claim and her negligent infliction of emotional distress claims. Thus, the only remaining issue for this Court to decide is Plaintiff's federal claim under 42 U.S.C. 1983 against Deputy Norris.

Plaintiff brings her claim against Dpt. Norris under 42 U.S.C. § 1983. That statute states:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."
> 42 U.S.C. § 1983

### a. Qualified Immunity

The Sixth Circuit has held that qualified immunity "is a threshold question to be resolved at the earliest possible point," *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)). As such, the Court will start with this issue.

8

As detailed below, the Court finds that Defendant Deputy Norris is not entitled to qualified immunity.

### i. Violation of a Constitutional Right

Under Plaintiff's view of the facts, Dpt Norris gained control of Sheets, slammed her body onto her bed, moved his body on top of hers, and twisted her arm until she screamed. (ECF No. 26, Page 2). Sheets never touched Dpt. Norris nor made any movements toward or away from him. (*Id*.). She simply "asked for his card" and Dpt. Norris responded with force. (ECF. No. 18, Page 23). Plaintiff alleges these facts show that her Fourth Amendment right has been violated. (ECF No. 26, Page 11) *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.").

Dpt. Norris does not deny that some use of force occurred. He characterizes his actions as "reasonable under the circumstances." (ECF No. 23, Page 12). "Courts generally determine reasonableness of an officer's use of force by considering the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to flee." *Francis v. Huff*, No. 22-5282, 2022 U.S. App. LEXIS 28595 (6th Cir. Oct. 14, 2022) (citing *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989)). This is an objective inquiry, taken "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A reasonable use of force is not a violation of a constitutional right.

In assessing the reasonableness of Dpt. Norris' actions, this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, here the Plaintiff.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The Court does not weigh evidence at the summary judgment stage. Instead, the Court looks at whether the plaintiff has raised a genuine issue of material fact.

According to Sheets' testimony, Norris used force on her without any provocation, throwing her onto a bed, twisting her arm, and dislocating her elbow. While Norris disputes her testimony, at best, he points to conflicting testimony, which can only be resolved by a jury.

Plaintiff argues Dpt. Norris' dislocation of Sheets' arm after the deputy had full control of Sheets was unreasonable, especially considering the three elements of the *Graham* reasonability test. As mentioned above, these elements are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to flee." *Francis v. Huff*, No. 22-5282, 2022 U.S. App. LEXIS 28595 (6th Cir. Oct. 14, 2022) citing *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989).

Plaintiff first contends Dpt. Norris did not perceive a crime at the time he used force. (ECF No. 26, Page 14). And at the time Dpt. Norris used force on Sheets, "he did so without the benefit of knowing that she had misstated how long it had been since Mr. Boyd was present." (*Id.*). In other words, he was not yet aware Sheets had committed the crime of falsification. Additionally, as Plaintiff points out, Dpt. Reed and Dpt. Norris's depositions do not describe "any conduct on her part that could have constituted obstruction of justice" other than touching Dpt. Norris' shoulder. (ECF No. 26, Page 15). Dpt. Norris "arrested her based on one piece of information only: his belief, controverted both by Ms. Sheets and Deputy Reed, that Ms. Sheets touched him first." (ECF No. 26, Page 15).

Plaintiff argues alternatively, that if Dpt. Norris did perceive a crime at the time he used force, the crime could not have been severe. (*Id.*). Sheets was arrested for obstructing justice, falsification and resisting arrest. These are not what courts typically consider as severe crimes. Further, the charge of resisting arrest was never actually brought in municipal court. The action for which Sheets was arrested is similar to the underlying conduct for which the plaintiff in *Minchella v. Bauman* was arrested. There "Minchella, although being arrested for assault and battery, was in reality being arrested for nothing more than 'throwing' a piece of paper at Bauman…there is little doubt that Minchella's crime was not severe. Minchella… was only being arrested in this instance for a very minor occurrence." *Minchella v. Bauman*, 72 F. App'x 405, 408 (6th Cir. 2003). As in *Minchella*, Sheets' crime was not severe. There is no indication in the record that Dpt. Norris was objectively harmed by her claimed touch or that he was even subjectively frightened. Further, under Plaintiff's view of the facts, Sheets did not touch Dpt. Norris and, therefore, did not commit a crime at all.

Second, Plaintiff argues Sheets "did not present an imminent threat to the officers." (ECF No. 26, Page 16). As evidence, Plaintiff first references Sheets' deposition, in which Sheets states "she did not touch the deputy and did not approach him or back away from him." (ECF No. 26, Page 16) (ECF No. 18, Pages 33–34). Next, Plaintiff references the depositions of Dpt. Norris to make the case that Sheets was "in a position where there was distance" between her and the two deputies "and did not present an imminent threat to the officers." (ECF No. 26, Page 16). Defendants, however, argue that the threat to the officers was greater than Plaintiff alleges. They point out that "[t]here is unanimous consent that the 'area is very tight in'" the bedroom. (ECF No. 27, Page 7). As such, contrary to Plaintiff's argument, the distance

11

between Sheets and the officers could not have been great. This, coupled with "Plaintiff's growing irritation," increased the risk to the officers. (ECF No. 27, Page 8).

However, despite the relatively close proximity of Sheets to the deputies and her verbal protests, no reasonable officer could have found that she posed a threat. Sheets was a small sixty-three year-old woman in a room with two younger, larger, male officers. Dpt. Norris describes himself as roughly 6 foot tall, at about 220 to 225 pounds and partakes in regular exercise. (ECF No. 19, Page 6). There is no allegation that Sheets was armed, or that any of the officers believed her to be. Further, Sheets states she expressed her irritation by simply asking for Dpt. Norris' card, not by yelling or causing a commotion. (ECF No. 18, Page 23). And, according to Sheets, she never touched Dpt. Norris. (*Id.*, Page 31). While Defendants argue "at the very least, Deputy Norris thought Plaintiff touched him," Dpt. Norris' subjective understanding of Plaintiff's actions is not at issue here. What matters is what an objectively reasonable officer would believe.

Third, Plaintiff maintains Sheets "was not resisting or evading arrest at the time the force was used." (ECF No. 26, Page 16). Sheets, in deposition, specifically denies moving away from Dpt. Norris after he laid his hands on her. (ECF No. 18, Pages 33–34). This is supported by Dpt. Norris and Dpt. Reeds' depositions, which make no mention of any struggle. Further, Defendants do not address this element in either their Motion to Dismiss (ECF No. 23) or their Reply (ECF No. 27). As such, it can be fairly assumed a reasonable officer would have perceived Plaintiff "not resisting or evading arrest at the time the force was used." (ECF No. 26, Page 16) (*see Graham v. Connor*, 490 U.S. 386, 396 (1989)).

According to the testimony of Sheets, Dpt. Norris used unreasonable force. According to Sheets' testimony, she posed little to no threat to Dpt. Norris and Dpt. Reed, and no threat to

12

anyone else. While "[m]ore fully developed facts might well reveal that the officers' use of force was reasonable" at this stage "these allegations--supported by the record--create a triable issue of fact over whether the officers used excessive force." *Zantello v. Shelby Twp.*, 277 F. App'x 570, 574 (6th Cir. 2008).

### ii. Clearly Established

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). The "Supreme Court has made clear that the sine qua non of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612-13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Thus, a plaintiff is required to show that the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Plaintiff can make this showing in one of two ways. They may "identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Colson v. City of Alcoa*, 37 F.4th 1182, 1189 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021)). "The facts of another case need not be identical, but they must be similar enough that the other case 'squarely governs' this one." *Studdard v. Shelby Cty.*, 934 F.3d 478 (6th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148 (2018)). Or the plaintiff may argue that this is an "'obvious case' where general 'standards can 'clearly establish' the answer, even without a body of relevant case law.'" *Id*. quoting *Rivas-Villegas*, 142 S. Ct. at 8. Either way, a "plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact'; that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018)

13

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

Plaintiff does not argue that this is an "obvious case." (ECF No. 26). Instead, Plaintiff primarily cites to three Sixth Circuit cases, *Zantello v. Shelby Twp.*, 277 F. App'x 570 (6th Cir. 2008), *Pershell v. Cook*, 430 F. App'x 410 (6th Cir. 2011), and *Minchella v. Bauman,* 72 F. App'x 405 (6th Cir. 2003) that she maintains provided notice to Dpt. Norris that his specific conduct was unlawful. Defendants, however, contend Plaintiff's failed in her attempt to identify analogous cases. They state Plaintiff made "no effort to distinguish this case from the authorities cited within Defendants' Motion for Summary Judgment and instead offers cases involving significantly greater force including deadly force." (ECF No. 27, Page 11).

Plaintiff's most on point case, *Zantello v. Shelby Twp.*, involved officers responding to a fight between two individuals and arresting the plaintiff for felonious assault. After taking Zantello into custody, the officers allegedly used excessive force. "According to Zantello's fact-supported allegations, this is what happened: After he 'yelled at [Almansour], and lunged towards him to grab the bar[,] . . . the police officers just literally grabbed [him] and started throwing [him] around.' The officers 'twisted [him] around and jerked on [him],' and 'slammed [him] up against the refrigerator and twisted [his] knee and twisted [his] arm.' The officers 'push[ed]' Zantello and 'man handled' him while leading him to the back of the cruiser. When the officers put Zantello in the car, 'they slam[med] [his] head into the police car,' which gave Zantello 'a headache.'" *Zantello*, 277 F. App'x at 574 (internal citations omitted).

The Sixth Circuit reaffirmed the district court's finding that these actions violated Zantello's clearly established right against the use of "excessive force during the course of being

14

arrested." *Id*., at 573.  The Court reasoned "[t]he problem for the officers is that, according to Zantello, they continued to use force even after they had full control of the scene and even after he cooperated with them. More fully developed facts might well reveal that the officers' use of force was reasonable--if, for example, the arm twisting was only slight and incidental to the officers' effort to restrain Zantello rather than a gratuitous post-arrest exercise of force. But because at this stage in the proceeding we must view the evidence in Zantello's favor, we agree with the district court that these allegations--supported by the record--create a triable issue of fact over whether the officers used excessive force." *Zantello*, 277 F. App'x at 574

  Here, Plaintiff alleges that this set of facts is "exactly what happened" to her.  Sheets states that Dpt. Norris "grabbed me by the upper body" first.  (ECF No. 18, Page 31).  It was only after Dpt. Norris had a hold of her that the deputy "slammed me on my bed and got on top of me and twisted my arm until I screamed."  (*Id*., at Page 32).  Sheets also maintains that she made no moves toward and offered no resistance to Dpt. Sheets during this encounter.  (ECF No. 18, Pages 33–34).  Further, Sheets states that she experienced discomfort "within minutes" of Dpt. Norris bringing her to the bed, indicating that the deputy did not dislocate Sheets' arm immediately after bringing her to the bed.  (*Id*., at Page 34).

  Under Plaintiff's account, the facts of the instant case resemble the same triable issue of fact the Sixth Circuit found in *Zantello*.  Both involve an excessive use of force after the arresting officer had sufficient control over the Plaintiff.  However, Defendants contend the cases are distinguishable, primarily because the "force at issue in *Zantello* was far greater than that used by Deputy Norris."  (ECF No. 27, Page 12).  Defendants find that the differences in level of force makes *Zantello* inapplicable to the case at hand.  "The *Zantello* case does not clearly signal that moving Plaintiff's arm behind her back in an attempt to handcuff her was a violation of the

Fourth Amendment such that 'every reasonable officer' in Deputy Norris's position would have understood the alleged unconstitutionality." (*Id.*, at Pages 12–13).

The level of force in the instant case, while likely less than that used by the officers in *Zantello*, was still substantial enough to dislocate Sheets' arm. And under Plaintiff's account, it was unnecessary. (ECF No. 26, Page 13). Further, as detailed above, Sheets alleges that Dpt. Norris did much more than simply move her "arm behind her back in an attempt to handcuff her." (ECF No. 27, Pages 12–13). Viewing the facts in a light most favorable to Plaintiff, Dpt. Norris took control of Sheets, slammed her to the bed, twisted her arm for a substantial period of time, and eventually dislocated her elbow. All the while, Sheets put up no resistance. The Sixth Circuit has held that "[o]ur cases say that 'the right of a nonviolent [and non-resistant] arrestee to be free from unnecessary pain knowingly inflicted during an arrest [i]s clearly established.'" *Zantello*, 277 F. App'x at 574 (*quoting St. John v. Hickey*, 411 F.3d 762, 772, 774 (6th Cir. 2005)). Under this binding precedent, if Plaintiff's account is to be believed, then Dpt. Norris violated Sheets' clearly established right. Plaintiff has carried her burden of showing "facts and inferences" that "would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." *Williams v. Maurer*, 9 F.4th 416 (6th Cir. 2021); *See Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020). As such, qualified immunity is denied as to Dpt. Norris.

### b. Excessive Force Under 42 U.S.C. § 1983

Here, as described fully in Section D(a)(i), Plaintiff has presented a record supported argument that Dpt. Norris violated Sheets' Fourth Amendment right against the use of "excessive force during the course of being arrested." *Zantello*, 277 F. App'x at 573. As such, Plaintiff has

16

shown a genuine issue of material fact as to whether Sheets was subject to a deprivation of a right secured by the Constitution. Thus, summary judgment is inappropriate.

### E. Conclusion

For the foregoing reasons, the Court **GRANTS** summary judgment in part and **DENIES** summary judgment in part. This case is to remain open.

**IT IS SO ORDERED.**

**3/2/2023**  
**DATE**

**s/Edmund A. Sargus, Jr.**  
**EDMUND A. SARGUS, JR.**  
**UNITED STATES DISTRICT JUDGE**